ORIGINAL

SEDGWICK, DETERT, MORAN & ARNOLD LLP
BRIAN D. HARRISON Bar No. 157123
VANESSA L. O'BRIEN Bar No. 225699
One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105
Telephone: (415) 781-7900
Facsimile: (415) 781-2635

Attorneys for Defendant
PHILADELPHIA INDEMNITY
INSURANCE COMPANY

FILED
2008 MAY 12 PM 2:27
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY ____ DEPUTY

FAXED

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LENDER SUPPORT SYSTEMS, INC. Plaintiff,<br><br>v.<br><br>PHILADELPHIA INDEMNITY INSURANCE CO., and DOES 1 through 20, inclusive,<br><br>Defendants. | CASE NO. '08 CV 0848 WQH BLM<br><br>NOTICE OF REMOVAL OF CIVIL ACTION TO THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA; DEMAND FOR JURY TRIAL<br><br>[ORIGINALLY SAN DIEGO COUNTY SUPERIOR COURT CASE NO. 37-2008-00081683-CU-IC-CTL] |

TO THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF CALIFORNIA AND TO THE CLERK OF THAT COURT:

PLEASE TAKE NOTICE that defendant Philadelphia Indemnity Insurance Company ("Philadelphia") hereby removes the above described action from the Superior Court of the State of California, County of San Diego, to the United States District Court for the Southern District of California, pursuant to the provisions of 28 U.S.C. § 1441, and respectfully alleges as follows:

1. Jurisdiction of this action is found within 28 U.S.C. §§ 1332 and 1441(a) as the matter in controversy exceeds the $75,000, exclusive of interest and costs, and is between citizens of different states.

2. On or about April 8, 2008, plaintiff Lender Support Systems, Inc. Inc. ("LSSI") filed a complaint in the Superior Court of California, County of San Diego, bearing Case No. 37-2008-00081683-CU-IC-CTL, and naming as the defendants Philadelphia Indemnity Insurance Company and Does 1 through 20, inclusive, which purports to allege causes of action for breach of the covenant of good faith and fair dealing and declaratory relief.

3. Philadelphia first received copies of the summons and complaint by mail service on April 14, 2008. True and correct copies of the summons, notice of case assignment, and complaint are attached hereto as Exhibit A.

4. On May 9, 2008, Philadelphia filed and served its answer to LSSI's complaint. A true and correct copy of the answer is attached hereto as Exhibit B.

5. This action is a civil action over which this court has original jurisdiction under 28 U.S.C. § 1332, and is one which may be removed to this court by Philadelphia pursuant to the provisions of 28 U.S.C. § 1441(a), in that the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs, and is between citizens of different states. This is a suit for declaratory relief regarding the duty to pay defense costs and the duty to indemnify and for breach of the covenant of good faith and fair dealing. LSSI seeks actual, incidental, consequential and punitive damages, including payment of defense fees, interest and costs of suit, for the alleged failure of Philadelphia to defend and to indemnify LSSI in the underlying action involving LSSI ("Underlying Action"), and for a judicial declaration that LSSI is entitled to benefits under the terms of the insurance policy issued by Philadelphia to LSSI.

6. In the Underlying Action, the plaintiff, Sonja D'Anneo, alleged causes of action for failure to pay earned wages in violation of Labor Code sections 201 and 202, penalties for not paying wages in violation of Labor Code section 203, conversion, and unfair business practices, and sought recovery of attorneys' fees and costs according to proof. In the Underlying Action, plaintiff Sonja D'Anneo alleged that as a direct and proximate result of the actions by Lender Support Systems, Inc., she was entitled to compensatory damages, including, but not limited to, lost wages and employment benefits, in an amount in excess of $100,000. (Underlying Complaint, Prayer For Relief, ¶ 1.) Plaintiff also alleged that she was entitled to penalties of

SEDGWICK
DETERT, MORAN & ARNOLD LLP

approximately $25,000. (Underlying Complaint, Prayer For Relief, ¶ 3.) The Underlying Action settled for $35,000. (Declaration of Brian D. Harrison In Support of Notice of Removal ("Harrison Decl."), at ¶ 2, and Exhibit 1 attached thereto.)

7. In the complaint between Lender Support Systems, Inc. ("LSSI") and Philadelphia, LSSI seeks to recover from Philadelphia all damages stemming from Philadelphia's failure to provide insurance benefits to LSSI, punitive damages, costs of suit and attorneys' fees. (Complaint, Prayer for Relief, ¶¶ 1-6.) LSSI's alleged damages are at least $180,207.46, including $35,000 that LSSI expended to settle the Underlying Action and the total legal expense of $145,207.46 incurred by LSSI to defend the Underlying Action. These alleged damages are confirmed in a letter dated April 29, 2008 from LSSI's counsel, Harris. I Steinberg, to Philadelphia's counsel, Brian D. Harrison. (Harrison Decl., ¶ 2, and Exh. 1.) Thus, the damages that LSSI seeks to recover from Philadelphia's alleged failure to provide insurance benefits exceed the sum core value of $75,000, exclusive of interest and costs.

8. There is a diversity of citizenship between the plaintiff and defendant:

a. As set forth in paragraph 2 of the complaint in the Underlying Action (attached as Exhibit B to plaintiff's complaint), plaintiff Lender Support Systems, Inc. is a California corporation, with its principal place of business in Poway, California. Defendant Philadelphia Indemnity Insurance Company is an insurance company duly incorporated under the laws of Pennsylvania, with its principal place of business in the State of Pennsylvania.

Philadelphia hereby demands a trial by jury in this action.

WHEREFORE, defendant Philadelphia Indemnity Insurance Company gives notice that the above entitled action, now pending against it in Superior Court for the County of San Diego, State of California, has been removed therefrom to this court on grounds of diversity of citizenship.

///

///

///

SEDGWICK
DETERT, MORAN & ARNOLD LLP

DATED: May 9, 2008 SEDGWICK, DETERT, MORAN & ARNOLD LLP

By: [signature]
BRIAN D. HARRISON
Attorneys for Plaintiff
PHILADELPHIA INDEMNITY INSURANCE COMPANY

DEMAND FOR TRIAL JURY

Philadelphia hereby demands a trial by jury in this action.

DATED: May 9, 2008 SEDGWICK, DETERT, MORAN & ARNOLD LLP

By: [signature]
BRIAN D. HARRISON
Attorneys for Plaintiff
PHILADELPHIA INDEMNITY INSURANCE COMPANY

# EXHIBIT A

# SUMMONS
## (CITACION JUDICIAL)

SUM-100

FOR COURT USE ONLY
(SOLO PARA USO DE LA CORTE)

FILED 2008 APR -8 P 4:15 SUPERIOR COURT SAN DIEGO COUNTY, CA

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
PHILADELPHIA INDEMNITY INSURANCE COMPANY and DOES 1-20, Inclusive

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
LENDER SUPPORT SYSTEMS, INC.

**You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff.** A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (www.lawhelpcalifornia.org), the California Courts Online Self-Help Center (www.courtinfo.ca.gov/selfhelp), or by contacting your local court or county bar association.

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.courtinfo.ca.gov/selfhelp/espanol/), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.courtinfo.ca.gov/selfhelp/espanol/) o poniéndose en contacto con la corte o el colegio de abogados locales.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
San Diego Superior Court
330 West Broadway
San Diego, CA 92101
Downtown Central Branch

CASE NUMBER: *(Número del Caso):* 37-2008-00081683-CU-IC-CTL
81683

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Harris I. Steinberg (Bar #89288) 619-231-9449 619-231-8638
LEVINE, STEINBERG, MILLER & HUVER
550 West C Street, Suite 1810
San Diego, CA 92101

DATE: *(Fecha)* APR 0 8 2008 Clerk, by *(Secretario)* A. GUTIERREZ, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*

4. ☐ by personal delivery on *(date):*



Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. January 1, 2004]

**SUMMONS**

Legal Solutions Plus

Code of Civil Procedure §§ 412.20, 465

| | |
|---|---|
| **SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO**<br>STREET ADDRESS: 330 West Broadway<br>MAILING ADDRESS: 330 West Broadway<br>CITY AND ZIP CODE: San Diego, CA 92101<br>BRANCH NAME: Central<br>TELEPHONE NUMBER: (619) 685-6144 | |
| PLAINTIFF(S) / PETITIONER(S): Lender Support Systems Inc | |
| DEFENDANT(S) / RESPONDENT(S): Philadelphia Indemnity Insurance Company | |
| LENDER SUPPORT SYSTEMS INC VS. PHILADELPHIA INDEMNITY INSURANCE COMPANY | |
| **NOTICE OF CASE ASSIGNMENT** | CASE NUMBER:<br>37-2008-00081683-CU-IC-CTL |

Judge: Ronald S. Prager

Department: C-71

**COMPLAINT/PETITION FILED:** 04/08/2008

**CASES ASSIGNED TO THE PROBATE DIVISION ARE NOT REQUIRED TO COMPLY WITH THE CIVIL REQUIREMENTS LISTED BELOW**

IT IS THE DUTY OF EACH PLAINTIFF (AND CROSS-COMPLAINANT) TO SERVE A COPY OF THIS NOTICE WITH THE COMPLAINT (AND CROSS-COMPLAINT).

ALL COUNSEL WILL BE EXPECTED TO BE FAMILIAR WITH SUPERIOR COURT RULES WHICH HAVE BEEN PUBLISHED AS DIVISION II, AND WILL BE STRICTLY ENFORCED.

**TIME STANDARDS:** The following timeframes apply to general civil cases and must be adhered to unless you have requested and been granted an extension of time. General civil consists of all cases except: Small claims appeals, petitions, and unlawful detainers.

**COMPLAINTS:** Complaints must be served on all named defendants, and a CERTIFICATE OF SERVICE (SDSC CIV-345) filed within 60 days of filing. This is a mandatory document and may not be substituted by the filing of any other document.

**DEFENDANT'S APPEARANCE:** Defendant must generally appear within 30 days of service of the complaint. (Plaintiff may stipulate to no more than a 15 day extension which must be in writing and filed with the Court.)

**DEFAULT:** If the defendant has not generally appeared and no extension has been granted, the plaintiff must request default within 45 days of the filing of the Certificate of Service.

THE COURT ENCOURAGES YOU TO CONSIDER UTILIZING VARIOUS ALTERNATIVES TO LITIGATION, INCLUDING MEDIATION AND ARBITRATION, PRIOR TO THE CASE MANAGEMENT CONFERENCE. MEDIATION SERVICES ARE AVAILABLE UNDER THE DISPUTE RESOLUTION PROGRAMS ACT AND OTHER PROVIDERS. SEE ADR INFORMATION PACKET AND STIPULATION.

YOU MAY ALSO BE ORDERED TO PARTICIPATE IN ARBITRATION PURSUANT TO CCP 1141.10 AT THE CASE MANAGEMENT CONFERENCE. THE FEE FOR THESE SERVICES WILL BE PAID BY THE COURT IF ALL PARTIES HAVE APPEARED IN THE CASE AND THE COURT ORDERS THE CASE TO ARBITRATION PURSUANT TO CCP 1141.10. THE CASE MANAGEMENT CONFERENCE WILL BE CANCELLED IF YOU FILE FORM SDSC CIV-359 PRIOR TO THAT HEARING

## SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO

CASE NUMBER: 37-2008-00081683-CU-IC-CTL CASE TITLE: Lender Support Systems Inc vs. Philadelphia Indemnity Insur

## NOTICE TO LITIGANTS/ADR INFORMATION PACKAGE

You are required to serve a copy of this Notice to Litigants/ADR Information Package and a copy of the blank Stipulation to Alternative Dispute Resolution Process (received from the Civil Business Office at the time of filing) with a copy of the Summons and Complaint on all defendants in accordance with San Diego Superior Court Rule 2.1.5, Division II and CRC Rule 201.9.

## ADR POLICY

It is the policy of the San Diego Superior Court to strongly support the use of Alternative Dispute Resolution ("ADR") in all general civil cases. The court has long recognized the value of early case management intervention and the use of alternative dispute resolution options for amenable and eligible cases. The use of ADR will be discussed at all Case Management Conferences. It is the court's expectation that litigants will utilize some form of ADR – i.e. the court's mediation or arbitration programs or other available private ADR options as a mechanism for case settlement before trial

## ADR OPTIONS

**1) CIVIL MEDIATION PROGRAM:** The San Diego Superior Court Civil Mediation Program is designed to assist parties with the early resolution of their dispute. All general civil independent calendar cases, including construction defect, complex and eminent domain cases are eligible to participant in the program. Limited civil collection cases are not eligible at this time. San Diego Superior Court Local Rule 2.31, Division II addresses this program specifically. Mediation is a non- binding process in which a trained mediator 1) facilitates communication between disputants, and 2) assists parties in reaching a mutually acceptable resolution of all or part of their dispute. In this process, the mediator carefully explores not only the relevant evidence and law, but also the parties' underlying interests, needs and priorities. The mediator is not the decision-maker and will not resolve the dispute – the parties do. Mediation is a flexible, informal and confidential process that is less stressful than a formalized trial. It can also save time and money, allow for greater client participation and allow for more flexibility in creating a resolution.

**Assignment to Mediation, Cost and Timelines:** Parties may stipulate to mediation at any time up to the CMC or may stipulate to mediation at the CMC. Mediator fees and expenses are split equally by the parties, unless otherwise agreed. Mediators on the court's approved panel have agreed to the court's payment schedule for county-referred mediation: $150.00 per hour for each of the first two hours and their individual rate per hour thereafter. Parties may select any mediator, however, the court maintains a panel of court-approved mediators who have satisfied panel requirements and who must adhere to ethical standards. All court-approved mediator fees and other policies are listed in the Mediator Directory at each court location to assist parties with selection. **Discovery:** Parties do not need to conduct full discovery in the case before mediation is considered, utilized or referred. **Attendance at Mediation:** Trial counsel, parties and all persons with full authority to settle the case must personally attend the mediation, unless excused by the court for good cause.

**2) JUDICIAL ARBITRATION:** Judicial Arbitration is a binding or non-binding process where an arbitrator applies the law to the facts of the case and issues an award. The goal of judicial arbitration is to provide parties with an adjudication that is earlier, faster, less formal and less expensive than trial. The arbitrator's award may either become the judgment in the case if all parties accept or if no trial de novo is requested within the required time. Either party may reject the award and request a trial de novo before the assigned judge if the arbitration was non-binding. If a trial de novo is requested, the trial will usually be scheduled within a year of the filing date.

**Assignment to Arbitration, Cost and Timelines:** Parties may stipulate to binding or non-binding judicial arbitration or the judge may order the matter to arbitration at the case management conference, held approximately 150 days after filing, if a case is valued at under $50,000 and is "at issue". The court maintains a panel of approved judicial arbitrators who have practiced law for a minimum of five years and who have a certain amount of trial and/or arbitration experience. In addition, if parties select an arbitrator from the court's panel, the court will pay the arbitrator's fees. Superior Court

**3) SETTLEMENT CONFERENCES:** The goal of a settlement conference is to assist the parties in their efforts to negotiate a settlement of all or part of the dispute. Parties may, at any time, request a settlement conference before the judge assigned to their case; request another assigned judge or a pro tem to act as settlement officer; or may privately utilize the services of a retired judge. The court may also order a case to a mandatory settlement conference prior to trial before the court's assigned Settlement Conference judge.

**4) OTHER VOLUNTARY ADR:** Parties may voluntarily stipulate to private ADR options outside the court system including private binding arbitration, private early neutral evaluation or private judging at any time by completing the "Stipulation to Alternative Dispute Resolution Process" which is included in this ADR package. Parties may also utilize mediation services offered by programs that are partially funded by the county's Dispute Resolution Programs Act. These services are available at no cost or on a sliding scale based on need. For a list of approved DRPA providers, please contact the County's DRPA program office at (619) 238-2400.

**ADDITIONAL ADR INFORMATION:** For more information about the Civil Mediation Program, please contact the Civil Mediation Department at (619) 515-8908. For more information about the Judicial Arbitration Program, please contact the Arbitration Office at (619) 531-3818. For more information about Settlement Conferences, please contact the Independent Calendar department to which your case is assigned. Please note that staff can only discuss ADR options and cannot give legal advice.

| SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN DIEGO | FOR COURT USE ONLY |
|---|---|
| STREET ADDRESS: 330 West Broadway | |
| MAILING ADDRESS: 330 West Broadway | |
| CITY, STATE, & ZIP CODE: San Diego, CA 92101-3827 | |
| BRANCH NAME: Central | |
| PLAINTIFF(S): Lender Support Systems Inc | |
| DEFENDANT(S): Philadelphia Indemnity Insurance Company | |
| SHORT TITLE: LENDER SUPPORT SYSTEMS INC VS. PHILADELPHIA INDEMNITY INSURANCE COMPANY | |
| **STIPULATION TO ALTERNATIVE DISPUTE RESOLUTION PROCESS (CRC 3.221)** | CASE NUMBER: 37-2008-00081683-CU-IC-CTL |

Judge: Ronald S. Prager

Department: C-71

The parties and their attorneys stipulate that the matter is at issue and the claims in this action shall be submitted to the following alternative dispute resolution process. Selection of any of these options will not delay any case management time-lines.

- ☐ Court-Referred Mediation Program
- ☐ Private Neutral Evaluation
- ☐ Private Mini-Trial
- ☐ Private Summary Jury Trial
- ☐ Private Settlement Conference with Private Neutral
- ☐ Court-Ordered Nonbinding Arbitration
- ☐ Court-Ordered Binding Arbitration (Stipulated)
- ☐ Private Reference to General Referee
- ☐ Private Reference to Judge
- ☐ Private Binding Arbitration
- ☐ Other (specify): ____________________

It is also stipulated that the following shall serve as arbitrator, mediator or other neutral: (Name) ____________________

____________________

____________________

Alternate: (mediation & arbitration only) ____________________

Date: ____________________

Date: ____________________

____________________
Name of Plaintiff

____________________
Name of Defendant

____________________
Signature

____________________
Signature

____________________
Name of Plaintiff's Attorney

____________________
Name of Defendant's Attorney

____________________
Signature

____________________
Signature

(Attach another sheet if additional names are necessary). It is the duty of the parties to notify the court of any settlement pursuant to California Rules of Court, 3.1385. Upon notification of the settlement the court will place this matter on a 45-day dismissal calendar.

No new parties may be added without leave of court and all un-served, non-appearing or actions by names parties are dismissed.

**IT IS SO ORDERED.**

Dated: 04/08/2008

____________________
JUDGE OF THE SUPERIOR COURT

HARRIS I. STEINBERG (Bar No. 89288)
LEVINE, STEINBERG, MILLER & HUVER
550 W. "C" Street, Suite 1810
San Diego, California 92101
Phone:(619) 231-9449
Fax: (619)231-8638

Attorneys for Plaintiff

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO CENTRAL DIVISION

| | |
|---|---|
| LENDER SUPPORT SYSTEMS, INC.<br>Plaintiff,<br>v.<br>PHILADELPHIA INDEMNITY INSURANCE COMPANY and DOES 1 - 20, Inclusive,<br>Defendant. | CASE NO. 37-2008-00081683-CU-IC-CTL<br>(Unlimited Civil)<br>COMPLAINT FOR TORTIOUS BREACH OF INSURANCE CONTRACT AND DEMAND FOR JURY TRIAL<br>(Compensatory and Punitive Damages)<br>1. Breach of Duty of Fair Dealing and Good Faith<br>2. Declaratory Relief |

Plaintiff certifies that San Diego County is the proper venue for filing this lawsuit as the defendant insurance company does business in its jurisdictional area.

**PLAINTIFF, LENDER SUPPORT SYSTEMS, INC., (hereinafter LSSI) FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANT PHILADELPHIA INDEMNITY INSURANCE COMPANY (hereinafter PIIC) ONLY FOR BREACH OF THE DUTY OF GOOD FAITH AND FAIR DEALING, ALLEGES:**

1. That the true names or capacities, whether individual, corporate, associate, or otherwise, of defendants Does 1 through 20, inclusive, are unknown to plaintiff, who therefore sues said defendants by such fictitious names. Plaintiff is informed and believes and therefore

alleges that each of the defendants designated herein as Doe is legally responsible in some manner for the events and happenings herein referred to, and legally caused injury and damages proximately thereby to plaintiff as herein alleged. Plaintiff is informed and believes and thereon alleges that Does 1 through 20 are residents and citizens of the State of California, and made representations and promises to plaintiff during the sale of the Employment Practices Liability Insurance coverage which is the subject matter of this action. Plaintiff is informed and believes and thereon alleges that Does 1 through 20 are residents and citizens of the State of California and participated in processing plaintiff's claim for benefits under the Employment Practices Coverage which is the subject matter of this action.

2. That at all times herein mentioned, defendants, and each of them, were the agents and employees of each of the remaining defendants, and were at all times acting within the purpose and scope of said agency and employment, and each defendant has ratified and approved the acts of his agent.

3. On or about January 6, 2007, defendant PIIC issued a commercial lines policy, including Employment Practices Coverage, number PHSD222905 to plaintiff. A copy of said policy is marked as Exhibit "A", attached hereto, and incorporated herein by reference. Said coverage was entered into by plaintiff within the jurisdiction of the above-entitled court and required the payment of benefits within the jurisdiction of the above-entitled court for a total amount to be shown at the time of trial. In particular, the policy expressly promised and agreed to protect LSSI for Employment Practices Liability, including legal defense on the following types of claims:

I. INSURING AGREEMENT

The Underwriter shall pay on behalf of the Insured, Loss from Claims made against the Insured during the Policy Period (or, if applicable, the Extended Reporting Period), and reported to the Underwriter pursuant to the terms of this Policy, for an **Employment Practice Act.**

II. DEFINITIONS

A. **Employment Practice Act** means <u>any actual or alleged:</u>

1. wrongful dismissal, discharge or termination of employment;

2. <u>breach of a written or oral employment contract or implied employment contract;</u>

3. employment related misrepresentation;

4. wrongful failure to promote;

5. violation of employment discrimination laws (including harassment);

6. <u>wrongful deprivation of a career opportunity;</u>

7. employment related wrongful discipline;

8. <u>negligent employee evaluation;</u>

9. employment related invasion of privacy;

10. employment related defamation (including libel and slander);

11. sexual or workplace harassment of any kind;

12. constructive discharge of employment;

13. employment related Retaliation;

14. employment related humiliation;

15. wrongful demotion;

16. <u>negligent reassignment;</u>

17. violation of any federal state or local civil rights laws;

(Emphasis added)

Policy, Exh. A, p. 3 of 19

Under Exclusion D, PIIC eliminated indemnity for "loss" (i.e., indemnity) that the insured actually owed under "an express (written or verbal) contract of employment," but expressly agreed that PIIC would provide "Defense Costs" for a claim arising out of an "express contract of employment:"

III. EXCLUSIONS

The Underwriter shall not be liable under this Part 2 to make any payment for Loss in connection with any Claim made against the Insured:

* * *

D. arising out of, based upon or attributable to <u>obligations or payments</u> owed under (I) <u>an express (written or verbal) contract of employment,</u> (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; <u>however, this exclusion does not apply to any of the following:</u>

1. liability of the Private Company which would have attached even in the absence of such contract or agreement; or

2. <u>Defense Costs</u>:

(Emphasis added)
Exh. A (policy pp. 4 and 5 of 19.)

The promise of Defense Costs coverage for breach of a written or verbal employment contract was at all times express, plain and clear.

4. Plaintiff has paid all premiums due under said coverage to defendant PIIC at all relevant times herein and has performed all obligations under said policy on plaintiff's part to be performed.

5. On or about April 2, 2007, plaintiff suffered a loss compensable under the terms of said Employment Practices Coverage in that LSSI was served with a lawsuit (Case No. 37-2007-64417) in which the plaintiff (Ms. D'Anneo) asserted that LSSI had allegedly made and breached promises in an employment contract regarding alleged bonus and performance goals and compensation, and reassignment that precluded or frustrated her contract rights.

6. On or about April 10, 2007, plaintiff filed a claim for legal defense benefits and indemnity under said policy due to the D'Anneo complaint in which Ms. D'Anneo alleged "LSSI failed to define the goals and expectations of plaintiff (Ms. D'Anneo) as required under the express terms of plaintiff's employment" and that "LSSI elected to change plaintiff's job scope from primarily an operations manager, which provided a substantial opportunity to generate new client sales, to a client retention and account manager, which focused on retaining and generating revenue from existing clients" per ¶7 of the D'Anneo complaint. (See Exhibit B)

At ¶¶ 9 and 11 of the D'Anneo complaint she alleged:

9. Shortly thereafter, Plaintiff met with Mr. Burch to discuss the final evaluation. At the time of this meeting, LSSI had only paid Plaintiff approximately $30,000 of her projected $100,000 bonus money. During the meeting, Plaintiff expressed her dissatisfaction with the bonus that had been paid, and insisted that at absolute minimum she should receive the additional $20,000 performance bonus. <u>Plaintiff further explained her belief that it was not fair for LSSI to change her job scope in such a way that she could not earn the projected $50,000 sales bonus she was promised</u>. Mr. Burch offered to pay Plaintiff an additional $12,500 of the performance bonus during this meeting, but still refused to pay the sales bonus.

> 11. LSSI continued to drag its feet on the remaining $12,500 bonus money promised to Plaintiff during her meeting with Mr. Burch. Plaintiff thereafter decided that she had not [sic] choice but to leave LSSI as she had not been treated fairly and not been paid monies she was owed. Plaintiff believed that she had been taken advantage of, both initially, and with respect to the false promises made to her during her performance review.
>
> (Emphasis added.)
> Exh. B (complaint, p. 3)

7. Defendant PIIC has breached its duty of good faith and fair dealing owed to plaintiff in the following respects:

(A) Failure to make legal defense cost payments to plaintiff at a time when defendant knew that plaintiff was entitled to said payments under the terms of said Employment Practices Coverage in that the D'Anneo lawsuit alleged claims of breach of a written or oral employment contract, employment related misrepresentation, negligent reassignment, and negligent employee evaluation, all of which were expressly covered events and which obligated PIIC to defend the D'Anneo complaint. Despite the existence of these actual and/or potentially covered allegations, PIIC refused LSSI's claim.

(B) Misrepresenting to plaintiff pertinent facts and policy provisions relating to the insurance coverage in issue in that despite the express promises of coverage for Employment Practices Liability defendant refused to defend or assist LSSI based on an exclusion that was both inapplicable and that was not plain, conspicuous, clear and unambiguous.

(C) Not attempting in good faith to effectuate a prompt, fair and equitable settlement of plaintiff's claim for defense benefits in which liability was reasonably clear.

(D) Plaintiff is informed and believes and thereon alleges that defendant PIIC has breached its duty of fair dealing and good faith owed to plaintiff by other acts or omissions of which plaintiff is presently unaware. Plaintiff will seek leave of court to amend this complaint at such time as plaintiff discovers the other acts or omissions of said defendant constituting such breach.

8. As a proximate result of the aforementioned wrongful conduct of defendants, plaintiff has suffered, and will continue to suffer in the future, damages under said policy plus interest for a total amount to be shown at the time of trial.

9. As a further proximate result of the aforementioned wrongful conduct of defendants, plaintiff has suffered contract damages and other incidental damages and out of pocket expenses, including attorney fees, all to plaintiff's damage in a sum to be determined at time of trial, but in any event a sum in excess of the jurisdictional requirements of the above-entitled court.

10. Defendants' despicable conduct described herein was done with a conscious disregard of plaintiff's rights and with the intent to vex, injure or annoy plaintiff, such as to constitute oppression, fraud or malice under California Civil Code Section 3294, entitling plaintiff to punitive damages in an amount appropriate to punish or set an example of defendants.

**PLAINTIFF, LSSI, FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANT, PIIC, AND DOES 1 THROUGH 30, INCLUSIVE, IN DECLARATORY RELIEF ALLEGES:**

11. Plaintiff refers to paragraphs 1 through 9, inclusive, of the First Cause of Action, and incorporates those paragraphs as though set forth in full in this cause of action.

12. Pursuant to the terms of the insurance policy in question, plaintiff contends that the subject policy expressly agreed to defend plaintiff on employment practices claims of the nature involved in the D'Anneo action. Plaintiff has submitted all necessary documents and claim forms required in order to support its claim.

13. An actual controversy exists between plaintiff on the one hand and PIIC on the other in that plaintiff contends that a defense obligation exists. Defendant, on the other hand, has refused to defend and contends it has no obligations to insure LSSI on any of the D'Anneo allegations.

14. Plaintiff requests a judicial declaration of the rights of both parties pursuant to the terms and conditions of the insurance policy in question, and further requests a judicial declaration that plaintiff is entitled to benefits under the terms of the insurance policy in question.

WHEREFORE, plaintiff prays for judgment against defendants, and each of them as follows:

1. Damages for failure to provide insurance benefits under the subject policy in a sum to be determined at the time of trial;

2. General damages and other incidental damages in a sum to be determined at the time of trial;

3. Punitive and exemplary damages in an amount appropriate to punish or set as example of defendants;

4. For costs of suit and attorney's fees incurred herein;

5. A judicial declaration that plaintiff is entitled to benefits under the terms of the insurance policy in question; and

6. For such other and further relief as the Court deems just and proper.

PLAINTIFF DEMANDS A JURY TRIAL.

DATED: April 4, 2008

LEVINE, STEINBERG, MILLER & HUVER

By: [signature]
HARRIS I. STEINBERG
Attorneys for Plaintiff, Lender Support Systems, Inc.

# Philadelphia Indemnity Insurance Company

(A Stock Company founded in 1927)
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
1-800-759-4961

DON BODEN INSURANCE AGENCY
13794 HWY. 8 BUS. #4
EL CAJON, CA 92021
561-3660 LIC. 0557107

# Commercial Lines Policy

THIS POLICY CONSISTS OF:

- DECLARATIONS
- COMMON POLICY CONDITIONS
- ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
  - ONE OR MORE COVERAGE FORMS
  - APPLICABLE FORMS AND ENDORSEMENTS



EXHIBIT A

IN WITNESS WHEREOF, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

President

Secretary

## Philadelphia Insurance Companies

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

Philadelphia Indemnity Insurance Company

# COMMON POLICY DECLARATIONS

**Policy Number:** PHSD222905

**Named Insured and Mailing Address:**
Lender Support Systems, Inc.
13475 Danielson Street #220
Poway, CA 92064

**Producer:** 21572
Anderson & Murison
800 West Colorado Blvd.
Los Angeles, CA, 90041

**Policy Period From:** 01/06/2007 **To:** 01/06/2008

at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 7,333.00 |
| **Total** | **$ 7,333.00** |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

Countersignature Date

Authorized Representative

Philadelphia Indemnity Insurance Company

## Form Schedule – Policy

**Policy Number:** PHSD222905

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 1002 | Policyholder Notice (Loss Assistance Hotline) |
| Common Policy Dec | 0100 | Common Policy Declarations |
| PP 0701 | 0701 | Privacy Policy Notice |
| IL0985 | 0103 | Disclosure Pursuant to Terrorism Risk Ins Act of 2002 |

PI-PRD-1 (09/02)

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

[X] Philadelphia Indemnity Insurance Company    [ ] Philadelphia Insurance Company

Policy Number: PHSD222905

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item 1. Private Company Name and Address:
Lender Support Systems, Inc.
13475 Danielson Street #220
Poway, CA 92064

Internet Address: www. n/a

Item 2. Policy Period: From: 01/06/2007 To: 01/06/2008
(12:01 A.M. local time at the address shown in Item 1.)

Item 3. Limits of Liability:

| | | | |
|---|---|---|---|
| (A) | Part 1, D&O Liability: | $ | 1,000,000 each Policy Period. |
| (B) | Part 2, Employment Practices: | $ | 1,000,000 each Policy Period. |
| (C) | Part 3, Fiduciary Liability: | $ | each Policy Period. |
| (D) | Aggregate, All Parts: | $ | 1,000,000 each Policy Period. |

Item 4. Retention:

| | | | |
|---|---|---|---|
| (A) | Part 1, D&O Liability: | $ | 25,000 for each Claim under Insuring Agreement B & C. |
| | Private Offering: | $ | 25,000 for each Claim under Insuring Agreement B & C. |
| (B) | Part 2, Employment Practices: | $ | 25,000 for each Claim. |
| (C) | Part 3, Fiduciary Liability: | $ | for each Claim. |

Item 5. Prior and Pending Date: Part 1 01/06/2005 Part 2 01/06/2005 Part 3 No Date Applies

Item 6. Premium: Part 1 $ 3,682 Part 2 $ 3,651 Part 3

*Total Premium:* $ 7,333

Item 7. Endorsements: See Form List Attached

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

Authorized Representative

Countersignature

Countersignature Date

Philadelphia Indemnity Insurance Company

Form Schedule – Private Company Protection Plan

**Policy Number:** PHSD222905

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 0406 | Bell Endorsement |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-5 | 0902 | Professional Services Exclusion |
| PI-PRD-11 | 0902 | Aggregate Retention Endorsement |
| PI-PRD-19 | 0902 | Retention Waiver No Liability Endorsement |
| PI-PRD-20 | 0402 | Shareholder Exclusion |
| PI-PRD-35 | 0402 | Regulatory Exclusion (Securities Carve Back) |
| PI-PRD-38 | 0902 | Shared Limits Endorsement |
| PI-PRD-43 | 0902 | Third Party EPLI Exclusion |
| PI-PRD-48 | 0902 | Employers Shield Endorsement |
| PI-PRD-72 | 1003 | Entrepreneurs Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PL-CA | 0198 | California Amendatory Endorsement |
| PI-SLD-001 | 0103 | Cap on Losses from Certified Acts of Terrorism |

PP-0701 07-01

# PHILADELPHIA INSURANCE COMPANIES

## PRIVACY POLICY NOTICE

Philadelphia Insurance Company & Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies values your privacy and we are committed to protecting personal information that we collect during the course of our business relationship.

The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information we collect and how it may be disclosed. This does not reflect a change in the way we do business or handle your information.

### Information We Collect:

We collect personal information about you from the following sources:

- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

### Information We Disclose:

We will only disclose the information described above, as permitted by law, to our affiliates and non-affiliated third parties when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:

- Your agent or broker;
- Parties who perform a business, professional or insurance function for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, other insurers, medical care institutions and attorneys who need the information to investigate, defend or settle a claim involving you;
- Insurance regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes.
We do not disclose the personal information of persons who have ceased to be our customers.

### Protection of Information:

The Philadelphia Insurance Companies maintains physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

### How to Contact Us:

Feel free to call or write to us for additional information.

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
(877)-438-7459

POLICY NUMBER: PHSD222905

IL 09 85 01 03

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT OF 2002

**SCHEDULE***

| |
|---|
| **Terrorism Premium (Certified Acts)**<br>**$ 0**<br><br>**Additional information, if any, concerning the terrorism premium:** |
| * Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act of 2002, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.


© ISO Properties, Inc., 2003

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BELL ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

## I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of Limits of Insurance or Liability and/or additional coverages provided by this endorsement. This endorsement is subject to the provisions of the policy to which it is attached.

| | |
|---|---|
| Identity Theft Expense | $5,000 |
| Terrorism Travel Reimbursement | $5,000 |
| Emergency Real Estate Consulting Fee | $5,000 |
| Temporary Meeting Space Reimbursement | $5,000 |
| Workplace Violence Counseling | $5,000 |
| Kidnap Expense | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Image Restoration and Counseling | $5,000 |
| Donation Assurance | $5,000 |
| Business Travel | $5,000 |

## II. CONDITIONS

### A. Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

B. **Limits of Liability or Limits of Insurance**

1. When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limit of Limits of Liability or Limits of Insurance will apply. In no instance will multiple limits apply to coverages which may be duplicated within this policy. Additionally, If this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum Limits of Liability or Limit of Insurance under all such coverage parts or policies combined shall not exceed the highest applicable Limits of Liability or Limit of Insurance under any one coverage part or policy.

2. Limits of Liability or Limits of Insurance identified in Clause I. above are not excess of, but are in addition to the applicable Limits of Insurance stated in the Declarations.

C. **Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

III. **ADDITIONAL COVERAGES**

A. **Identity Theft Expense**

We will reimburse any present Director or Officer of the Named Insured, for "Identity Theft Expenses" incurred as the direct result of any "Identity Theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the Insured's first policy with the Company. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

B. **Terrorism Travel Reimbursement**

The Company will reimburse any present Director or Officer of the Named Insured in the event of a "Certified Act of Terrorism" during the policy period which necessitates that he/she incurs "Emergency Travel Expenses." The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

C. **Emergency Real Estate Consulting Fee**

The Company will reimburse the Insured any reallor's fee or real estate consultant's fee necessitated by the Insured's need to relocate due to the "Unforeseeable destruction" of the Insured's principal location listed on the Declarations page during the policy period. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

D. **Temporary Meeting Space Reimbursement**

The Company will reimburse the Insured for rental of meeting space which is

necessitated by the temporary unavailability of the Insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period. Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

E. Workplace Violence Counseling

In the event that an incidence of "workplace violence" occurs at any of the Insured's premises during the policy period, the Company will reimburse the Insured for expenses incurred for the emotional counseling of employees of the Insured, during the policy period. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

F. Kidnap Expense

The Company will pay on behalf of any Officer or Director of the Insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner", parent or child during the policy period, subject to a limit of $50,000 each Policy Period, but not subject to any deductible. Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

1. fees and expenses of an independent negotiator or consultant retained with prior approval of the Company;

2. interest on any loan taken by the Named Insured to pay Damages covered under this Policy; provided, however, that the Company shall not be liable for any interest accruing prior to thirty (30) days preceding the date of such payment, nor subsequent to the date of reimbursement from the Company for any portion of damages recoverable under this Policy;

3. costs of travel and accommodations incurred by the Named Insured which become necessary due to the applicable kidnapping;

4. the reward paid by the Named Insured, which is pre-approved by the Company, to an informant for information not otherwise available which leads to the arrest and conviction of persons responsible for any damages under this Policy; and

5. current salary to an Officer or Director of the Insured who is kidnapped; provided, however, that the employee shall be held for more than thirty (30) days. Salary shall be paid for a period commencing upon abduction and ceasing upon the earliest of either the release of the employee or discovery of the death of the employee, or 120 days after the Company receives the last credible evidence that the employee is still alive, or twelve (12) months after the date of kidnapping, or the exhaustion of the kidnap expense limit, whichever comes first.

G. Key Individual Replacement Expenses

The Company will pay "Key Individual Replacement Expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the Policy Period which results in the loss of life during the Policy Period. The "Key Individual Replacement Expenses" amount shall be the lesser of $50,000 or ten (10) times the annual premium paid for this policy. No deductible applies to this coverage.

H. Image Restoration and Counseling

The Company shall reimburse to the Insured expenses incurred for image restoration and counseling arising out of "Improper Acts" by any natural person Insured up to a limit of $5,000 per Policy Period for all Insureds combined. Covered expenses are limited to:

1. the costs of rehabilitation and counseling for the accused natural person Insured provided the natural person Insured is not ultimately found guilty of criminal conduct, said reimbursement to occur after acquittal of the natural person Insured;

2. the costs, charged by a recruiter or expended on advertising, of replacing an Officer as a result of "Improper Acts"; and

3. the costs of restoring the Named Insured's reputation and consumer confidence through image consulting.

No deductible applies to this coverage.

I. Donation Assurance

The Company shall reimburse the insured for "Failed Donation Claim(s)". The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

With respect to any "Failed Donation Claim", it is further agreed as follows:

1. the donor must never have been in bankruptcy, nor have filed for bankruptcy/reorganization prior to the time said pledge was made to the Insured;

2. for non-cash donations, payment by the Insurer of a "Failed Donation Claim" shall be based on the fair market value of said non-cash donation at the time of the "Failed Donation Claim;"

3. in the case of unemployment/incapacitation of a natural person donor and as a condition of payment of the "Failed Donation Claim;"

   (a) neither the natural person donor nor the Insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date and;

   (b) the donor shall be unemployed for at least 60 days prior to the Insurer making payment;

4. no coverage shall be afforded for a written pledge of funds or other measurable

tangible property to the Insured dated prior to the Policy Period;

5. a donation amount which is to be collected by the Insured over more than a 12 month period shall be deemed a single donation.

**J. Business Travel**

The Company will pay a Business Travel Accidental Death Benefit to the Named Insured if a Director or Officer suffers an "injury" while traveling on a common carrier for business purposes during the Policy Period which results in loss of life not later than 180 days after the Policy Period expiration, the date of cancellation or the date of non-renewal. The Accidental Death Benefit amount shall be $5,000 per occurrence. No deductible applies to this coverage. The "injury" must be reported to the Company during the Policy Period.

The Business Travel Accidental Death Benefit shall not be payable if the cause of the "injury" that resulted in loss of life was:

1. an intentional act by the insured;
2. an act of suicide or attempted suicide, whether or not the deceased was sane or insane at the time of the attempted suicide;
3. an act of war;
4. a disease process.

**IV. Definitions**

A. "Certified Act of Terrorism", whenever used in this endorsement will mean any act so defined under the Terrorism Risk Insurance Act of 2002.

B. "Domestic Partner", whenever used in this endorsement means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the Named Insured.

C. "Emergency Travel Expenses", whenever used in this endorsement will mean:

1. hotel expenses incurred which directly result from the cancellation of a scheduled transport, by train or air, by a commercial transportation carrier resulting directly from and within forty-eight hours of a "Certified Act of Terrorism;" and
2. the increased amount incurred in air or train fare which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "Certified Act of Terrorism."

D. "Failed Donation Claim", whenever used in this endorsement will mean written notice to the Insured during the Policy Period of:

1. the bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable tangible property to the Insured;

2. the unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable tangible property to the Insured.

E. "Identity Theft ", whenever used in this endorsement means the act of knowingly transferring or using, without lawful authority, a means of identification of any Officer or Director (or spouse thereof) of the Named Insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

F. "Identity Theft Expenses", whenever used in this endorsement means:

1. costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

2. costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors;

3. loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

G. "Improper Acts", whenever used in this endorsement means any actual or alleged act of:

1. sexual abuse;

2. sexual intimacy;

3. sexual molestation; and/or

4. sexual assault;

committed by an Insured against any natural person who is not an Insured. Such "Improper Acts" must have been committed by the Insured while in his or her capacity as an insured.

H. "injury", whenever used in this endorsement means any physical damage to the body caused by violence, fracture or an accident that results in physical damage or hurt.

I. "Key Individual Replacement Expenses", whenever used in this endorsement means the following necessary expenses:

1. costs of advertising the employment position opening;

2. travel, lodging, meal and entertainment expenses incurred in interviewing job

applicants for the employment position opening; and

3. miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up employment contracts.

J. "Unforeseeable Destruction", whenever used in this endorsement means damage resulting from a "Certified Act of Terrorism", fire, crash or collapse which renders all of the Insured's primary office completely unusable.

K. "Workplace violence", whenever used in this endorsement means any intentional use of or threat to use deadly force by any natural person, with intent to cause harm and that results in bodily "injury" or death of a member of the Insured or any other natural person while on the Insured's premises.

# PRIVATE COMPANY PROTECTION PLUS

Directors and Officers & Private Company Liability Insurance
Employment Practices Liability Insurance
Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

## PART 1
## DIRECTORS & OFFICERS LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENTS

A. INDIVIDUAL LIABILITY COVERAGE

The **Underwriter** shall pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss**.

B. PRIVATE COMPANY INDEMNITY COVERAGE

The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

C. PRIVATE COMPANY LIABILITY COVERAGE

The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II. DEFINITIONS

A. **D&O Wrongful Act** means any actual or alleged:

1. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

2. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

3. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only:

a. if such service is at the written request or direction of the **Private Company**; and

b. if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B. **Outside Entity** means:

1. any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

2. any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A. arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B. arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C. for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

2. **Defense Costs**.

D. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F. for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G. arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**.

IV. PRESUMPTIVE INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

## PART 2
## EMPLOYMENT PRACTICES LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured, Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

II. DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment;
2. breach of a written or oral employment contract or implied employment contract;
3. employment related misrepresentation;
4. wrongful failure to promote;
5. violation of employment discrimination laws (including harassment);
6. wrongful deprivation of a career opportunity;
7. employment related wrongful discipline;
8. negligent employee evaluation;
9. employment related invasion of privacy;
10. employment related defamation (including libel and slander);
11. sexual or workplace harassment of any kind;
12. constructive discharge of employment;
13. employment related **Retaliation**;
14. employment related humiliation;
15. wrongful demotion;
16. negligent reassignment;
17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party, Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

B. **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

1. exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;
2. refusing to violate any law;
3. having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;
4. disclosing in writing to a superior or to any governmental agency any alleged violations of law;
5. filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C. **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

B. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation**;

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

2. **Defense Costs**;

E. to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F. arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.

## PART 3
## FIDUCIARY LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II. DEFINITIONS

A. **Administration** means: (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B. **Benefit Plan** means:

1. any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2. any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3. any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C. **Fiduciary Liability Act** means any actual or alleged:

1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**..

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C. arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D. arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

E. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

F. arising out of, based upon or attributable to an **Employment Practices Act** or a **D&O Wrongful Act**.

## PART 4
## COMMON POLICY DEFINITIONS

A. **Application** means:

1. the **Application** for this Policy, including any material submitted therewith; and

2. the **Application(s)**, including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

1. a written demand for monetary or non-monetary relief;

2. a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

3. a criminal proceeding commenced by a return of an indictment;

4. a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

5. an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;

6. solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

   against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

7. a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

A claim shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Costs** means:

1. any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Costs** shall not include:

   a. any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

   b. salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

   c. salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2. a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E. **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G. **Individual Insured** means:

1. any individual who has been, now is or shall become a director, officer, governor, trustee, **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or **Employee** of any **Benefit Plan**;

2. the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

3. the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

4. with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H. **Insured** means the **Private Company** and **Individual Insured**.

I. **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

J. **Loss** means:

1. **Damages**;

2. **Defense Costs**;

but **Loss** does not include:

1. criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or

2. taxes; or

3. matters deemed uninsurable under the law to which this Policy shall be construed; or

4. any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or

5. any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K. **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L. **Private Company** means:

1. the **Named Corporation**, and

2. any **Subsidiary**, and

3. any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and

4. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M. **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N. **Private Offering** means securities offered or issued by the **Private Company** which are exempt from registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O. **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC). **Public Offering** does not include a **Private Offering**.

P. **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction**. The **Run-Off Policy** shall apply to

**Claims** made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q. **Subsidiary** means:

1. a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

2. a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**. The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3. a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this Policy required by the **Underwriter** relating to such new **Subsidiary**. Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R. **Transaction** shall mean:

1 the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

2. another entity, or person or group of entities and/or persons acting in concert acquiring securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

3. **Public Offering**.

S. **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T. **Wrongful Act** means:

1. with respect to Part 1, any **D&O Wrongful Act**,
2. with respect to Part 2, any **Employment Practice Act**,
3. with respect to Part 3, any **Fiduciary Liability Act**.

## PART 5
## COMMON POLICY EXCLUSIONS

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B. arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C. arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D. arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E. arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F. arising out of, based upon or attributable to:

   1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

   2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

   3. any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G. arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H. to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I. for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J. brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim** by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K. brought or maintained by any **Individual Insured** except:

1. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;
2. a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;
3. a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee**(s) who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L. for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M. for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N. arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of 1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

1. to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;

2. to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

## PART 6
## COMMON POLICY CONDITIONS

I. LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A. With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B. With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C. The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D. **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations. The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted

E. The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II. RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III. DEFENSE AND SETTLEMENT

A. The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**. However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**. Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

B. If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld. The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C. The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D. In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E. If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds**.

F. The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H. ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1 (Directors and Officers Liability Insurance), the **Underwriter** shall:

1. first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2. with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A. In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B. If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C. All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**. Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V. CANCELLATION AND NON-RENEWAL

A. The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B. The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C. The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI. REPRESENTATIONS AND SEVERABILITY

A. The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B. Except for material facts or circumstances known to the **Individual Insured** signing the **Application**, no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII. SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII. EXTENSION PERIOD

A. If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim**.

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B. If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C. All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX. CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X. ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI. AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

XII. OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

XIII. ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV. ACTION AGAINST THE UNDERWRITER; ARBITRATION

A. No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B. Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV. CHANGE IN OWNERSHIP OR CONTROL

A. If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1. the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2. the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3. in the case of a **Public Offering**, the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission. The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years. If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI. TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII. COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII. TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX. ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

JAMES R. PATTERSON (SBN: 211102)
HARRY W. HARRISON (SBN: 211141)
HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101
Telephone: (619) 756-6990
Facsimile: (619) 756-6991

Attorneys For: Plaintiff SONJA D'ANNEO

FILED
CIVIL BUSINESS OFFICE
CENTRAL DIVISION
APR 2 2007
CLERK - SUPERIOR COURT
SAN DIEGO COUNTY, CA

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| SONJA D'ANNEO, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>LENDER SUPPORT SYSTEMS, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO.: 37-2007-00064417-CU-OE-CTL<br><br>COMPLAINT FOR:<br>(1) FAILURE TO PAY EARNED WAGES IN VIOLATION OF LABOR CODE SECTIONS 201 AND 202;<br>(2) CLAIM OF WAITING TIME PENALTIES PER LABOR CODE SECTION 203;<br>(3) CONVERSION; AND<br>(4) UNFAIR BUSINESS PRACTICES<br><br>DEMAND FOR JURY TRIAL |

Plaintiff, SONJA D'ANNEO, alleges:

1. Plaintiff SONJA D'ANNEO ("Plaintiff") is, and at all relevant times mentioned herein was, a resident of San Diego County, California and employed by Defendants and San Diego County, California.

2. Defendant LENDER SUPPORT SYSTEMS, INC. ("LSSI") is a California corporation with its principal place of business in Poway, California.

3. Plaintiff is informed, believes and thereon alleges that Defendants DOES 1 through 20 were in some manner responsible for the acts and injuries complained of herein and were at all relevant times the representatives, employees, agents, partners, joint venturers and/or directors of the remaining defendants. Plaintiff is ignorant of the true names and capacities of



EXHIBIT B

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

defendants sued herein as DOES 1 through 20, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will seek leave to amend this complaint to allege the true names and capacities of the defendants when ascertained.

4. Plaintiff is informed, believes and thereon alleges that each of the defendants was, at all times relevant to this action, the agent, employee, representative, partner, director, member and/or joint venturer of the remaining defendants and was acting within the course and scope of that relationship. Plaintiff is further informed, believes and thereon alleges that each of the defendants herein gave consent to, ratified, and/or authorized the acts alleged herein as to each of the remaining defendants.

## FACTUAL ALLEGATIONS

5. LSSI provided Plaintiff with a written contract proposal calling for the payment of substantial bonus money that was represented to be achievable and expected assuming Plaintiff performed in a reasonably satisfactory manner. Plaintiff's projected annual bonus totaled at least $100,000. LSSI promised to pay Plaintiff $50,000 so long as she performed in a satisfactory manner, and met readily achievable goals that LSSI promised to define at the beginning of her employment. LSSI promised to pay Plaintiff an additional bonus equal to 10% of any sales generated by Plaintiff, projected to be at least $50,000 of additional bonus money.

6. Plaintiff relied on LSSI's promise to pay achievable bonus money in agreeing to join LSSI and take a pay cut in salary from her former employer. LSSI knew and understood that Plaintiff was taking a reduced salary and was expecting and relying on the availability of bonus money as part of her compensation package.

7. LSSI failed to define the goals and expectations of Plaintiff as required under the express terms of Plaintiffs' employment. And soon after her employment began, LSSI elected to change Plaintiff's job scope from primarily an operations manager, which provided a substantial opportunity to generate new-client sales, to a client retention and account manager, which focused on retaining and generating revenue from existing clients. LSSI was apparently having trouble with some of its key accounts, and asked Plaintiff to immediately intervene to salvage these accounts, which Plaintiff did and in the process generated substantial revenues.

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

8. When it came time for Plaintiff's one-year review, her direct supervisor, Mr. Cary Burch, asked Plaintiff to prepare a self-evaluation. Plaintiff did so and provided it to Mr. Burch for his review and comments. Mr. Burch reviewed this evaluation, made changes, interjected his comments, and rated Plaintiff as to each of the many categories identified therein. Importantly, Mr. Burch rated Plaintiff's work "satisfactory" or higher for each and every category, and even rated Plaintiff "outstanding" as to one category, commenting that he would rarely rate someone so high. Also importantly, Mr. Burch specifically acknowledged that Plaintiff was asked to work outside the scope of her original job description, and that Plaintiff successfully handled the transition and provided valuable contributions to LSSI outside of the original scope.

9. Shortly thereafter, Plaintiff met with Mr. Burch to discuss the final evaluation. At the time of this meeting, LSSI had only paid Plaintiff approximately $30,000 of her projected $100,000 bonus money. During the meeting, Plaintiff expressed her dissatisfaction with the bonus that had been paid, and insisted that at absolute minimum she should receive the additional $20,000 performance bonus. Plaintiff further explained her belief that it was not fair for LSSI to change her job scope in such a way that she could not earn the projected $50,000 sales bonus she was promised. Mr. Burch offered to pay Plaintiff an additional $12,500 of the performance bonus during this meeting, but still refused to pay the sales bonus.

10. After the meeting with Mr. Burch, Plaintiff felt extremely upset over the bonus money she had been promised, and felt it was not fair that she was not getting her sales bonus despite the fact that she had generated a substantial amount of sales from existing clients after being assigned to client retention. Nevertheless, Plaintiff continued performing her work at an extremely high level.

11. LSSI continued to drag its feet on the remaining $12,500 bonus money promised to Plaintiff during her meeting with Mr. Burch. Plaintiff thereafter decided that she had not choice but to leave LSSI as she had not been treated fairly and not been paid monies she was owed. Plaintiff believed that she had been taken advantage of, both initially, and with respect to the false promises made to her during her performance review.

///

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

12. Upon receiving Plaintiff's notice, Mr. Burch became extremely agitated. He demanded that Plaintiff provide information and cooperate in the transition necessitated by her departure. At one point, Mr. Burch even commented that he would keep the level of Plaintiff's cooperation in mind "relative to the remaining bonus dollars" that still had not been paid. Plaintiff was more than happy to assist in the transition, and further expected to be paid at least the remaining $12,500 bonus money that had been promised to her by Mr. Burch

13. At the time of her departure, Plaintiff inquired as to when she could expect to receive the remaining $12,500 bonus money she had been promised. In response, Plaintiff received an absurd proposed "Separation Agreement" filled with numerous egregiously unlawful terms. Plaintiff was told that she would receive $5,000 if she agreed to the Separation Agreement. Plaintiff refused to sign this unlawful agreement.

**FIRST CAUSE OF ACTION**
**(Failure to Pay Final Paycheck in Violation of Labor Code Sections 201 and 202)**
**(Against all Defendants)**

14. Plaintiff incorporates herein by reference the above paragraphs as though fully set forth herein.

15. California Labor Code section 204 establishes the fundamental right of all employees in the State of California to be paid wages for their work in amounts and at regular intervals set by law.

16. California Labor Code sections 201 and 202 provide that an employee who resigns employment by giving at least 72 hours of notice must be paid all of his wages, including all bonus money, immediately at the time of quitting.

17. Pursuant to Labor Code sections 218, 218.5 and 218.6, Plaintiff may bring a civil action for unpaid wages against the employer and may recover the unpaid balance of the full amount of such wages, together with costs of suit, interest and attorneys' fees.

18. Plaintiff began working for Defendant LSSI on May 16, 2005 at an annual salary of $100,000. Plaintiff was promised the opportunity to earn bonus money projected to be at least $100,000 annually for satisfactory performance.

///

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

19. During the entire sixteen months of her employment, Plaintiff performed all work requested of her in a satisfactory manner.

20. LSSI instructed Plaintiff to perform work outside the original scope of her employment in lieu of the original scope. Plaintiff performed all of the additionally requested work in a satisfactory manner.

21. Plaintiff submitted her notice of resignation to Defendant LSSI on September 14, 2006 and Plaintiff's last day of employment was September 18, 2006.

22. Despite Plaintiff's request, Defendant LSSI failed and/or refused to pay Plaintiff wages owed her at the time of her departure.

23. Defendants, and each of them, have failed and refused, and continue to fail and refuse to pay Plaintiff's wages, including bonus money earned during Plaintiff's sixteen months of employment, in violation of the provisions of Labor Code sections 201 and 202.

24. As a proximate result of Defendants' failure to pay wages, as alleged above, Plaintiff has been harmed in that Plaintiff has suffered a substantial loss of wages, *inter alia*, all to her damage in an amount in excess of $100,000. In addition, Plaintiff is entitled to civil penalties pursuant to Labor Code section 210, costs and attorneys' fees in prosecuting this matter pursuant to Labor Code section 218.5, and interest on all due and unpaid wages pursuant to Labor Code section 218.6.

## SECOND CAUSE OF ACTION
**(Claim for Waiting Time Penalties Per Labor Code Section 203)**
**(Against all Defendants)**

25. Plaintiff incorporates herein by reference the above paragraphs as though fully set forth herein.

26. Pursuant to California Labor Code, all wages due and owing an employee at the time of discharge must be paid immediately upon discharge. Labor Code section 203 provides that an employee's wages shall continue as a penalty until paid or for a period of up to 30 days from the time they were due, whichever period is shorter.

27. At the time of Plaintiff's resignation, Defendants failed and refused, and continue to fail and refuse to pay Plaintiff all wages due and owing, including Plaintiff's earned bonus

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

money identified above. Defendants' actions are and continue to be willful in that Defendants have deliberately refused to pay Plaintiff's earned and accrued wages.

28. Pursuant to California Labor Code section 203, Plaintiff is entitled to a penalty equal to Plaintiff's daily rate of pay multiplied by 30 days. In addition, Plaintiff is entitled to costs and attorneys' fees in prosecuting this matter pursuant to Labor Code section 218.5 in an amount to be established at trial and interest pursuant to Labor Code section 218.6.

## THIRD CAUSE OF ACTION
**(Conversion)**
**(Against all Defendants)**

29. Plaintiff incorporates herein by reference the above paragraphs as though fully set forth herein.

30. Once earned, unpaid wages become the property of the employee.

31. By failing to pay the entire wages earned and due on the designated pay day or within 72 hours of notice of resignation and retaining the sums earned Plaintiff, Defendants wrongfully exercised dominion and control over the property of Plaintiff. Defendants have failed and refused, and continue to fail and refuse to pay the total amounts owed to Plaintiff.

32. As a proximate result of the omissions of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered and continues to suffer a substantial loss of earnings and other employment benefits, *inter alia*, all to her damage in an amount in excess of $100,000.

33. On information and belief, Defendants were aware and admitted that Plaintiff was owed additional bonus money at the time of her departure from LSSI. Defendants made a conscious decision to use the wages owed Plaintiff as leverage to induce her into agreeing to an unlawful and oppressive Separation Agreement, which Plaintiff refused to sign.

34. Defendants committed the acts alleged herein maliciously, fraudulently, oppressively, and despicably with the wrongful intent of injuring Plaintiff, and with improper and evil motive amounting to malice in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount to be established at trial.

///

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

## FOURTH CAUSE OF ACTION

**(Unfair Business Practices in Violation of California Business & Professions Code section 17200, et seq.)**
**(Against all Defendants)**

35. Plaintiff incorporates herein by reference the above paragraphs as though fully set forth herein.

36. Plaintiff is informed and believes and thereon alleges that the multiple illegal acts alleged herein were perpetuated by Defendant, and said acts satisfy the criteria for unfair and illegal business practices under California Business and Professions Code section 17200, et seq.

37. These practices include, but are not limited to the following: failing to and refusing to pay wages due in violation of Labor Code sections 201 and 202 at the time of Plaintiff's resignation, or after.

38. Plaintiff is therefore entitled to equitable relief, namely restitution, under California Business and Professions Code section 17200, et seq., and injunctive relief compelling Defendant to immediately cease and desist all illegal activities described herein.

## PRAYER

WHEREFORE, Plaintiff prays for judgment against defendants as follows:

**ON THE FIRST, THIRD, AND FOURTH CAUSES OF ACTION**

1. For compensatory damages, including, but not limited to, lost wages and employment benefits, *inter alia*, in an amount in excess of $100,000;

**ON THE FIRST AND SECOND CAUSES OF ACTION**

2. For reasonable attorneys' fees pursuant to Labor Code section 218.5 according to proof;

**ON THE SECOND CAUSE OF ACTION**

3. For penalties pursuant to Labor Code section 203 of approximately $25,000;

**ON THE THIRD CAUSE OF ACTION**

4. For punitive damages according to proof at trial;

///

///

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

ON THE FOURTH CAUSE OF ACT[illegible]

5. For an injunction causing defendants to immediately cease and desist all unfair and illegal business activities, and to disgorge, and pay Plaintiff all wages earned and retained by defendants, and each of them, during perpetration of such activities;

ON ALL CAUSES OF ACTION

6. For interest at the legal rate;

7. For costs of suit; and

8. For such other legal and/or equitable relief as the court deems just and proper.

Dated: April 2, 2007

HARRISON PATTERSON & O'CONNOR LLP

By: ______________________

James R. Patterson
Harry W. Harrison
Attorneys For Plaintiff SONJA D'ANNEO

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

# EXHIBIT B

COPY

2008 MAY -9 PM 12:37

SAN DIEGO COUNTY, CA

SEDGWICK, DETERT, MORAN & ARNOLD LLP
BRIAN D. HARRISON Bar No. 157123
VANESSA L. O'BRIEN Bar No. 225699
One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105
Telephone: (415) 781-7900
Facsimile: (415) 781-2635

Attorneys for Defendant
PHILADELPHIA INDEMNITY
INSURANCE COMPANY

SUPERIOR COURT OF THE STATE OF CALIFORNIA

COUNTY OF SAN DIEGO--CENTRAL DIVISION

BY FAX

| | |
|---|---|
| LENDER SUPPORT SYSTEMS, INC.<br>Plaintiff,<br><br>v.<br><br>PHILADELPHIA INDEMNITY INSURANCE CO., and DOES I through 20, inclusive,<br><br>Defendants. | CASE NO. 37-2008-00081683-CU-IC-CTL<br><br>PHILADELPHIA INDEMNITY INSURANCE COMPANY'S ANSWER TO COMPLAINT OF PLAINTIFF LENDER SUPPORT SYSTEMS, INC. |

COMES NOW defendant Philadelphia Indemnity Insurance Company ("PIIC") and, in answer to the unverified complaint of plaintiff Lender Support Systems, Inc. ("plaintiff") on file herein, denies each and every allegation in the complaint and further denies that plaintiff has suffered any damage in the sum or sums alleged, or in any sum or at all, or is otherwise entitled to any relief.

AFFIRMATIVE DEFENSES

FIRST AFFIRMATIVE DEFENSE

PIIC alleges that the complaint, and each and every purported cause of action therein, fails to state facts sufficient to constitute a cause of action against it.

///

///

SECOND AFFIRMATIVE DEFENSE

PIIC alleges that the complaint, and each and every purported cause of action therein, fails to state a claim upon which relief can be granted.

THIRD AFFIRMATIVE DEFENSE

PIIC alleges that, to the extent that the complaint was not brought in good faith pursuant to Code of Civil Procedure § 128.7, or Rule 11 of the Federal Rules of Civil Procedure, PIIC is entitled to and will seek reasonable expenses, including attorneys' fees, incurred in defending the action, and any verdict should be adjusted accordingly.

FOURTH AFFIRMATIVE DEFENSE

PIIC alleges that the causes of action attempted to be stated and set forth in the complaint are barred by all applicable contract and statute of limitations provisions, and the limitations as set forth in the policy.

FIFTH AFFIRMATIVE DEFENSE

To the extent that plaintiff has failed to mitigate, minimize, or avoid any damages it allegedly sustained, any recovery against PIIC must be reduced accordingly.

SIXTH AFFIRMATIVE DEFENSE

PIIC has at all times exercised due care concerning any actions, conduct, or other matters alleged in the complaint, or any purported claim asserted therein.

SEVENTH AFFIRMATIVE DEFENSE

Plaintiff has not suffered any damages as a result of any actions taken by PIIC, and plaintiff is thus barred from asserting the complaint, or any purported claim, against PIIC.

EIGHTH AFFIRMATIVE DEFENSE

PIIC and its representatives acted reasonably and in good faith at all times material herein, based on all relevant facts and circumstances known by them at the time they so acted. Accordingly, plaintiff is barred from any recovery in this action.

NINTH AFFIRMATIVE DEFENSE

PIIC alleges that its coverage interpretations and claims handling were and are reasonable as a matter of law and were not and are not inherently unreasonable as a matter of law.

TENTH AFFIRMATIVE DEFENSE

PIIC alleges that the complaint and each cause of action contained therein fails to state sufficient facts to constitute a valid claim for attorneys' fees.

ELEVENTH AFFIRMATIVE DEFENSE

PIIC alleges that the complaint fails to state facts sufficient to warrant an award of punitive or exemplary damages, and plaintiffs have failed to plead malice, fraud, or oppression with the specificity required under California Civil Code § 3294.

TWELFTH AFFIRMATIVE DEFENSE

The complaint, to the extent it seeks punitive and exemplary damages against PIIC, violates defendant's right to protection from "excessive" fines as provided in the Eighth Amendment to the United States Constitution and the Constitution of the State of California, violates defendant's right to substantive due process and equal protection as provided in the Fifth and Fourteenth Amendments to the United States Constitution and the Constitution of the State of California, does not meet the tests for allowing punitive damages as set forth by the United States Supreme Court in *BMW v. Gore,* 517 U.S. 559, 116 S.Ct. 1589 (1996), and *State Farm Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513 (2003), and other causes, and therefore fails to state a cause of action supporting the punitive or exemplary damages claimed.

THIRTEENTH AFFIRMATIVE DEFENSE

The contract of insurance between plaintiff and defendant expressly provides for arbitration of disputes of the type alleged in the complaint. Plaintiff has failed to comply with the agreement to arbitrate, and the agreement precludes this litigation.

FOURTEENTH AFFIRMATIVE DEFENSE

PIIC alleges that plaintiff has failed to set out its claims with sufficient particularity to permit PIIC to raise all appropriate defenses and, thus, PIIC reserves its rights to add additional defenses as a factual basis for these claims becomes known.

WHEREFORE, defendant Philadelphia Indemnity Insurance Company prays for judgment as follows:

1. That plaintiff take nothing by reason of the complaint;

2. That defendant Philadelphia Indemnity Insurance Company be dismissed;

3. That defendant Philadelphia Indemnity Insurance Company be awarded costs of suit incurred herein; and

4. For such other and further relief as this Court may deem just and proper.

DATED: May 9, 2008

SEDGWICK, DETERT, MORAN & ARNOLD LLP

By: [signature]
BRIAN D. HARRISON
Attorneys for Defendant
PHILADELPHIA INDEMNITY
INSURANCE COMPANY

## PROOF OF SERVICE

I am a resident of the State of California, over the age of eighteen years, and not a party to the within action. My business address is Sedgwick, Detert, Moran & Arnold LLP, One Market Plaza, Steuart Tower, 8th Floor, San Francisco, California 94105. On May 9, 2008, I served the within document(s):

**ANSWER TO COMPLAINT**

☐ FACSIMILE - by transmitting via facsimile the document(s) listed above to the fax number(s) set forth on the attached Telecommunications Cover Page(s) on this date before 5:00 p.m.

☒ MAIL - by placing the document(s) listed above in a sealed envelope with postage thereon fully prepaid, in the United States mail at San Francisco, California addressed as set forth below.

☐ PERSONAL SERVICE - by personally delivering the document(s) listed above to the person(s) at the address(es) set forth below.

☐ OVERNIGHT COURIER - by placing the document(s) listed above in a sealed envelope with shipping prepaid, and depositing in a collection box for next day delivery to the person(s) at the address(es) set forth below via .

Harris I. Steinberg, Esq.
Levine, Steinberg, Miller & Huver
550 West C Street, Suite 1810
San Diego, CA 92101
Telephone: (619) 231-9449
Facsimile: (619) 231-8638

Attorneys for Plaintiff
*Lender Support Systems, Inc.*

I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

I declare under penalty of perjury under the laws of the State of California that the above is true and correct. Executed on May 9, 2008, at San Francisco, California.

Quintella M. Griffin

SEDGWICK
DETERT, MORAN & ARNOLD LLP



SF/1509239v1

JS 44 (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

ORIGINAL

FAXED

**I. (a) PLAINTIFFS**
LENDER SUPPORT SYSTEMS, INC.

**DEFENDANTS**
PHILADELPHIA INDEMNITY INSURANCE COMPANY

(b) County of Residence of First Listed Plaintiff: San Diego County, CA
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant: Montgomery County, PA
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

(c) Attorney's (Firm Name, Address, and Telephone Number)
Harris I. Steinberg, Levine, Steinberg, Miller & Huver, 550 West C. Street, Suite 1810, San Diego, CA 92101

Attorneys (If Known) **'08 CV 0848 WQH BLM**
Brian D. Harrison, Sedgwick, Detert, Moran & Arnold, One Market Plaza, Steuart Tower, 8th Floor, San Francisco, Ca

**II. BASIS OF JURISDICTION** (Place an "X" in One Box Only)

- ☐ 1 U.S. Government Plaintiff
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☐ 2 U.S. Government Defendant
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (Place an "X" in One Box for Plaintiff and One Box for Defendant) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. NATURE OF SUIT** (Place an "X" in One Box Only)

**CONTRACT**
- ☒ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans)
- ☐ 153 Recovery of Overpayment of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury

PERSONAL INJURY
- ☐ 362 Personal Injury - Med. Malpractice
- ☐ 365 Personal Injury - Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 444 Welfare
- ☐ 445 Amer. w/Disabilities - Employment
- ☐ 446 Amer. w/Disabilities - Other
- ☐ 440 Other Civil Rights

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

Habeas Corpus:
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition

**FORFEITURE/PENALTY**
- ☐ 610 Agriculture
- ☐ 620 Other Food & Drug
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 630 Liquor Laws
- ☐ 640 R.R. & Truck
- ☐ 650 Airline Regs.
- ☐ 660 Occupational Safety/Health
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Mgmt. Relations
- ☐ 730 Labor/Mgmt.Reporting & Disclosure Act
- ☐ 740 Railway Labor Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Empl. Ret. Inc. Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 400 State Reapportionment
- ☐ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 810 Selective Service
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 875 Customer Challenge 12 USC 3410
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 892 Economic Stabilization Act
- ☐ 893 Environmental Matters
- ☐ 894 Energy Allocation Act
- ☐ 895 Freedom of Information Act
- ☐ 900Appeal of Fee Determination Under Equal Access to Justice
- ☐ 950 Constitutionality of State Statutes

**V. ORIGIN** (Place an "X" in One Box Only)

☐ 1 Original Proceeding ☒ 2 Removed from State Court ☐ 3 Remanded from Appellate Court ☐ 4 Reinstated or Reopened ☐ 5 Transferred from another district (specify) ☐ 6 Multidistrict Litigation ☐ 7 Appeal to District Judge from Magistrate Judgment

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 USC § 1441
Brief description of cause: Declaratory relief; breach of the covenant of good faith and fair dealing

**VII. REQUESTED IN COMPLAINT:** ☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23 DEMAND $
CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE ______ DOCKET NUMBER ______

DATE 5-8-08 SIGNATURE OF ATTORNEY OF RECORD [signature]

FOR OFFICE USE ONLY

RECEIPT # 150702 AMOUNT $350.– APPLYING IFP ______ JUDGE ______ MAG. JUDGE ______

MS 5/12

**UNITED STATES**
**DISTRICT COURT**
SOUTHERN DISTRICT OF CALIFORNIA
SAN DIEGO DIVISION

**# 150802 - MS**

**May 12, 2008**
**14:27:53**

**Civ Fil Non-Pris**
USAO #.: 08-CV-0848 CIVIL FILING
Judge..: WILLIAM Q HAYES
Amount.: $350.00 CK
Check#.: BC68813

**Total-> $350.00**

FROM: LENDER SUPPORT SYSTEMS, INC
VS. PHILADELOHIA INDEMNITY INS
CIVIL FILING