TABLE OF CONTENTS TO EXHIBITS

Exhibit 1: Pages 1-1 through 1-36

Exhibit 2: Pages 2-37 through 2-44

Exhibit 3: Pages 3-45 through 3-52

Exhibit 4: Pages 4-53 through 4-54

**Philadelphia Indemnity Insurance Company**

(A Stock Company founded in 1927)
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
1-800-759-4961

DON BODEN INSURANCE AGENCY
13794 HWY. 8 BUS. #4
EL CAJON, CA 92021
561-3660 LIC. 0557107

# Commercial Lines Policy

THIS POLICY CONSISTS OF:

- DECLARATIONS
- COMMON POLICY CONDITIONS
- ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
  - ONE OR MORE COVERAGE FORMS
  - APPLICABLE FORMS AND ENDORSEMENTS



EXHIBIT 1
1-1

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

President

Secretary

**Philadelphia Insurance Companies**
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
Philadelphia Indemnity Insurance Company

# COMMON POLICY DECLARATIONS

**Policy Number:** PHSD222905

**Named Insured and Mailing Address:**
Lender Support Systems, Inc.
13475 Danielson Street #220
Poway, CA 92064

**Producer:** 21572
Anderson & Murison
800 West Colorado Blvd.
Los Angeles, CA, 90041

**Policy Period From:** 01/06/2007 **To:** 01/06/2008 at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | PREMIUM |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 7,333.00 |
| **Total** | **$ 7,333.00** |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

Countersignature Date

Authorized Representative

1-3

Philadelphia Indemnity Insurance Company

## Form Schedule – Policy

**Policy Number:** PHSD222905

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 1002 | Policyholder Notice (Loss Assistance Hotline) |
| Common Policy Dec | 0100 | Common Policy Declarations |
| PP 0701 | 0701 | Privacy Policy Notice |
| IL0985 | 0103 | Disclosure Pursuant to Terrorism Risk Ins Act of 2002 |



1-4

PI-PRD-1 (09/02)

# Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

[X] Philadelphia Indemnity Insurance Company  [ ] Philadelphia Insurance Company

Policy Number: PHSD222905

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item 1. Private Company Name and Address:
Lender Support Systems, Inc.
13475 Danielson Street #220
Poway, CA 92064

Internet Address: www. n/a

Item 2. Policy Period: From: 01/06/2007 To: 01/06/2008
(12:01 A.M. local time at the address shown in Item 1.)

Item 3. Limits of Liability:

| | | | |
|---|---|---|---|
| (A) | Part 1, D&O Liability: | $ | 1,000,000 each Policy Period. |
| (B) | Part 2, Employment Practices: | $ | 1,000,000 each Policy Period. |
| (C) | Part 3, Fiduciary Liability: | $ | each Policy Period. |
| (D) | Aggregate, All Parts: | $ | 1,000,000 each Policy Period. |

Item 4. Retention:

| | | | |
|---|---|---|---|
| (A) | Part 1, D&O Liability: | $ | 25,000 for each Claim under Insuring Agreement B & C. |
| | Private Offering: | $ | 25,000 for each Claim under Insuring Agreement B & C. |
| (B) | Part 2, Employment Practices: | $ | 25,000 for each Claim. |
| (C) | Part 3, Fiduciary Liability: | $ | for each Claim. |

Item 5. Prior and Pending Date: Part 1 01/06/2005 Part 2 01/06/2005 Part 3 No Date Applies

Item 6. Premium: Part 1 $ 3,682 Part 2 $ 3,651 Part 3

*Total Premium:* $ 7,333

Item 7. Endorsements: See Form List Attached



1-5

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.

| | | |
|---|---|---|
| Authorized Representative | Countersignature | Countersignature Date |



1-6

Philadelphia Indemnity Insurance Company

# Form Schedule – Private Company Protection Plan

**Policy Number:** PHSD222905

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 0406 | Bell Endorsement |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-5 | 0902 | Professional Services Exclusion |
| PI-PRD-11 | 0902 | Aggregate Retention Endorsement |
| PI-PRD-19 | 0902 | Retention Waiver No Liability Endorsement |
| PI-PRD-20 | 0402 | Shareholder Exclusion |
| PI-PRD-35 | 0402 | Regulatory Exclusion (Securities Carve Back) |
| PI-PRD-38 | 0902 | Shared Limits Endorsement |
| PI-PRD-43 | 0902 | Third Party EPLI Exclusion |
| PI-PRD-48 | 0902 | Employers Shield Endorsement |
| PI-PRD-72 | 1003 | Entrepreneurs Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PL-CA | 0198 | California Amendatory Endorsement |
| PI-SLD-001 | 0103 | Cap on Losses from Certified Acts of Terrorism |



1-7

# PHILADELPHIA INSURANCE COMPANIES

## PRIVACY POLICY NOTICE

Philadelphia Insurance Company & Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies values your privacy and we are committed to protecting personal information that we collect during the course of our business relationship.

The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information we collect and how it may be disclosed. This does not reflect a change in the way we do business or handle your information.

### Information We Collect:

We collect personal information about you from the following sources:

- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

### Information We Disclose:

We will only disclose the information described above, as permitted by law, to our affiliates and non-affiliated third parties when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:

- Your agent or broker;
- Parties who perform a business, professional or insurance function for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, other insurers, medical care institutions and attorneys who need the information to investigate, defend or settle a claim involving you;
- Insurance regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes.
We do not disclose the personal information of persons who have ceased to be our customers.

### Protection of Information:

The Philadelphia Insurance Companies maintains physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

### How to Contact Us:

Feel free to call or write to us for additional information.

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
(877)-438-7459

POLICY NUMBER: PHSD222905 IL 09 85 01 03

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT OF 2002

**SCHEDULE***

| |
|---|
| **Terrorism Premium (Certified Acts)**<br>**$** 0<br><br>**Additional information, if any, concerning the terrorism premium:** |
| * Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act of 2002, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

 © ISO Properties, Inc., 2003 

1-9

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BELL ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

## I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of Limits of Insurance or Liability and/or additional coverages provided by this endorsement. This endorsement is subject to the provisions of the policy to which it is attached.

| | |
|---|---|
| Identity Theft Expense | $5,000 |
| Terrorism Travel Reimbursement | $5,000 |
| Emergency Real Estate Consulting Fee | $5,000 |
| Temporary Meeting Space Reimbursement | $5,000 |
| Workplace Violence Counseling | $5,000 |
| Kidnap Expense | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Image Restoration and Counseling | $5,000 |
| Donation Assurance | $5,000 |
| Business Travel | $5,000 |

## II. CONDITIONS

### A. Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.



1-10

B. **Limits of Liability or Limits of Insurance**

1. When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limit of Limits of Liability or Limits of Insurance will apply. In no instance will multiple limits apply to coverages which may be duplicated within this policy. Additionally, If this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum Limits of Liability or Limit of Insurance under all such coverage parts or policies combined shall not exceed the highest applicable Limits of Liability or Limit of Insurance under any one coverage part or policy.

2. Limits of Liability or Limits of Insurance identified in Clause I. above are not excess of, but are in addition to the applicable Limits of Insurance stated in the Declarations.

C. **Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

## III. ADDITIONAL COVERAGES

A. **Identity Theft Expense**

We will reimburse any present Director or Officer of the Named Insured, for "Identity Theft Expenses" incurred as the direct result of any "Identity Theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the Insured's first policy with the Company. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

B. **Terrorism Travel Reimbursement**

The Company will reimburse any present Director or Officer of the Named Insured in the event of a "Certified Act of Terrorism" during the policy period which necessitates that he/she incurs "Emergency Travel Expenses." The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

C. **Emergency Real Estate Consulting Fee**

The Company will reimburse the Insured any realtor's fee or real estate consultant's fee necessitated by the Insured's need to relocate due to the "Unforeseeable destruction" of the Insured's principal location listed on the Declarations page during the policy period. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

D. **Temporary Meeting Space Reimbursement**

The Company will reimburse the Insured for rental of meeting space which is

necessitated by the temporary unavailability of the Insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period. Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

E. **Workplace Violence Counseling**

In the event that an incidence of "workplace violence" occurs at any of the Insured's premises during the policy period, the Company will reimburse the Insured for expenses incurred for the emotional counseling of employees of the Insured, during the policy period. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

F. **Kidnap Expense**

The Company will pay on behalf of any Officer or Director of the Insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner", parent or child during the policy period, subject to a limit of $50,000 each Policy Period, but not subject to any deductible. Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

1. fees and expenses of an independent negotiator or consultant retained with prior approval of the Company;

2. interest on any loan taken by the Named Insured to pay Damages covered under this Policy; provided, however, that the Company shall not be liable for any interest accruing prior to thirty (30) days preceding the date of such payment, nor subsequent to the date of reimbursement from the Company for any portion of damages recoverable under this Policy;

3. costs of travel and accommodations incurred by the Named Insured which become necessary due to the applicable kidnapping;

4. the reward paid by the Named Insured, which is pre-approved by the Company, to an informant for information not otherwise available which leads to the arrest and conviction of persons responsible for any damages under this Policy; and

5. current salary to an Officer or Director of the Insured who is kidnapped; provided, however, that the employee shall be held for more than thirty (30) days. Salary shall be paid for a period commencing upon abduction and ceasing upon the earliest of either the release of the employee or discovery of the death of the employee, or 120 days after the Company receives the last credible evidence that the employee is still alive, or twelve (12) months after the date of kidnapping, or the exhaustion of the kidnap expense limit, whichever comes first.

G. **Key Individual Replacement Expenses**



1-12

The Company will pay "Key Individual Replacement Expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the Policy Period which results in the loss of life during the Policy Period. The "Key Individual Replacement Expenses" amount shall be the lesser of $50,000 or ten (10) times the annual premium paid for this policy. No deductible applies to this coverage.

H. Image Restoration and Counseling

The Company shall reimburse to the Insured expenses incurred for image restoration and counseling arising out of "Improper Acts" by any natural person Insured up to a limit of $5,000 per Policy Period for all Insureds combined. Covered expenses are limited to:

1. the costs of rehabilitation and counseling for the accused natural person Insured provided the natural person Insured is not ultimately found guilty of criminal conduct, said reimbursement to occur after acquittal of the natural person Insured;

2. the costs, charged by a recruiter or expended on advertising, of replacing an Officer as a result of "Improper Acts"; and

3. the costs of restoring the Named Insured's reputation and consumer confidence through image consulting.

No deductible applies to this coverage.

I. Donation Assurance

The Company shall reimburse the insured for "Failed Donation Claim(s)". The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

With respect to any "Failed Donation Claim", it is further agreed as follows:

1. the donor must never have been in bankruptcy, nor have filed for bankruptcy/reorganization prior to the time said pledge was made to the Insured;

2. for non-cash donations, payment by the Insurer of a "Failed Donation Claim" shall be based on the fair market value of said non-cash donation at the time of the "Failed Donation Claim;"

3. in the case of unemployment/incapacitation of a natural person donor and as a condition of payment of the "Failed Donation Claim;"

   (a) neither the natural person donor nor the Insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date and;

   (b) the donor shall be unemployed for at least 60 days prior to the Insurer making payment;

4. no coverage shall be afforded for a written pledge of funds or other measurable

tangible property to the Insured dated prior to the Policy Period;

5. a donation amount which is to be collected by the Insured over more than a 12 month period shall be deemed a single donation.

**J. Business Travel**

The Company will pay a Business Travel Accidental Death Benefit to the Named Insured if a Director or Officer suffers an "injury" while traveling on a common carrier for business purposes during the Policy Period which results in loss of life not later than 180 days after the Policy Period expiration, the date of cancellation or the date of non-renewal. The Accidental Death Benefit amount shall be $5,000 per occurrence. No deductible applies to this coverage. The "injury" must be reported to the Company during the Policy Period.

The Business Travel Accidental Death Benefit shall not be payable if the cause of the "injury" that resulted in loss of life was:

1. an intentional act by the insured;
2. an act of suicide or attempted suicide, whether or not the deceased was sane or insane at the time of the attempted suicide;
3. an act of war;
4. a disease process.

**IV. Definitions**

A. "Certified Act of Terrorism", whenever used in this endorsement will mean any act so defined under the Terrorism Risk Insurance Act of 2002.

B. "Domestic Partner", whenever used in this endorsement means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the Named Insured.

C. "Emergency Travel Expenses", whenever used in this endorsement will mean:

1. hotel expenses incurred which directly result from the cancellation of a scheduled transport, by train or air, by a commercial transportation carrier resulting directly from and within forty-eight hours of a "Certified Act of Terrorism;" and
2. the increased amount incurred in air or train fare which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "Certified Act of Terrorism."

D. "Failed Donation Claim", whenever used in this endorsement will mean written notice to the Insured during the Policy Period of:



1-14

1. the bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable tangible property to the Insured;

2. the unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable tangible property to the Insured.

E. "Identity Theft ", whenever used in this endorsement means the act of knowingly transferring or using, without lawful authority, a means of identification of any Officer or Director (or spouse thereof) of the Named Insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

F. "Identity Theft Expenses", whenever used in this endorsement means:

1. costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

2. costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors;

3. loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

G. "Improper Acts", whenever used in this endorsement means any actual or alleged act of:

1. sexual abuse;

2. sexual intimacy;

3. sexual molestation; and/or

4. sexual assault;

committed by an Insured against any natural person who is not an Insured. Such "Improper Acts" must have been committed by the Insured while in his or her capacity as an insured.

H. "injury", whenever used in this endorsement means any physical damage to the body caused by violence, fracture or an accident that results in physical damage or hurt.

I. "Key Individual Replacement Expenses", whenever used in this endorsement means the following necessary expenses:

1. costs of advertising the employment position opening;

2. travel, lodging, meal and entertainment expenses incurred in interviewing job

applicants for the employment position opening; and

3. miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up employment contracts.

J. "Unforeseeable Destruction", whenever used in this endorsement means damage resulting from a "Certified Act of Terrorism", fire, crash or collapse which renders all of the Insured's primary office completely unusable.

K. "Workplace violence", whenever used in this endorsement means any intentional use of or threat to use deadly force by any natural person, with intent to cause harm and that results in bodily "injury" or death of a member of the Insured or any other natural person while on the Insured's premises.



1-16

# PRIVATE COMPANY PROTECTION PLUS

Directors and Officers & Private Company Liability Insurance
Employment Practices Liability Insurance
Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

## PART 1
## DIRECTORS & OFFICERS LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENTS

A. INDIVIDUAL LIABILITY COVERAGE

The **Underwriter** shall pay on behalf of the **Individual Insured**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss**.

B. PRIVATE COMPANY INDEMNITY COVERAGE

The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

C. PRIVATE COMPANY LIABILITY COVERAGE

The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II. DEFINITIONS

A. **D&O Wrongful Act** means any actual or alleged:

1. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

2. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

3. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only:



1-17

a. if such service is at the written request or direction of the **Private Company**; and

b. if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B. **Outside Entity** means:

1. any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

2. any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A. arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B. arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C. for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

2. **Defense Costs**.

D. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F. for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G. arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**.



1-18

IV. PRESUMPTIVE INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

## PART 2
## EMPLOYMENT PRACTICES LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured, Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

II. DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment;
2. breach of a written or oral employment contract or implied employment contract;
3. employment related misrepresentation;
4. wrongful failure to promote;
5. violation of employment discrimination laws (including harassment);
6. wrongful deprivation of a career opportunity;
7. employment related wrongful discipline;
8. negligent employee evaluation;
9. employment related invasion of privacy;
10. employment related defamation (including libel and slander);
11. sexual or workplace harassment of any kind;
12. constructive discharge of employment;
13. employment related **Retaliation**;
14. employment related humiliation;
15. wrongful demotion;
16. negligent reassignment;
17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party, Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual



1-19

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

B. **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

1. exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

2. refusing to violate any law;

3. having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;

4. disclosing in writing to a superior or to any governmental agency any alleged violations of law;

5. filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C. **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

B. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation**;

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

2. **Defense Costs**;

E. to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F. arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.

## PART 3
## FIDUCIARY LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II. DEFINITIONS

A. **Administration** means: (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B. **Benefit Plan** means:

1. any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2. any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3. any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C. **Fiduciary Liability Act** means any actual or alleged:

1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans.**

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA.**

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C. arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D. arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

E. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

F. arising out of, based upon or attributable to an **Employment Practices Act** or a **D&O Wrongful Act**.

## PART 4
## COMMON POLICY DEFINITIONS

A. **Application** means:

1. the **Application** for this Policy, including any material submitted therewith; and
2. the **Application(s)**, including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

1. a written demand for monetary or non-monetary relief;
2. a judicial or civil proceeding commenced by the service of a complaint or similar pleading;
3. a criminal proceeding commenced by a return of an indictment;
4. a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;
5. an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;
6. solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

7. a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

A **claim** shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Costs** means:

1. any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim**, whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Costs** shall not include:

   a. any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

   b. salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

   c. salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2. a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E. **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G. **Individual Insured** means:

1. any individual who has been, now is or shall become a director, officer, governor, trustee, **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or **Employee** of any **Benefit Plan**;

2. the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

3. the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

4. with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H. **Insured** means the **Private Company** and **Individual Insured**.



1-24

I. **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

J. **Loss** means:

1. **Damages**;
2. **Defense Costs**;

but **Loss** does not include:

1. criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or
2. taxes; or
3. matters deemed uninsurable under the law to which this Policy shall be construed; or
4. any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or
5. any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K. **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L. **Private Company** means:

1. the **Named Corporation**, and
2. any **Subsidiary**, and
3. any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and
4. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M. **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N. **Private Offering** means securities offered or issued by the **Private Company** which are exempt from registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O. **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC). **Public Offering** does not include a **Private Offering**.

P. **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction**. The **Run-Off Policy** shall apply to



1-25

**Claims** made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q. **Subsidiary** means:

1. a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

2. a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**. The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3. a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this Policy required by the **Underwriter** relating to such new **Subsidiary**. Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R. **Transaction** shall mean:

1 the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

2. another entity, or person or group of entities and/or persons acting in concert acquiring securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

3. **Public Offering**.

S. **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T. **Wrongful Act** means:



1-26

1. with respect to Part 1, any **D&O Wrongful Act**,
2. with respect to Part 2, any **Employment Practice Act**,
3. with respect to Part 3, any **Fiduciary Liability Act**.

**PART 5**
**COMMON POLICY EXCLUSIONS**

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B. arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C. arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D. arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E. arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F. arising out of, based upon or attributable to:

1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

3. any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G. arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H. to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I. for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J. brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim** by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K. brought or maintained by any **Individual Insured** except:

1. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;
2. a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;
3. a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee**(s) who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L. for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M. for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N. arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of 1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

1. to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;



1-28

2. to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

## PART 6
## COMMON POLICY CONDITIONS

I. LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A. With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B. With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C. The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D. **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations. The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted

E. The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II. RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III. DEFENSE AND SETTLEMENT

A. The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim**. However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter**. Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.



1-29

B. If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld. The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C. The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D. In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E. If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds.**

F. The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim,** then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H. ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1 (Directors and Officers Liability Insurance), the **Underwriter** shall:



1-30

1. first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2. with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A. In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B. If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C. All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**. Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V. CANCELLATION AND NON-RENEWAL

A. The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B. The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C. The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI. REPRESENTATIONS AND SEVERABILITY

A. The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B. Except for material facts or circumstances known to the **Individual Insured** signing the **Application,** no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII. SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII. EXTENSION PERIOD

A. If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B. If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:



1-32

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C. All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX. CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI. AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

XII. OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.



1-33

XIII. ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV. ACTION AGAINST THE UNDERWRITER; ARBITRATION

A. No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B. Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV. CHANGE IN OWNERSHIP OR CONTROL

A. If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1. the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2. the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3. in the case of a **Public Offering**, the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission. The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years. If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI. TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII. COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII. TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX. ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), section III (EXCLUSIONS), item E. is replaced by:

E. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 4 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

JAMES R. PATTERSON (SBN: 211102)
HARRY W. HARRISON (SBN: 211141)
HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101
Telephone: (619) 756-6990
Facsimile: (619) 756-6991

Attorneys For: Plaintiff SONJA D'ANNEO

FILED
CIVIL BUSINESS OFFICE
CENTRAL DIVISION
APR 2 2007
CLERK - SUPERIOR COURT
SAN DIEGO COUNTY, CA

SUPERIOR COURT OF CALIFORNIA

COUNTY OF SAN DIEGO

| | |
|---|---|
| SONJA D'ANNEO, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>LENDER SUPPORT SYSTEMS, INC., a California corporation; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO.: 37-2007-00064417-CU-OE-CTL<br><br>**COMPLAINT FOR:**<br>**(1) FAILURE TO PAY EARNED WAGES IN VIOLATION OF LABOR CODE SECTIONS 201 AND 202;**<br>**(2) CLAIM OF WAITING TIME PENALTIES PER LABOR CODE SECTION 203;**<br>**(3) CONVERSION; AND**<br>**(4) UNFAIR BUSINESS PRACTICES**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff, SONJA D'ANNEO, alleges:

1. Plaintiff SONJA D'ANNEO ("Plaintiff") is, and at all relevant times mentioned herein was, a resident of San Diego County, California and employed by Defendants and San Diego County, California.

2. Defendant LENDER SUPPORT SYSTEMS, INC. ("LSSI") is a California corporation with its principal place of business in Poway, California.

3. Plaintiff is informed, believes and thereon alleges that Defendants DOES 1 through 20 were in some manner responsible for the acts and injuries complained of herein and were at all relevant times the representatives, employees, agents, partners, joint venturers and/or directors of the remaining defendants. Plaintiff is ignorant of the true names and capacities of

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101



EXHIBIT 2
2-37

defendants sued herein as DOES 1 through 20, inclusive, and therefore sues these defendants by such fictitious names. Plaintiff will seek leave to amend this complaint to allege the true names and capacities of the defendants when ascertained.

4. Plaintiff is informed, believes and thereon alleges that each of the defendants was, at all times relevant to this action, the agent, employee, representative, partner, director, member and/or joint venturer of the remaining defendants and was acting within the course and scope of that relationship. Plaintiff is further informed, believes and thereon alleges that each of the defendants herein gave consent to, ratified, and/or authorized the acts alleged herein as to each of the remaining defendants.

## FACTUAL ALLEGATIONS

5. LSSI provided Plaintiff with a written contract proposal calling for the payment of substantial bonus money that was represented to be achievable and expected assuming Plaintiff performed in a reasonably satisfactory manner. Plaintiff's projected annual bonus totaled at least $100,000. LSSI promised to pay Plaintiff $50,000 so long as she performed in a satisfactory manner, and met readily achievable goals that LSSI promised to define at the beginning of her employment. LSSI promised to pay Plaintiff an additional bonus equal to 10% of any sales generated by Plaintiff, projected to be at least $50,000 of additional bonus money.

6. Plaintiff relied on LSSI's promise to pay achievable bonus money in agreeing to join LSSI and take a pay cut in salary from her former employer. LSSI knew and understood that Plaintiff was taking a reduced salary and was expecting and relying on the availability of bonus money as part of her compensation package.

7. LSSI failed to define the goals and expectations of Plaintiff as required under the express terms of Plaintiffs' employment. And soon after her employment began, LSSI elected to change Plaintiff's job scope from primarily an operations manager, which provided a substantial opportunity to generate new-client sales, to a client retention and account manager, which focused on retaining and generating revenue from existing clients. LSSI was apparently having trouble with some of its key accounts, and asked Plaintiff to immediately intervene to salvage these accounts, which Plaintiff did and in the process generated substantial revenues.

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101



2-38

8. When it came time for Plaintiff's one-year review, her direct supervisor, Mr. Cary Burch, asked Plaintiff to prepare a self-evaluation. Plaintiff did so and provided it to Mr. Burch for his review and comments. Mr. Burch reviewed this evaluation, made changes, interjected his comments, and rated Plaintiff as to each of the many categories identified therein. Importantly, Mr. Burch rated Plaintiff's work "satisfactory" or higher for each and every category, and even rated Plaintiff "outstanding" as to one category, commenting that he would rarely rate someone so high. Also importantly, Mr. Burch specifically acknowledged that Plaintiff was asked to work outside the scope of her original job description, and that Plaintiff successfully handled the transition and provided valuable contributions to LSSI outside of the original scope.

9. Shortly thereafter, Plaintiff met with Mr. Burch to discuss the final evaluation. At the time of this meeting, LSSI had only paid Plaintiff approximately $30,000 of her projected $100,000 bonus money. During the meeting, Plaintiff expressed her dissatisfaction with the bonus that had been paid, and insisted that at absolute minimum she should receive the additional $20,000 performance bonus. Plaintiff further explained her belief that it was not fair for LSSI to change her job scope in such a way that she could not earn the projected $50,000 sales bonus she was promised. Mr. Burch offered to pay Plaintiff an additional $12,500 of the performance bonus during this meeting, but still refused to pay the sales bonus.

10. After the meeting with Mr. Burch, Plaintiff felt extremely upset over the bonus money she had been promised, and felt it was not fair that she was not getting her sales bonus despite the fact that she had generated a substantial amount of sales from existing clients after being assigned to client retention. Nevertheless, Plaintiff continued performing her work at an extremely high level.

11. LSSI continued to drag its feet on the remaining $12,500 bonus money promised to Plaintiff during her meeting with Mr. Burch. Plaintiff thereafter decided that she had not choice but to leave LSSI as she had not been treated fairly and not been paid monies she was owed. Plaintiff believed that she had been taken advantage of, both initially, and with respect to the false promises made to her during her performance review.

///

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101



2-39

12. Upon receiving Plaintiff's notice, Mr. Burch became extremely agitated. He demanded that Plaintiff provide information and cooperate in the transition necessitated by her departure. At one point, Mr. Burch even commented that he would keep the level of Plaintiff's cooperation in mind "relative to the remaining bonus dollars" that still had not been paid. Plaintiff was more than happy to assist in the transition, and further expected to be paid at least the remaining $12,500 bonus money that had been promised to her by Mr. Burch

13. At the time of her departure, Plaintiff inquired as to when she could expect to receive the remaining $12,500 bonus money she had been promised. In response, Plaintiff received an absurd proposed "Separation Agreement" filled with numerous egregiously unlawful terms. Plaintiff was told that she would receive $5,000 if she agreed to the Separation Agreement. Plaintiff refused to sign this unlawful agreement.

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

## FIRST CAUSE OF ACTION
**(Failure to Pay Final Paycheck in Violation of Labor Code Sections 201 and 202)**
**(Against all Defendants)**

14. Plaintiff incorporates herein by reference the above paragraphs as though fully set forth herein.

15. California Labor Code section 204 establishes the fundamental right of all employees in the State of California to be paid wages for their work in amounts and at regular intervals set by law.

16. California Labor Code sections 201 and 202 provide that an employee who resigns employment by giving at least 72 hours of notice must be paid all of his wages, including all bonus money, immediately at the time of quitting.

17. Pursuant to Labor Code sections 218, 218.5 and 218.6, Plaintiff may bring a civil action for unpaid wages against the employer and may recover the unpaid balance of the full amount of such wages, together with costs of suit, interest and attorneys' fees.

18. Plaintiff began working for Defendant LSSI on May 16, 2005 at an annual salary of $100,000. Plaintiff was promised the opportunity to earn bonus money projected to be at least $100,000 annually for satisfactory performance.

///



2-40

19. During the entire sixteen months of her employment, Plaintiff performed all work requested of her in a satisfactory manner.

20. LSSI instructed Plaintiff to perform work outside the original scope of her employment in lieu of the original scope. Plaintiff performed all of the additionally requested work in a satisfactory manner.

21. Plaintiff submitted her notice of resignation to Defendant LSSI on September 14, 2006 and Plaintiff's last day of employment was September 18, 2006.

22. Despite Plaintiff's request, Defendant LSSI failed and/or refused to pay Plaintiff wages owed her at the time of her departure.

23. Defendants, and each of them, have failed and refused, and continue to fail and refuse to pay Plaintiff's wages, including bonus money earned during Plaintiff's sixteen months of employment, in violation of the provisions of Labor Code sections 201 and 202.

24. As a proximate result of Defendants' failure to pay wages, as alleged above, Plaintiff has been harmed in that Plaintiff has suffered a substantial loss of wages, *inter alia*, all to her damage in an amount in excess of $100,000. In addition, Plaintiff is entitled to civil penalties pursuant to Labor Code section 210, costs and attorneys' fees in prosecuting this matter pursuant to Labor Code section 218.5, and interest on all due and unpaid wages pursuant to Labor Code section 218.6.

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

## SECOND CAUSE OF ACTION

**(Claim for Waiting Time Penalties Per Labor Code Section 203)**
**(Against all Defendants)**

25. Plaintiff incorporates herein by reference the above paragraphs as though fully set forth herein.

26. Pursuant to California Labor Code, all wages due and owing an employee at the time of discharge must be paid immediately upon discharge. Labor Code section 203 provides that an employee's wages shall continue as a penalty until paid or for a period of up to 30 days from the time they were due, whichever period is shorter.

27. At the time of Plaintiff's resignation, Defendants failed and refused, and continue to fail and refuse to pay Plaintiff all wages due and owing, including Plaintiff's earned bonus

money identified above. Defendants' actions are and continue to be willful in that Defendants have deliberately refused to pay Plaintiff's earned and accrued wages.

28. Pursuant to California Labor Code section 203, Plaintiff is entitled to a penalty equal to Plaintiff's daily rate of pay multiplied by 30 days. In addition, Plaintiff is entitled to costs and attorneys' fees in prosecuting this matter pursuant to Labor Code section 218.5 in an amount to be established at trial and interest pursuant to Labor Code section 218.6.

**THIRD CAUSE OF ACTION**
**(Conversion)**
**(Against all Defendants)**

29. Plaintiff incorporates herein by reference the above paragraphs as though fully set forth herein.

30. Once earned, unpaid wages become the property of the employee.

31. By failing to pay the entire wages earned and due on the designated pay day or within 72 hours of notice of resignation and retaining the sums earned Plaintiff, Defendants wrongfully exercised dominion and control over the property of Plaintiff. Defendants have failed and refused, and continue to fail and refuse to pay the total amounts owed to Plaintiff.

32. As a proximate result of the omissions of Defendants, and each of them, Plaintiff has been harmed in that Plaintiff has suffered and continues to suffer a substantial loss of earnings and other employment benefits, *inter alia*, all to her damage in an amount in excess of $100,000.

33. On information and belief, Defendants were aware and admitted that Plaintiff was owed additional bonus money at the time of her departure from LSSI. Defendants made a conscious decision to use the wages owed Plaintiff as leverage to induce her into agreeing to an unlawful and oppressive Separation Agreement, which Plaintiff refused to sign.

34. Defendants committed the acts alleged herein maliciously, fraudulently, oppressively, and despicably with the wrongful intent of injuring Plaintiff, and with improper and evil motive amounting to malice in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover punitive damages from Defendants in an amount to be established at trial.

///

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101



2-42

**FOURTH CAUSE OF ACTION**

**(Unfair Business Practices in Violation of California Business & Professions Code section 17200, et seq.)**

**(Against all Defendants)**

35. Plaintiff incorporates herein by reference the above paragraphs as though fully set forth herein.

36. Plaintiff is informed and believes and thereon alleges that the multiple illegal acts alleged herein were perpetuated by Defendant, and said acts satisfy the criteria for unfair and illegal business practices under California Business and Professions Code section 17200, et seq.

37. These practices include, but are not limited to the following: failing to and refusing to pay wages due in violation of Labor Code sections 201 and 202 at the time of Plaintiff's resignation, or after.

38. Plaintiff is therefore entitled to equitable relief, namely restitution, under California Business and Professions Code section 17200, et seq., and injunctive relief compelling Defendant to immediately cease and desist all illegal activities described herein.

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101

**PRAYER**

WHEREFORE, Plaintiff prays for judgment against defendants as follows:

**ON THE FIRST, THIRD, AND FOURTH CAUSES OF ACTION**

1. For compensatory damages, including, but not limited to, lost wages and employment benefits, *inter alia*, in an amount in excess of $100,000;

**ON THE FIRST AND SECOND CAUSES OF ACTION**

2. For reasonable attorneys' fees pursuant to Labor Code section 218.5 according to proof;

**ON THE SECOND CAUSE OF ACTION**

3. For penalties pursuant to Labor Code section 203 of approximately $25,000;

**ON THE THIRD CAUSE OF ACTION**

4. For punitive damages according to proof at trial;

///

///

## ON THE FOURTH CAUSE OF ACTION

5. For an injunction causing defendants to immediately cease and desist all unfair and illegal business activities, and to disgorge, and pay Plaintiff all wages earned and retained by defendants, and each of them, during perpetration of such activities;

## ON ALL CAUSES OF ACTION

6. For interest at the legal rate;
7. For costs of suit; and
8. For such other legal and/or equitable relief as the court deems just and proper.

Dated: April 2, 2007

HARRISON PATTERSON & O'CONNOR LLP

By: [signature]
James R. Patterson
Harry W. Harrison
Attorneys For Plaintiff SONJA D'ANNEO

HARRISON PATTERSON & O'CONNOR LLP
402 West Broadway
Suite 1905
San Diego, CA 92101



2-44

SEDGWICK
DETERT, MORAN & ARNOLD LLP

One Market Plaza
Steuart Tower, 8th Floor
San Francisco, California 94105
Tel: 415.781.7900 Fax: 415.781.2635

www.sdma.com

December 13, 2007

VIA US MAIL AND FACSIMILE

M. Patricia Welling, Esq.
General Counsel
**LENDER SUPPORT SYSTEMS, INC.**
13475 Danielson Street, #220
Poway, California 92064

**Re:** ***Sonja D'Anneo v. Lender Support Systems, Inc., et al.***
**San Diego Superior Court Case No.: 37-2007-00064417-CU-OE-CTL**
**Insured: Lender Support Systems, Inc.**
**Claimant: Sonja D'Anneo**
**Policy No.: PHSD222905**
**Claim No.: 289131**
**Our File No.: 0875-010964**

Dear Ms. Welling:

Our firm has been retained by Philadelphia Indemnity Insurance Company ("Philadelphia") to assist in its investigation of the referenced matter. After careful consideration, for the reasons expressed herein, Philadelphia has determined that coverage is not available for the claims asserted in the *D'Anneo* action.

We understand that you are the person to whom Philadelphia should be communicating this information. If we are mistaken and we should be communicating this information to someone else, please advise us as soon as possible of that person's name and contact information.

Should you or any insured believe that Philadelphia's analysis is in error, Philadelphia will consider any additional documentation or information which might be provided. Any such additional information or documentation should be forwarded to our attention.

SF/1470827v1

## POLICY INFORMATION

Philadelphia issued Private Company Protection Plus Policy No. PHSD222905 to Lender Support Systems, Inc. ("LSSI"), effective January 6, 2007 to January 6, 2008 (the "Policy"). The Policy provides Part 2 Employment Practices Liability with a limit of liability of $1,000,000 for each policy period, subject to a $25,000 retention per claim. The retention is waived upon a finding of no liability. Pursuant to the Entrepreneurs Pro-Pak Elite Coverage Endorsement, defense costs are in addition to, not part of, the limit of liability.

The Policy provides a duty to defend upon request of the insured. LSSI has chosen not to tender this matter to Philadelphia and instead is seeking reimbursement of defense costs, less retention, from the date of tender going forward.

## CLAIM SUMMARY

Philadelphia provides the following summary based on its understanding of the facts and circumstances at issue. If you believe Philadelphia is mistaken in its understanding, please let us know of any necessary corrections at your earliest convenience. By providing this summary, Philadelphia does not intend to suggest that any of the allegations identified below are true.

On April 2, 2007, Sonja D'Anneo ("D'Anneo" or "plaintiff") filed a complaint against LSSI in San Diego Superior Court entitled *Sonja D'Anneo v. Lender Support Systems, Inc., et al.* (Case No. 37-3007-00064417-CU-OE-CTL.) (the "*D'Anneo* action").

In her complaint, D'Anneo alleges LSSI failed or refused to pay her "wages," including bonus money "earned." Specifically, D'Anneo contends she agreed to join LSSI expecting and relying on LSSI's promise to pay her an achievable bonus totaling at least $100,000. D'Anneo alleges LSSI promised to pay her $50,000 so long as she performed in a satisfactory manner and met readily achievable goals. She further alleges LSSI promised to pay her an additional bonus equal to 10% of any sales she generated, projected to be at least $50,000 of additional bonus money.

Soon after her employment began, D'Anneo contends the scope of her employment was changed from a position with substantial opportunity to generate new client sales, to a position which focused on retaining and generating revenue from existing clients.

After D'Anneo's one year review, she alleges LSSI had paid only $30,000 of her $50,000 performance bonus. Plaintiff contends it wasn't fair for LSSI to change her job scope in such a way that she could not earn the projected $50,000 sales bonus she was promised. She claims the Insured then offered to pay an additional $12,500 of the performance bonus but refused to pay any part of the $50,000 sales bonus.

The complaint contains causes of action for: (1) violation of California Labor Code ("Labor Code") §§ 201 and 202; (2) penalties under Labor Code § 203; (3) Conversion; and (4) violation of California Business & Professions Code § 17200 *et seq.* ("Section 17200").

Plaintiff alleges that LSSI violated Labor Code §§ 201 and 202 by failing or refusing to pay her wages due, including bonus money, at her time of departure as required by Labor Code § 204. She seeks civil penalties pursuant to Labor Code § 210, costs and attorneys fees pursuant to Labor Code §218.5 and interest due on all unpaid wages pursuant to Labor Code § 281.6. Plaintiff further seeks waiting time penalties under Labor Code § 203 for LSSI's failure to timely pay wages at the time of discharge of employment.

Plaintiff's Third Cause of Action contends that LSSI was aware and admitted that she was owned additional bonus money at the time of her departure and made a conscious decision to use the wages owed as leverage to induce plaintiff into entering into a Settlement Agreement entitling her to punitive damages.

Finally, plaintiff alleges that LSSI's conduct constitutes an unfair and unlawful business practice in violation of Section 17200 entitling her to equitable relief in the form of restitution.

By her complaint, plaintiff seeks to recover compensatory damages including, but not limited to, lost wages and employment benefits in an amount in excess of $100,000; reasonable attorneys' fees; waiting time penalties in the amount of $25,000; punitive damages; injunctive relief ordering LSSI to cease and desist all unfair and illegal business activities, restitution and disgorgement of wages earned and retained by LSSI during unlawful and illegal business activities; interest; costs of suit; and any other legal and/or equitable relief the court deems just and proper.

## COVERAGE ANALYSIS

### A. Policy Provisions

#### 1. Insuring Agreement

Part 2.I. of the Policy provides Employment Practices Liability coverage as follows:

> The **Underwriter** shall pay on behalf of the **Insured, Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act.**

2. **Employment Practice Act**

Part 2.II.A. of the Policy, as amended by the Third Party EPLI Exclusion endorsement, defines "Employment Practice Act" to include, in pertinent part:

> breach of a written or oral employment contract or implied employment contract; employment related misrepresentation; ... wrongful deprivation of a career opportunity; ... [or] violation of any federal, state or local civil rights laws ... committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or **Organization**.

The *D'Anneo* alleges an Employment Practice Act which took place before or during the policy period.

3. **Claim and Notice**

Pursuant to Part 4.B.2. of the Policy, the *D'Anneo* action, a judicial or civil proceeding commenced by the filing of a complaint, qualifies as a Claim that was timely noticed to Philadelphia.

**B. Exclusion B - FLSA Exclusion**

Part 2.III.B. of the Policy, as amended by the Amendment of Exclusions endorsement, provides in pertinent part, that Philadelphia will not be liable to make any payment for Loss in connection with any Claim made against the Insured:

> for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by ... the Fair Labor Standards Act ... any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory or common law ... provided further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** ... including, but not limited to ... any unfair business practice claim alleged because of failure to pay **Earned Wages** .... 

"Earned Wages" is defined as "wages or overtime pay for services rendered."

1. **No Coverage Because Bonus Money Qualifies as "Wages"**

Section 200 of the California Labor Code provides that "'[w]ages' includes all amounts for labor performed by employees of every description, whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation." Lab. Code § 200(a). Likewise, the California Division of Labor Standards Enforcement offers the following definition of "bonus" in its "Glossary"[1]:

> Money promised to an employee in addition to the monthly salary, hourly wage, commission or piece rate usually due as compensation. Bonuses are in addition to any other remuneration rate and may be predicated on performance over and above that which is paid for hours worked, pieces made, or sales completed. . . . Sums earned as bonuses are wages under the definition found in Labor Code Section 200.

Plaintiff alleges that LSSI failed or refused to pay "wages" owed in the form of bonus money earned by performing satisfactorily and/or meeting all agreed-to conditions. Bonus money constitutes "Earned Wages" as defined by the Policy and is precluded from coverage under the FLSA Exclusion.

With respect to the sales bonus, LSSI argues that because plaintiff does not contend she "earned" the projected $50,000 sales bonus, at least that portion of the bonus does not qualify as Earned Wages as defined by the Policy. LSSI points to plaintiff's allegation that "it was not fair for LSSI to change her job scope in such a way that she could not earn the projected $50,000 sales bonus she was promised." (Complaint, ¶9, lines 14-16.)

However, while the complaint contends that D'Anneo "was promised the opportunity to earn bonus money projected to be at least $100,000 annually for satisfactory performance" it also alleges that during her employment, she "performed all work requested of her in a satisfactory manner." (Complaint, ¶18, lines 26-27; ¶19, lines 1-2.) Plaintiff further alleges "she felt it was not fair that she was not getting her sales bonus despite the fact that she had generated a substantial amount of sales[.]" (Complaint, ¶10, lines 19-20). Finally, other than the single reference to the deprivation of an opportunity to earn the sales bonus, plaintiff makes no distinction in the complaint between wages owed to her under the performance bonus as opposed to the sales bonus.

---

[1] The glossary is available at http://www.dir.ca.gov/dlse/Glossary.asp.

Plaintiff alleges she performed *all work* requested in a satisfactory manner, including generating a substantial amount of sales. It appears plaintiff does, in fact, contend she "earned" both the performance and sales bonuses. Plaintiff could not reach the $100,000 amount alleged in paragraph 18 of the complaint without including both the $50,000 performance bonus and the $50,000 sales bonus. But regardless of whether plaintiff alleges or differentiates between performance and sales bonuses, they nevertheless remain bonuses which are "wages" under state law, and are excluded from coverage.

**2. No Coverage for Labor Code Causes of Action**

Title 29 U.S.C.A. Chapter 8, sections 201-216, comprise a federal statute known as the Fair Labor Standards Act of 1938 ("FLSA"). The central purpose of the FLSA is to achieve certain minimum labor standards. *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288 (S.C. 1960). The Labor Code regulates labor (wages, hours and working conditions) on a state level.

The Labor Code regulates the same general subject matter as the FLSA, and was created to protect certain classes of workers from working too many hours, at too low a wage, in poor working conditions. Thus, the Labor Code is state law which is similar to the FLSA. Therefore, Philadelphia respectfully reserve the right to deny coverage on this basis.

**C. No Coverage for Conversion Cause of Action**

Plaintiff's Third Cause of Action for Conversion connotes restitution of ill gotten gains. Restitution is not an insurable damage. *Bank of the West v. Sup. Ct. of Contra Costa County*, 2 Cal.4th 1254, 1260 (Cal. 1992) ("it is well established that one may not insure against the risk of being ordered to return money or property that has been wrongfully acquired.") Id. at 1266. As such, there can be no coverage for plaintiff's Conversion Cause of Action.

**D. No Coverage For Section 17200 Claims**

The Fourth Cause of Action asserts that LSSI's violations of Labor Code §§ 201 and 202 constitute unfair and unlawful business practices in violation of Section 17200. The FLSA Exclusion expressly precludes coverage for unfair business practices involving Earned Wages.

Further, the Policy's definition of Loss excludes from coverage "matters deemed uninsurable under the law to which this Policy shall be construed." The only non-punitive monetary relief available under Section 17200 is restitution – which is uninsurable under California law. *Bank of the West v. Sup. Ct. of Contra Costa County*, 2 Cal.4th 1254, 1266. As such, there can be no coverage for any relief awarded under Section 17200.

E. **Other Potentially Relevant Policy Provisions**

While Philadelphia believes that the FLSA Exclusion is dispositive of coverage for the *D'Anneo* action, below we identify other potentially relevant exclusions, endorsements and definitions which may operate to otherwise preclude or limit coverage.

Plaintiff seeks restitution and injunctive relief pursuant to Section 17200. As stated previously, restitution is not an insurable loss under California law. Further, the definition of Loss also excludes injunctive relief.

Plaintiff's First Cause of Action seeks statutory penalties under Labor Code § 210. Plaintiff's Second Cause of Action seeks waiting time penalties under Labor Code § 203. The Policy's definition of Loss excludes from coverage "criminal or civil fines or penalties imposed by law." As such, there can be no coverage for statutory penalties.

California Insurance Code § 533 provides, in pertinent part, that "an insurer is not liable for a loss caused by the willful act of the insured." Similarly, California Civil Code § 1668 prohibits as against the policy of the law any contracts "which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent." Accordingly, should it be determined that LSSI's actions were deliberate or willful, California Insurance Code § 533 and California Civil Code § 1668 may limit or preclude coverage.

**RESERVATION OF RIGHTS**

The respective rights and obligations of Philadelphia and LSSI should be considered fully reserved under the Policy and applicable law. Philadelphia's evaluation is based on presently known facts and circumstances. Specification herein of coverage issues and reservations is not a waiver of other coverage rights and defenses which may exist in Philadelphia's favor or which may arise in the future. Philadelphia reserves it right to assert additional coverage or legal defenses as they may be ascertained.

**CONCLUSION**

If you believe Philadelphia's analysis is in any way incorrect or if you have any additional facts which you feel would alter its position, Philadelphia would be pleased to give this matter further consideration. LSSI is entitled to have the California Department of

Insurance review this coverage decision. The address and phone number are:

California Department of Insurance
300 South Spring Street
Los Angeles, CA 90013
(800) 927-4357

Please contact us with any questions, or if you wish to discuss this matter further.

Very truly yours,

SEDGWICK, DETERT, MORAN & ARNOLD LLP

Martin J. O'Leary
Erin J. Volkmar

MJO/EJV

**U.S. Department of Labor**
**Employment Standards Administration**





# Wage and Hour Division (WHD)

Printer-Friendly Version



WHD U.S. Wage and Hour Division

To promote and achieve compliance with labor standards to protect and enhance the welfare of the nation's workforce.



## Compliance Assistance - Fair Labor Standards Act (FLSA)

### Overview

The FLSA establishes minimum wage, overtime pay, recordkeeping, and youth employment standards affecting employees in the private sector and in Federal, State, and local governments. Covered nonexempt workers are entitled to a minimum wage of not less than $5.85 per hour effective July 24, 2007; $6.55 per hour effective July 24, 2008; and $7.25 per hour effective July 24, 2009. Overtime pay at a rate not less than one and one-half times the regular rate of pay is required after 40 hours of work in a workweek.

- FLSA Minimum Wage: The federal minimum wage is $5.85 per hour effective July 24, 2007; $6.55 per hour effective July 24, 2008; and $7.25 per hour effective July 24, 2009. Many states also have minimum wage laws. In cases where an employee is subject to both state and federal minimum wage laws, the employee is entitled to the higher minimum wage.
- FLSA Overtime: Covered nonexempt employees must receive overtime pay for hours worked over 40 per workweek (any fixed and regularly recurring period of 168 hours — seven consecutive 24-hour periods) at a rate not less than one and one-half times the regular rate of pay. There is no limit on the number of hours employees 16 years or older may work in any workweek. The FLSA does not require overtime pay for work on weekends, holidays, or regular days of rest, unless overtime is worked on such days.
- Hours Worked (PDF): Hours worked ordinarily include all the time during which an employee is required to be on the employer's premises, on duty, or at a prescribed workplace.
- Recordkeeping (PDF): Employers must display an official poster outlining the requirements of the FLSA. Employers must also keep employee time and pay records.
- Youth Employment: These provisions are designed to protect the educational opportunities of minors and prohibit their employment in jobs and under conditions detrimental to their health or well-being.

### General Guidance

- Handy Reference Guide to the FLSA
- Fact Sheets
- Employment Law Guide: Minimum Wage and Overtime Pay
- Questions and Answers about the FLSA

### Posters

- FLSA Minimum Wage Poster
  - Spanish Version
  - Chinese Version (PDF)
  - Russian Version (PDF)
  - Thai Version (PDF)

EXHIBIT 4
4-53

- Additional FLSA Posters

## Interpretive Guidance

- Opinion Letters
- Field Handbook
- Field Bulletins

## E-tools

- The Coverage and Employment Status Advisor helps identify which workers are employees covered by the FLSA.
- The Hours Worked Advisor provides information to help determine which hours spent in work-related activities are considered FLSA "hours worked" and therefore must be paid.
- The Overtime Security Advisor helps determine which employees are exempt from the FLSA minimum wage and overtime pay requirements under the Part 541 overtime regulations.
- The Overtime Calculator Advisor computes the amount of overtime pay due in a sample pay period based on information from the user.
- The Child Labor Rules Advisor answers questions about the FLSA's youth employment provisions, including at what age young people can work and the jobs they can perform.
- The Section 14(c) Advisor helps users understand the special minimum wage requirements for workers with disabilities.

## Presentations

- Comprehensive FLSA Presentation (Microsoft® PowerPoint®)
- Executive, Administrative, and Professional Exemption Presentation (Microsoft® PowerPoint®)

## Applicable Laws and Regulations

- **Law**
  - The FLSA (PDF)
- **Regulations**
  - 29 CFR Chapter V



**U.S. Department of Labor**
Frances Perkins Building
200 Constitution Avenue, NW
Washington, DC 20210

**1-866-4-USA-DOL**
TTY: 1-877-889-5627
**Contact Us**

4-54

| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF CALIFORNIA | | FOR COURT USE ONLY |
|---|---|---|
| **TITLE OF CASE (Abbreviated)**<br>**Lender Support Systems, Inc. v. Philadelphia Indemnity Ins. Co.** | | |
| **ATTORNEY(S) NAME AND ADDRESS**<br>HARRIS I. STEINBERG<br>LEVINE, STEINBERG, MILLER & HUVER<br>550 West "C" Street, Suite 1810<br>San Diego, California 92101 | **TELEPHONE**<br>(619) 231-9449 | |
| ATTORNEY(S) FOR: Plaintiff | HEARING: DATE-TIME-DEPT | Case No.: **08-CV-0848-WQH (BLM)** |

I, Harris Steinberg, caused the attorney(s) on the service list to be served via the Court's electronic filing system per local Rule 5.4.

On July17, 2008 I served the following document(s) described as:

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT;
MEMORANDUM OF POINTS AND AUTHORITIES;
DECLARATION OF GREG MARTIN;
DECLARATION OF HARRIS I. STEINBERG

| | |
|---|---|
| Brian D. Harrison, Esq.<br>brian.harrison@sdma.com | Attorney for Defendant Philadelphia Indemnity Ins. Company |
| quintella.griffin@sdma.com | |

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 17th day of July 2008 at San Diego, California.

/s/ Harris Steinberg