# Exhibit 1

## Philadelphia Indemnity Insurance Company

(A Stock Company founded in 1927)
One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004
1-800-759-4961

# Commercial Lines Policy

THIS POLICY CONSISTS OF:

- DECLARATIONS
- COMMON POLICY CONDITIONS
- ONE OR MORE COVERAGE PARTS. A COVERAGE PART CONSISTS OF:
  - ONE OR MORE COVERAGE FORMS
  - APPLICABLE FORMS AND ENDORSEMENTS

**POL 001**

BJP-190-1 (12-98)

**IN WITNESS WHEREOF**, we have caused this policy to be executed and attested, and, if required by state law, this policy shall not be valid unless countersigned by our authorized representative.

President

Secretary

**POL 002**

BJP-190-1 (12-98)

# Loss Control Notice

Welcome to PIC Loss Control Services. PIC is familiar with the unique loss control programming needs of your organization and has achieved superior results in this area. We are committed to delivering quality and timely loss prevention services and risk control products to your organization. Customer satisfaction through the delivery of these quality professional products to achieve measurable risk improvement results is our goal. We know the fulfillment of the loss control commitment is not complete until we deliver upon our promises.

Our product specific service capabilities follow on the next few pages. They include a multi-faceted approach to risk management covering safety program development, site audits, and training (including a new interactive web-based training). We offer a wide range of products and value-added services at no cost to help you achieve your risk management goals.

Please take a moment to register for our website @ *www.losscontrol.com* to gain full access to these resources. Please assign yourself your own username and password. Your registration request will be processed within two business days.

We look forward to helping to make your insurance program a success. We are standing by if you have any questions or if we may be of further assistance. Please contact us at:

Jeffrey M. Collins, AVP & Director
Loss Control Department
Phone: 610-617-7717
E-Mail: jcollins@phlyins.com

Mark A. Konchan, Manager
Loss Control Department
Phone: 610-538-2967
E-Mail: mkonchan@phlyins.com

# PIC LOSS CONTROL SERVICES

## TOTAL SOLUTION TO YOUR RISK MANAGEMENT NEEDS




**OUR MISSION:** *"We welcome the opportunity to demonstrate how we can tailor a program suitable for our customers needs. We are committed to providing our customer, with improved communications, quicker implementation of loss control servicing initiatives, and an improved identity towards the needs of our consumers."*

**We provide customized loss control consultation services to the following products:**

Protect your business with PIC Loss Control Services. Keep costs down by choosing Loss Control Programs specific to your industry and exposures. We'll show you how to implement Risk Management Programs and Client Training Services that get results.

| | |
|---|---|
| • Day Cares & Day Camps | • Mobile Home Parks |
| • Boat Dealers | • Municipalities |
| • Bowling Centers | • Non-Profit & For-Profit Agencies |
| • Guides & Outfitters | • Office Buildings, Real Estate, Shopping Centers |
| • Health & Fitness Clubs, Wellness Centers | • Residential Occupancies (Apartments, Condominiums, Home Owners Associations) |
| • Health Care Industry (Nursing Homes, Assisted Living, Hospitals) | • School Districts, Specialty Schools, Colleges and Universities |
| • Hotels | • Social Services Agencies |
| • Mental Health Services | • Sports Arenas, Ice Arenas & Recreation Centers |

**Benefits of our Service:**

- **National coverage with no limitations to territory.**
- **Clients can register for our website *www.losscontrol.com* to access our comprehensive online resources at no cost.**
- **Large network of loss control and risk management professionals with expertise in all aspects of Risk Management.**
- Superior level of Quality and timely risk assessment and loss prevention services.
- Tailor a risk management program suitable for your needs

5/4/2005

**POL 004**

## SAFETY MANAGEMENT RESOURCES:




PureSafety : This **interactive online defensive driver training course** is designed to teach the driver how to minimize the risks involved with driving any type of vehicle, and how to avoid dangerous driving situations and improper driving techniques. These are things everyone should know how to do, both on and off the job. This can be accessed through *www.losscontrol.com* at no cost to PIC policyholders. A final exam and completion certificate are also available online.




yourHRdepartment The Way to Work Today

**Web-enabled EPLI Risk Management Services.** YourHRdepartment, Inc™ provides FREE HR training programs and other materials to all EPL Policyholders to assist the policyholders in reducing their exposure to employment practices liability. This can be accessed through *www.losscontrol.com*.

**SafetyFirst**

SAFETY IS MY GOAL 9999Z
1-888-550-SAFE
*Your Comments Welcome*

**Driver Monitoring Program.** - SafetyFirst Systems, LLC ("SafetyFirst") provides a vehicle driver monitoring system uniquely geared to the transportation industry. SafetyFirst's primary product is a driver performance feedback service that highlights risk-taking behaviors. Independent studies by major insurance companies have shown a 20-65% reduction in collisions when information developed by the program is used to coach drivers on their performance and influence a behavior change. "1-800-550-SAFE" decals are placed on rear of commercial vehicles (vans, pickups, delivery trucks, tractor trailers, etc.) that encourage motorists to report risk-taking behaviors. Calls are received at staffed, 'round the clock (24/7/365), dedicated call center for documentation and reporting to the client for management review.

http://www.phly.com/home/products/losscontrol.asp

WEMED

Loss Control Hotline

**WEMED Loss Assistance Hotline** - Philadelphia Insurance Companies (PIC) has partnered with nationally recognized law firm Wilson, Elser, Moskowitz, Edelman and Dicker LLP to offer a Loss Assistance Hotline. This hotline provides policyholders with 2 free hours of legal consultation with knowledgeable attorneys on any matter that could potentially result in a claim under your PIC policy. This loss assistance hotline is NOT a loss reporting hotline. Please visit *www.losscontrol.com* for full details including contact information.

**You can also contact WEMED online to inquire about loss assistance by visiting the following website:** WEMED Loss Assistance Hotline.

5/4/2005

## STRATEGIC ALLIANCES:



These services are pre-negotiated arrangements with "Best in Class" vendors and provide solutions to your human resources and risk management needs. PIC does not receive any revenue from these alliances.

**IntelliCorp**

**IntelliCorp Records, Inc.** - IntelliCorp Records, Inc., an affiliate of the Insurance Services Offices (ISO), is the leading provider of innovative decision-support products for employment and background checks and offers the best screening tools in the industry. IntelliCorp offers a wide range of innovative pre-employment verification and screening services, including criminal background checks, previous employment and education references, motor vehicle records and more.

As a PIC client, you receive the value-added benefit of reduced pricing and access to the largest criminal history database available. IntelliCorp provides customers with industry leading information solutions enabling them to make better decisions. No other provider gets you closer to the comprehensive, timely and accurate data you need. Your organization will avoid costly hiring and recruiting mistakes and limit exposure to risk litigation. You can access IntelliCorp's employment solutions by visiting www.losscontrol.com. Please make certain you have your Policy Number available. Some of the information available includes:

| | | |
|---|---|---|
| Workers compensation records | Nationwide criminal records searches | Single-county court searches |
| Education verification | Criminal Super Search - 50 states of criminal record data | Federal criminal records search in all U.S. district courts |
| Employment verification | Arrest and booking records | Motor vehicle records - all 50 states |
| Personnel assessments | Statewide criminal searches | Social Security number verification |
| Drug testing | Civil court records | Credit reports |

**Getting started:**

1. Click on "Total Solution Pre-Employment Verification, Screening Services, and Motor Vehicle Record Checks" located on the front page of www.losscontrol.com.
2. Enter promotion code **PHLY**
3. As part of the activation process, you'll need to submit a photocopy of one of these documents:
   - Business license
   - Vendor license
   - Federal identification number (on a legal/government document)
4. The system will invoice you when you register. You can pay by monthly invoice or credit card. If you choose monthly invoicing, you must complete our Credit Authorization Form. You can submit the form on-line during the

registration process or fax it to 440-505-0261. IntelliCorp submits all invoices through e-mail and will invoice you on the first business day after the end of the month. If you pay by credit card, you'll receive an e-mail statement.

your HR department.com *The Way To Work Today*

**YourHRdepartment, Inc.** - offers a full-service Human Resources Management program, including HR consulting services, to Philadelphia Insurance Company (PIC) policyholders.

**PIC clients are entitled to the below benefits at no additional cost:**

- Monthly HR newsletters (by e-mail) covering both federal and state employment law news to help you comply with ever-changing employment laws
- On-line HR training programs, including Anti-Harassment/Discrimination; Hiring; HIPAA; Privacy in the Workplace; Progressive Discipline; and Termination
- HR Self-Audit Checklists to quickly spot HR landmines

**Additional HR services available at 15% discount:**

- YourHRassistant™ (Internet-based HR management)
- Employee handbooks
- HR management forms
- Full-service HR consulting
- HR telephone support by HR experts
- Other consulting services

Access to all services are available through *www.losscontrol.com*.

## POLICYHOLDER NOTICE (LOSS ASSISTANCE HOTLINE)

We are pleased to enclose an original copy of your policy. Please take a moment to review the policy to ensure it meets your needs.

Please feel free to contact our local sales representatives or our customer service unit at 877-GET-PHLY, if you need further assistance.

As a free loss control benefit to our policyholders, Philadelphia Insurance Companies (PIC) has partnered with a nationally recognized law firm Wilson, Elser, Moskowitz, Edelman and Dicker LLP (WEMED), to offer a toll-free **Loss Assistance Hotline**. The toll-free loss assistance hotline telephone number is **1-877-742-2201**. You can also contact a WEMED attorney online at either of the following internet addresses: **http://www.wemed.com/pic/ or <http://www.losscontrol.com> .** This hotline provides policyholders 2 free hours of legal consultation with a knowledgeable attorney on any matter that could potentially result in a claim under your PIC policy. This loss assistance hotline is **NOT** a loss reporting hotline. To report a claim, read the claim reporting instructions in your Policy, or ask your agent. If you have questions concerning the loss assistance hotline, please contact us at 1-800-759-4961 x7717.

The Philadelphia Insurance Companies thanks you for choosing us to meet your insurance needs.

Sincerely,

Philadelphia Insurance Companies

**POL 009**

# Philadelphia Insurance Companies

One Bala Plaza, Suite 100, Bala Cynwyd, Pennsylvania 19004

Philadelphia Indemnity Insurance Company

## COMMON POLICY DECLARATIONS

**Policy Number:** PHSD222905

**Named Insured and Mailing Address:**
Lender Support Systems, Inc.
13475 Danielson Street #220
Poway, CA 92064

**Producer:** 21572
Anderson & Murison
800 West Colorado Blvd.
Los Angeles, CA, 90041

**Policy Period From:** 01/06/2007 **To:** 01/06/2008

at 12:01 A.M. Standard Time at your mailing address shown above.

**Business Description:** For Profit Organization

IN RETURN FOR THE PAYMENT OF THE PREMIUM, AND SUBJECT TO ALL THE TERMS OF THIS POLICY, WE AGREE WITH YOU TO PROVIDE THE INSURANCE AS STATED IN THIS POLICY.

THIS POLICY CONSISTS OF THE FOLLOWING COVERAGE PARTS FOR WHICH A PREMIUM IS INDICATED. THIS PREMIUM MAY BE SUBJECT TO ADJUSTMENT.

| | **PREMIUM** |
|---|---|
| Commercial Property Coverage Part | |
| Commercial General Liability Coverage Part | |
| Commercial Crime Coverage Part | |
| Commercial Inland Marine Coverage Part | |
| Commercial Auto Coverage Part | |
| Businessowners | |
| Workers Compensation | |
| Private Company Protection | 7,333.00 |
| **Total** | **$ 7,333.00** |

**FORM (S) AND ENDORSEMENT (S) MADE A PART OF THIS POLICY AT THE TIME OF ISSUE**
**Refer To Forms Schedule**

*Omits applicable Forms and Endorsements if shown in specific Coverage Part/Coverage Form Declarations

Countersignature Date

Authorized Representative



POL 010

Philadelphia Indemnity Insurance Company

## Form Schedule – Policy

**Policy Number:** PHSD222905

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| BJP-190-1 | 1298 | Commercial Lines Policy Jacket |
| LAH-Notice | 1002 | Policyholder Notice (Loss Assistance Hotline) |
| Common Policy Dec | 0100 | Common Policy Declarations |
| PP 0701 | 0701 | Privacy Policy Notice |
| IL0985 | 0103 | Disclosure Pursuant to Terrorism Risk Ins Act of 2002 |

PI-PRD-1 (09/02)

## Private Company Protection Plus

DIRECTORS AND OFFICERS & PRIVATE COMPANY LIABILITY
EMPLOYMENT PRACTICES LIABILITY INSURANCE
FIDUCIARY LIABILITY INSURANCE

[X] Philadelphia Indemnity Insurance Company    [ ] Philadelphia Insurance Company

Policy Number: PHSD222905

DECLARATIONS

**NOTICE: EXCEPT TO SUCH EXTENT AS MAY OTHERWISE BE PROVIDED HEREIN, THIS POLICY IS WRITTEN ON A CLAIMS MADE BASIS AND COVERS ONLY THOSE CLAIMS FIRST MADE DURING THE POLICY PERIOD AND REPORTED IN WRITING TO THE INSURER PURSUANT TO THE TERMS HEREIN. THE AMOUNTS INCURRED FOR DEFENSE COST SHALL BE APPLIED AGAINST THE RETENTION.**

Item 1. Private Company Name and Address:
Lender Support Systems, Inc.
13475 Danielson Street #220
Poway, CA 92064

Internet Address: www. n/a

Item 2. Policy Period: From: 01/06/2007 To: 01/06/2008
(12:01 A.M. local time at the address shown in Item 1.)

Item 3. Limits of Liability:

| | | | |
|---|---|---|---|
| (A) | Part 1, D&O Liability: | $ | 1,000,000 each Policy Period. |
| (B) | Part 2, Employment Practices: | $ | 1,000,000 each Policy Period. |
| (C) | Part 3, Fiduciary Liability: | $ | each Policy Period. |
| (D) | Aggregate, All Parts: | $ | 1,000,000 each Policy Period. |

Item 4. Retention:

| | | | |
|---|---|---|---|
| (A) | Part 1, D&O Liability: | $ | 25,000 for each Claim under Insuring Agreement B & C. |
| | Private Offering: | $ | 25,000 for each Claim under Insuring Agreement B & C. |
| (B) | Part 2, Employment Practices: | $ | 25,000 for each Claim. |
| (C) | Part 3, Fiduciary Liability: | $ | for each Claim. |

Item 5. Prior and Pending Date: Part 1 01/06/2005 Part 2 01/06/2005 Part 3 No Date Applies

Item 6. Premium: Part 1 $ 3,682 Part 2 $ 3,651 Part 3

*Total Premium:* $ 7,333

Item 7. Endorsements: See Form List Attached

PI-PRD-1 (09/02)

In witness whereof, the Insurer issuing this Policy has caused this Policy to be signed by its authorized officers, but it shall not be valid unless also signed by the duly authorized representative of the Insurer.



| Authorized Representative | Countersignature | Countersignature Date |
|---|---|---|

Philadelphia Indemnity Insurance Company

## Form Schedule – Private Company Protection Plan

**Policy Number:** PHSD222905

Forms and Endorsements applying to this Coverage Part and made a part of this policy at time of issue:

| Form | Edition | Description |
|---|---|---|
| PI-PRD-1 | 0902 | Private Company Protection Plus Declarations |
| PI-BELL-1 | 0406 | Bell Endorsement |
| PI-PRD-2 | 0902 | Private Company Protection Plus Policy |
| PI-PRD-5 | 0902 | Professional Services Exclusion |
| PI-PRD-11 | 0902 | Aggregate Retention Endorsement |
| PI-PRD-19 | 0902 | Retention Waiver No Liability Endorsement |
| PI-PRD-20 | 0402 | Shareholder Exclusion |
| PI-PRD-35 | 0402 | Regulatory Exclusion (Securities Carve Back) |
| PI-PRD-38 | 0902 | Shared Limits Endorsement |
| PI-PRD-43 | 0902 | Third Party EPLI Exclusion |
| PI-PRD-48 | 0902 | Employers Shield Endorsement |
| PI-PRD-72 | 1003 | Entrepreneurs Pro-Pak Elite Coverage |
| PI-PRD-75 | 1203 | Amendment of Exclusions |
| PI-PL-CA | 0198 | California Amendatory Endorsement |
| PI-SLD-001 | 0103 | Cap on Losses from Certified Acts of Terrorism |

PP-0701 07-01

# PHILADELPHIA INSURANCE COMPANIES

# PRIVACY POLICY NOTICE

Philadelphia Insurance Company & Philadelphia Indemnity Insurance Company

The Philadelphia Insurance Companies values your privacy and we are committed to protecting personal information that we collect during the course of our business relationship.

The collection, use and disclosure of certain nonpublic personal information are regulated by law.

This notice is for your information only and requires no action on your part. It will inform you about the types of information we collect and how it may be disclosed. This does not reflect a change in the way we do business or handle your information.

## Information We Collect:

We collect personal information about you from the following sources:

- Applications or other forms such as claims forms or underwriting questionnaires completed by you;
- Information about your transactions with us, our affiliates or others; and
- Depending on the type of transaction you are conducting with us, information may be collected from consumer reporting agencies, health care providers, employers and other third parties.

## Information We Disclose:

We will only disclose the information described above, as permitted by law, to our affiliates and non-affiliated third parties when necessary to conduct our normal business activities.

For example, we may make disclosures to the following types of third parties:

- Your agent or broker;
- Parties who perform a business, professional or insurance function for our company, including our reinsurance companies;
- Independent claims adjusters, investigators, other insurers, medical care institutions and attorneys who need the information to investigate, defend or settle a claim involving you;
- Insurance regulatory agencies in connection with the regulation of our business; and
- Lienholders, mortgagees, lessors or other persons shown on our records as having legal or beneficial interest in your policy.

We do not sell your information to others for marketing purposes.
We do not disclose the personal information of persons who have ceased to be our customers.

## Protection of Information:

The Philadelphia Insurance Companies maintains physical, electronic and procedural safeguards that comply with state and federal regulations to protect the confidentiality of your personal information. We also limit employee access to personally identifiable information to those with a business reason for knowing such information.

## How to Contact Us:

Feel free to call or write to us for additional information.

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
(877)-438-7459

POLICY NUMBER: PHSD222905 IL 09 85 01 03

**THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF YOUR POLICY IN RESPONSE TO THE DISCLOSURE REQUIREMENTS OF THE TERRORISM RISK INSURANCE ACT OF 2002. THIS ENDORSEMENT DOES NOT GRANT ANY COVERAGE OR CHANGE THE TERMS AND CONDITIONS OF ANY COVERAGE UNDER THE POLICY.**

# DISCLOSURE PURSUANT TO TERRORISM RISK INSURANCE ACT OF 2002

**SCHEDULE***

| |
|---|
| **Terrorism Premium (Certified Acts)**<br>**$** 0<br><br>**Additional Information, if any, concerning the terrorism premium:** |
| * Information required to complete this Schedule, if not shown on this endorsement, will be shown in the Declarations. |

**A. Disclosure Of Premium**

In accordance with the federal Terrorism Risk Insurance Act of 2002, we are required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under that Act. The portion of your premium attributable to such coverage is shown in the Schedule of this endorsement or in the policy Declarations.

**B. Disclosure Of Federal Participation In Payment Of Terrorism Losses**

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals 90% of that portion of the amount of such insured losses that exceeds the applicable insurer retention.

**POL 016**

 © ISO Properties, Inc., 2003 

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# BELL ENDORSEMENT

Unless otherwise stated herein, the terms, conditions, exclusions and other limitations set forth in this endorsement are solely applicable to coverage afforded by this endorsement, and the policy is amended as follows:

## I. SCHEDULE OF ADDITIONAL COVERAGES AND LIMITS

The following is a summary of Limits of Insurance or Liability and/or additional coverages provided by this endorsement. This endorsement is subject to the provisions of the policy to which it is attached.

| | |
|---|---|
| Identity Theft Expense | $5,000 |
| Terrorism Travel Reimbursement | $5,000 |
| Emergency Real Estate Consulting Fee | $5,000 |
| Temporary Meeting Space Reimbursement | $5,000 |
| Workplace Violence Counseling | $5,000 |
| Kidnap Expense | $50,000 |
| Key Individual Replacement Expenses | $50,000 |
| Image Restoration and Counseling | $5,000 |
| Donation Assurance | $5,000 |
| Business Travel | $5,000 |

## II. CONDITIONS

### A. Applicability of Coverage

Coverage provided by your policy and any endorsements attached thereto is amended by this endorsement where applicable.

B. **Limits of Liability or Limits of Insurance**

1. When coverage is provided by this endorsement and another coverage form or endorsement attached to this policy, the greater limit of Limits of Liability or Limits of Insurance will apply. In no instance will multiple limits apply to coverages which may be duplicated within this policy. Additionally, If this policy and any other coverage part or policy issued to you by us, or any company affiliated with us, apply to the same occurrence, offense, wrongful act, accident or loss, the maximum Limits of Liability or Limit of Insurance under all such coverage parts or policies combined shall not exceed the highest applicable Limits of Liability or Limit of Insurance under any one coverage part or policy.

2. Limits of Liability or Limits of Insurance identified in Clause I. above are not excess of, but are in addition to the applicable Limits of Insurance stated in the Declarations.

C. **Claim Expenses**

Coverages provided herein are not applicable to the generation of claim adjustment costs by you; such as fees you may incur by retaining a public adjuster or appraiser.

**III. ADDITIONAL COVERAGES**

A. **Identity Theft Expense**

We will reimburse any present Director or Officer of the Named Insured, for "Identity Theft Expenses" incurred as the direct result of any "Identity Theft" first discovered and reported during the policy period; provided that it began to occur subsequent to the effective date of the Insured's first policy with the Company. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

B. **Terrorism Travel Reimbursement**

The Company will reimburse any present Director or Officer of the Named Insured in the event of a "Certified Act of Terrorism" during the policy period which necessitates that he/she incurs "Emergency Travel Expenses." The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

C. **Emergency Real Estate Consulting Fee**

The Company will reimburse the Insured any realtor's fee or real estate consultant's fee necessitated by the Insured's need to relocate due to the "Unforeseeable destruction" of the Insured's principal location listed on the Declarations page during the policy period. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

D. **Temporary Meeting Space Reimbursement**

The Company will reimburse the Insured for rental of meeting space which is

necessitated by the temporary unavailability of the Insured's primary office space due to the failure of a climate control system, or leakage of a hot water heater during the policy period. Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not insured under this policy. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

**E. Workplace Violence Counseling**

In the event that an incidence of "workplace violence" occurs at any of the Insured's premises during the policy period, the Company will reimburse the Insured for expenses incurred for the emotional counseling of employees of the Insured, during the policy period. The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

**F. Kidnap Expense**

The Company will pay on behalf of any Officer or Director of the Insured, reasonable fees incurred as a result of the kidnapping of them or their spouse, "domestic partner", parent or child during the policy period, subject to a limit of $50,000 each Policy Period, but not subject to any deductible. Coverage will not apply to any kidnapping by or at the direction of any present or former family member of the victim.

Reasonable fees will include:

1. fees and expenses of an independent negotiator or consultant retained with prior approval of the Company;

2. interest on any loan taken by the Named Insured to pay Damages covered under this Policy; provided, however, that the Company shall not be liable for any interest accruing prior to thirty (30) days preceding the date of such payment, nor subsequent to the date of reimbursement from the Company for any portion of damages recoverable under this Policy;

3. costs of travel and accommodations incurred by the Named Insured which become necessary due to the applicable kidnapping;

4. the reward paid by the Named Insured, which is pre-approved by the Company, to an informant for information not otherwise available which leads to the arrest and conviction of persons responsible for any damages under this Policy; and

5. current salary to an Officer or Director of the Insured who is kidnapped; provided, however, that the employee shall be held for more than thirty (30) days. Salary shall be paid for a period commencing upon abduction and ceasing upon the earliest of either the release of the employee or discovery of the death of the employee, or 120 days after the Company receives the last credible evidence that the employee is still alive, or twelve (12) months after the date of kidnapping, or the exhaustion of the kidnap expense limit, whichever comes first.

**G. Key Individual Replacement Expenses**

The Company will pay "Key Individual Replacement Expenses" if the Chief Executive Officer or Executive Director suffers an "injury" during the Policy Period which results in the loss of life during the Policy Period. The "Key Individual Replacement Expenses" amount shall be the lesser of $50,000 or ten (10) times the annual premium paid for this policy. No deductible applies to this coverage.

**H. Image Restoration and Counseling**

The Company shall reimburse to the Insured expenses incurred for image restoration and counseling arising out of "Improper Acts" by any natural person Insured up to a limit of $5,000 per Policy Period for all Insureds combined. Covered expenses are limited to:

1. the costs of rehabilitation and counseling for the accused natural person Insured provided the natural person Insured is not ultimately found guilty of criminal conduct, said reimbursement to occur after acquittal of the natural person Insured;

2. the costs, charged by a recruiter or expended on advertising, of replacing an Officer as a result of "Improper Acts"; and

3. the costs of restoring the Named Insured's reputation and consumer confidence through image consulting.

No deductible applies to this coverage.

**I. Donation Assurance**

The Company shall reimburse the insured for "Failed Donation Claim(s)". The limit for this coverage will be $5,000 per policy period for all Insureds combined. No deductible applies to this coverage.

With respect to any "Failed Donation Claim", it is further agreed as follows:

1. the donor must never have been in bankruptcy, nor have filed for bankruptcy/reorganization prior to the time said pledge was made to the Insured;

2. for non-cash donations, payment by the Insurer of a "Failed Donation Claim" shall be based on the fair market value of said non-cash donation at the time of the "Failed Donation Claim;"

3. in the case of unemployment/incapacitation of a natural person donor and as a condition of payment of the "Failed Donation Claim;"

   (a) neither the natural person donor nor the Insured shall have had reason to believe the donor would become unemployed or incapacitated subsequent to the donation date and;

   (b) the donor shall be unemployed for at least 60 days prior to the Insurer making payment;

4. no coverage shall be afforded for a written pledge of funds or other measurable

tangible property to the Insured dated prior to the Policy Period;

5. a donation amount which is to be collected by the Insured over more than a 12 month period shall be deemed a single donation.

**J. Business Travel**

The Company will pay a Business Travel Accidental Death Benefit to the Named Insured if a Director or Officer suffers an "injury" while traveling on a common carrier for business purposes during the Policy Period which results in loss of life not later than 180 days after the Policy Period expiration, the date of cancellation or the date of non-renewal. The Accidental Death Benefit amount shall be $5,000 per occurrence. No deductible applies to this coverage. The "injury" must be reported to the Company during the Policy Period.

The Business Travel Accidental Death Benefit shall not be payable if the cause of the "injury" that resulted in loss of life was:

1. an intentional act by the insured;
2. an act of suicide or attempted suicide, whether or not the deceased was sane or insane at the time of the attempted suicide;
3. an act of war;
4. a disease process.

**IV. Definitions**

A. "Certified Act of Terrorism", whenever used in this endorsement will mean any act so defined under the Terrorism Risk Insurance Act of 2002.

B. "Domestic Partner", whenever used in this endorsement means any person who qualifies as a domestic partner under the provisions of any federal, state or local statute or regulation, or under the terms and provisions of any employee benefit or other program established by the Named Insured.

C. "Emergency Travel Expenses", whenever used in this endorsement will mean:

1. hotel expenses incurred which directly result from the cancellation of a scheduled transport, by train or air, by a commercial transportation carrier resulting directly from and within forty-eight hours of a "Certified Act of Terrorism;" and
2. the increased amount incurred in air or train fare which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a "Certified Act of Terrorism."

D. "Failed Donation Claim", whenever used in this endorsement will mean written notice to the Insured during the Policy Period of:

1. the bankruptcy or reorganization of any donor whereby such bankruptcy or reorganization prevents the donor from honoring a prior written pledge of funds or other measurable tangible property to the Insured;

2. the unemployment or incapacitation of a natural person donor preventing him/her from honoring a prior written pledge of funds or other measurable tangible property to the Insured.

E. "Identity Theft ", whenever used in this endorsement means the act of knowingly transferring or using, without lawful authority, a means of identification of any Officer or Director (or spouse thereof) of the Named Insured with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

F. "Identity Theft Expenses", whenever used in this endorsement means:

1. costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies;

2. costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors;

3. loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

G. "Improper Acts", whenever used in this endorsement means any actual or alleged act of:

1. sexual abuse;

2. sexual intimacy;

3. sexual molestation; and/or

4. sexual assault;

committed by an Insured against any natural person who is not an Insured. Such "Improper Acts" must have been committed by the Insured while in his or her capacity as an insured.

H. "injury", whenever used in this endorsement means any physical damage to the body caused by violence, fracture or an accident that results in physical damage or hurt.

I. "Key Individual Replacement Expenses", whenever used in this endorsement means the following necessary expenses:

1. costs of advertising the employment position opening;

2. travel, lodging, meal and entertainment expenses incurred in interviewing job

applicants for the employment position opening; and

3. miscellaneous extra expenses incurred in finding, interviewing and negotiating with the job applicants, including, but not limited to, overtime pay, costs to verify the background and references of the applicants and legal expenses incurred to draw up employment contracts.

J. "Unforeseeable Destruction", whenever used in this endorsement means damage resulting from a "Certified Act of Terrorism", fire, crash or collapse which renders all of the Insured's primary office completely unusable.

K. "Workplace violence", whenever used in this endorsement means any intentional use of or threat to use deadly force by any natural person, with intent to cause harm and that results in bodily "injury" or death of a member of the Insured or any other natural person while on the Insured's premises.

# PRIVATE COMPANY PROTECTION PLUS

Directors and Officers & Private Company Liability Insurance
Employment Practices Liability Insurance
Fiduciary Liability Insurance

In consideration of the premium paid and in reliance upon all statements made and information furnished to the **Underwriter**, including all statements made in the **Application**, the **Underwriter** agrees to provide coverage as shown in the Declarations and described as follows:

## PART 1
## DIRECTORS & OFFICERS LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENTS

A. INDIVIDUAL LIABILITY COVERAGE

The **Underwriter** shall pay on behalf of the **Individual Insured, Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, except to the extent the **Private Company** has indemnified the **Individual Insured** for such **Loss.**

B. PRIVATE COMPANY INDEMNITY COVERAGE

The **Underwriter** shall pay on behalf of the **Private Company, Loss** from **Claims** made against **Individual Insureds** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for **D&O Wrongful Acts**, if the **Private Company** has indemnified such **Individual Insureds** for such **Loss**.

C. PRIVATE COMPANY LIABILITY COVERAGE

The **Underwriter** shall pay on behalf of the **Private Company**, **Loss** from **Claims** made against the **Private Company** during the **Policy Period** (or, if applicable, during the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **D&O Wrongful Act**.

II. DEFINITIONS

A. **D&O Wrongful Act** means any actual or alleged:

1. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured**; or

2. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by the **Private Company**; or

3. act, error, omission, misstatement, misleading statement, neglect, or breach of duty committed or attempted by an **Individual Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity**, but only:

a. if such service is at the written request or direction of the **Private Company**; and

b. if, at the time such service began, the **Individual Insured** did not know or could not have reasonably foreseen that such act, error, omission, misstatement, misleading statement, neglect, or breach of duty could lead to a **Claim** under this Policy.

B. **Outside Entity** means:

1. any not-for-profit entity described in section 501(c)(3) of the Internal Revenue Code of 1986 (as amended); or

2. any other entity listed as an **Outside Entity** in an endorsement to this Policy.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 1 to make any payment for **Loss** in connection with any **Claim** made against the **Private Company** under Insuring Agreement C:

A. arising out of, based upon or attributable to any actual or alleged plagiarism, infringement of copyright, patent, trademark, trade name, trade dress, service mark, title or slogan, piracy or misappropriation of ideas or trade secrets;

B. arising out of, based upon or attributable to any actual or alleged price fixing, restraint of trade, monopolization, unfair competition, or violation of the Federal Trade Commission Act, the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, the Hart-Scott-Rodino Anti-Trust Improvement Act or any other similar federal, state, or local statutory provision or common law anywhere in the world;

C. for any actual or alleged liability under any written or oral contract or agreement; however, this exclusion does not apply to any of the following:

1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

2. **Defense Costs**.

D. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

E. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act, Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law;

F. for any actual or alleged malfunction of any product or failure of any product to perform in any manner as a result of any defect, deficiency, inadequacy or dangerous condition in such product or in its design or manufacture;

G. arising out of, based upon or attributable to an **Employment Practices Act** or a **Fiduciary Liability Act**.

IV. PRESUMPTIVE INDEMNIFICATION

If the **Private Company** is permitted or required by common or statutory law, but fails to indemnify the **Individual Insured** for **Loss** (except by reason of its financial insolvency), any payment by the **Underwriter** of such **Loss** shall be subject to the Insuring Agreement C Retention Amount set forth in Item 4.(A) of the Declarations. The charter, by-laws, shareholder and board of director's resolutions of the **Private Company** shall be deemed to provide indemnification for such **Loss** to the fullest extent permitted by law.

## PART 2
## EMPLOYMENT PRACTICES LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for an **Employment Practice Act**.

II. DEFINITIONS

A. **Employment Practice Act** means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment;
2. breach of a written or oral employment contract or implied employment contract;
3. employment related misrepresentation;
4. wrongful failure to promote;
5. violation of employment discrimination laws (including harassment);
6. wrongful deprivation of a career opportunity;
7. employment related wrongful discipline;
8. negligent employee evaluation;
9. employment related invasion of privacy;
10. employment related defamation (including libel and slander);
11. sexual or workplace harassment of any kind;
12. constructive discharge of employment;
13. employment related **Retaliation**;
14. employment related humiliation;
15. wrongful demotion;
16. negligent reassignment;
17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

Solely with respect to any **Claim** brought by or on behalf of any **Third Party**, **Employment Practice Act** means any actual or alleged wrongful failure to employ, discrimination, sexual

harassment or violation of such **Third Party's** civil rights in relation to such wrongful failure to employ, discrimination or sexual harassment, whether direct, indirect, or unintentional, committed by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Private Company**.

B. **Retaliation** means retaliatory treatment against an **Individual Insured** on account of such individual:

1. exercising his or her rights under law, including but not limited to rights under any workers compensation laws, the Family and Medical Leave Act, or the Americans with Disabilities Act;

2. refusing to violate any law;

3. having assisted or testified in or cooperated with a proceeding or investigation regarding alleged violations of law by the **Insured**;

4. disclosing in writing to a superior or to any governmental agency any alleged violations of law;

5. filing any claim against the **Insured** under the Federal False Claims Act or any other similar "whistle blower" federal, state, or local law.

C. **Third Party** means any natural person who is an active or current customer, supplier, vendor, applicant, business invitee or other client of the **Private Company**.

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 2 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

B. for any actual or alleged violation of any of the responsibilities, obligations, or duties imposed by ERISA, the National Labor Relations Act (including the Labor Management Relations Act of 1947), Fair Labor Standards Act (except the Equal Pay Act ), Occupational Safety and Health Act, Consolidated Omnibus Budget Reconciliation Act of 1985, Worker Adjustment and Retraining Notification Act; or any amendments to or rules, regulations or orders promulgated pursuant to these laws, or similar provisions of any federal, state or local statutory or common law; however, this exclusion shall not apply to any **Claim** for **Retaliation**;

C. arising out of, based upon or attributable to a lockout, strike, picket line, replacement or other similar action resulting from labor disputes, labor negotiations, or collective bargaining agreements; provided that this exclusion will not apply to any **Claim** for **Retaliation**;

D. arising out of, based upon or attributable to obligations or payments owed under (i) an express (written or verbal) contract of employment, (ii) an agreement to make payments in the event of the termination of employment, or (iii) an agreement to assume another's liability; however, this exclusion does not apply to any of the following:

1. liability of the **Private Company** which would have attached even in the absence of such contract or agreement; or

2. **Defense Costs**;

E. to the extent such **Loss**, other than **Defense Costs**, constitutes employment-related benefits, stock options, perquisites, deferred compensation, payment of insurance, or any other type of compensation earned by the claimant in the course of employment or the equivalent value thereof; however, this exclusion shall not apply to front pay or back pay;

F. arising out of, based upon or attributable to a **D&O Wrongful Act** or a **Fiduciary Liability Act**.

## PART 3
## FIDUCIARY LIABILITY INSURANCE

(To be read in conjunction with the Common Policy Definitions, Exclusions and Conditions Sections, Part 4, 5, 6 below)

I. INSURING AGREEMENT

The **Underwriter** shall pay on behalf of the **Insured**, **Loss** from **Claims** made against the **Insured** during the **Policy Period** (or, if applicable, the Extended Reporting Period), and reported to the **Underwriter** pursuant to the terms of this Policy, for a **Fiduciary Liability Act**.

II. DEFINITIONS

A. **Administration** means: (i) giving counsel to **Employees**, beneficiaries or participants regarding any **Benefit Plan**, (ii) providing interpretations and handling records in connection with any **Benefit Plan**, or (iii) effecting enrollment, termination or cancellation of **Employees** or participants under any **Benefit Plan**.

B. **Benefit Plan** means:

1. any **Welfare Benefit Plan** which was, is now or becomes sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**;

2. any **Pension Benefit Plan** which was, on or prior to the effective date of this Policy, sponsored by the **Private Company** solely for the benefit of the **Employees** of the **Private Company**, provided that coverage was available in respect of such **Pension Benefit Plan** under any policy of which this Policy is a renewal or replacement and such **Pension Benefit Plan** has been reported in writing to the **Underwriter** as part of the **Application**;

3. any **Pension Benefit Plan** created or acquired (through merger, consolidation or otherwise) during the **Policy Period** by the **Insured** solely for the benefit of the **Employees** of the **Private Company**, but only upon the condition that within 90 days after such creation or acquisition, the **Insured** shall have (i) provided written notice to the **Underwriter** of such newly created **Pension Benefit Plan**, and (ii) agreed to any additional terms and paid any additional premium required by the **Underwriter** in its sole discretion;

4. any government-mandated benefit program for workers compensation, unemployment, social security or disability benefit for **Employees** of the **Private Company**.

However, **Benefit Plan** does not include any multi-employer plan.

Coverage for **Benefit Plans** which are sold, terminated or spun-off during or prior to the **Policy Period** shall apply only with respect to any **Fiduciary Liability Act** occurring prior to the date

of such sale or spin-off, or in the case of termination, prior to the final date of asset distribution of such **Benefit Plan**.

C. **Fiduciary Liability Act** means any actual or alleged:

1. breach by an **Insured** of the responsibilities, obligations or duties imposed upon fiduciaries of any **Benefit Plan** by **ERISA**; or

2. negligent act, error or omission by an **Insured** solely in the **Administration** of any **Benefit Plans**.

D. **Pension Benefit Plan** means any employee pension benefit plan, as defined in **ERISA**.

E. **Welfare Benefit Plan** means any employee welfare benefit plan, as defined in **ERISA.**

III. EXCLUSIONS

The **Underwriter** shall not be liable under this Part 3 to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to the actual or alleged failure to collect or fund contributions owed to any **Benefit Plan**; or for the return or reversion to any employer of any contribution to or asset of a **Benefit Plan**;

B. to the extent such **Loss** constitutes benefits due or to become due under a **Benefit Plan** or benefits which would be due under a **Benefit Plan** if its terms complied with all applicable law; however, this exclusion shall not apply to **Defense Costs**;

C. arising out of, based upon or attributable to any failure or omission to effect and maintain insurance or bonding for the property or assets of any **Benefit Plan**;

D. arising out of, based upon or attributable to any liability of others assumed by the **Insured** under any contract or agreement, other than any contract or agreement establishing a **Benefit Plan**.

E. arising out of, based upon or attributable to any failure to comply with any law concerning workers compensation, unemployment insurance, social security, disability benefits or any similar laws;

F. arising out of, based upon or attributable to an **Employment Practices Act** or a **D&O Wrongful Act**.

## PART 4
## COMMON POLICY DEFINITIONS

A. **Application** means:

1. the **Application** for this Policy, including any material submitted therewith; and

2. the **Application**(s), including any material submitted therewith, for all previous policies issued by the **Underwriter** of which this Policy is a direct or indirect renewal or replacement,

all of which shall be deemed a part of this Policy as if physically attached hereto.

B. **Claim** means:

1. a written demand for monetary or non-monetary relief;

2. a judicial or civil proceeding commenced by the service of a complaint or similar pleading;

3. a criminal proceeding commenced by a return of an indictment;

4. a formal administrative or regulatory proceeding commenced by the filing of a notice of charges, formal investigation order or similar document, including, but not limited to, proceedings before the Equal Employment Opportunity Commission or any similar governmental agency;

5. an arbitration or mediation or other alternative dispute resolution proceeding if the **Insured** is obligated to participate in such proceeding or if the **Insured** agrees to participate in such proceeding, with the **Underwriter's** written consent, such consent not to be unreasonably withheld;

6. solely with respect to Part 3 (Fiduciary Liability Insurance), a written notice of commencement of an investigation by the Department of Labor or the Pension Benefit Guaranty Corporation;

   against an **Insured** for a **Wrongful Act**, including any appeal therefrom; or

7. a written request received by an **Insured** to toll or waive a statute of limitations, relating to a potential **Claim** as described above.

However, **Claim** shall not include a labor or grievance proceeding pursuant to a collective bargaining agreement.

A **claim** shall be considered made when an **Insured** first receives notice of the **Claim**.

C. **Damages** means any monetary judgment (including any pre- and post- judgment interest thereon) or monetary settlement, including the punitive, exemplary or multiple portion of any judgment (to the extent such damage is insurable under law of any jurisdiction which has a substantial relationship to the **Insured** or to the **Claim** seeking such damage and which is most favorable to the insurability of such damage).

D. **Defense Costs** means:

1. any reasonable and necessary legal fees and expenses incurred in the defense of a **Claim,** whether by the **Insured** with the **Underwriter's** consent or directly by the **Underwriter**, in the investigation, adjustment, defense and appeal of a **Claim**, except that **Defense Costs** shall not include:

    a. any amounts incurred in defense of any **Claim** for which any other insurer has a duty to defend, regardless of whether or not such other insurer undertakes such duty; or

    b. salaries, wages, overhead or benefit expenses associated with any **Insured** except as specified in subparagraph 2. below; or

    c. salaries, wages, overhead or benefit expenses associated with employees of the **Underwriter**; and

2. a $250 per day per **Individual Insured** supplemental payment for the attendance at the request or with the consent of the **Underwriter** by such **Individual Insured** at hearings, trials or depositions. Such payment shall not exceed $5000 in the aggregate for all **Individual Insureds** in each **Claim**.

E. **Employee** means any natural person whose labor or service is engaged by and directed by the **Private Company**, including part-time, seasonal, leased and temporary employees as well as volunteers, but only while that natural person is acting in his or her capacity as such. **Employee** shall not include any independent contractors, unless specifically scheduled by endorsement.

F. **ERISA** means the Employee Retirement Income Security Act of 1974, as amended, any similar federal, state, local or common law, and any rules and regulations promulgated thereunder.

G. **Individual Insured** means:

1. any individual who has been, now is or shall become a director, officer, governor, trustee, **Employee**, volunteer, management committee member, or member of the Board of Managers of the **Private Company** or, solely with respect to Part 3 (Fiduciary Liability Insurance), a director, officer, governor, trustee or **Employee** of any **Benefit Plan**;

2. the lawful spouse of a director, officer, governor, trustee, or equivalent executive of the **Private Company**, but only for actual or alleged **Wrongful Acts** of such person for which such spouse may be liable as the spouse of such person;

3. the estate, heirs, legal representatives or assigns of a deceased director or officer, or the legal representatives or assigns of such a person who is incompetent, but only for **Wrongful Acts** of the person described in G. (1) or (4) which, in the absence of such death or incompetence, would have been covered by this Policy;

4. with respect to a **Private Company** chartered outside the United States of America, any individual who has been, now is or shall become a person serving in a position with such **Private Company** that is equivalent to any position described in (1) above.

H. **Insured** means the **Private Company** and **Individual Insured**.

I. **Interrelated Wrongful Act** means: any causally connected **Wrongful Act** or any series of the same, similar or related **Wrongful Acts**.

J. **Loss** means:

1. **Damages**;
2. **Defense Costs**;

but **Loss** does not include:

1. criminal or civil fines or penalties imposed by law except that solely with respect to Part 3 (Fiduciary Liability Insurance) **Loss** includes fines or penalties imposed under Section 502 (i) and (l) of **ERISA**; or
2. taxes; or
3. matters deemed uninsurable under the law to which this Policy shall be construed; or
4. any amounts other than **Defense Costs**, which an **Insured** is obligated to pay as a result of a **Claim** seeking relief or redress in any form other than monetary damages; or
5. any costs other than **Defense Costs** associated with any accommodation required pursuant to the American With Disabilities Act (removed Civil Rights Act of 1964) and the rules or regulations promulgated thereunder, amendments thereto, or similar provisions of any federal, state or local law or common law.

K. **Named Corporation** means the first entity named in Item 1 of the Declarations Page.

L. **Private Company** means:

1. the **Named Corporation**, and
2. any **Subsidiary**, and
3. any entity or person as a debtor in possession within the meaning of the United States Bankruptcy Code or similar legal status under foreign law, and
4. solely with respect to Part 3 (Fiduciary Liability Insurance), any **Benefit Plan**.

M. **Policy Period** means the period of time specified in Item 2 of the Declarations Page.

N. **Private Offering** means securities offered or issued by the **Private Company** which are exempt from registration with the United States Securities and Exchange Commission pursuant to Section 3 (b) of the Securities Act of 1933.

O. **Public Offering** means securities issued by the **Private Company** for initial public offering, public sale, public solicitation or public distribution to the general public and which is subject to full registration with the United States Securities & Exchange Commission (SEC). **Public Offering** does not include a **Private Offering**.

P. **Run-Off Policy** means a new policy of insurance offered by the **Underwriter** at the request of the **Named Corporation** in the event of a **Transaction**. The **Run-Off Policy** shall apply to

**Claims** made and reported to the **Underwriter** during the term of the **Run-Off Policy**, but only for **Wrongful Acts** occurring prior to the effective date of said **Transaction**.

Q. **Subsidiary** means:

1. a corporation of which the **Named Corporation** owns on or before the inception of the **Policy Period** more than 50% of the issued and outstanding voting stock either directly, or indirectly through one or more of its **Subsidiaries** or the right to elect, appoint or designate more than 50% of such entity's **board** of directors, trustees, or managers and which is set forth in the **Application**;

2. a corporation which becomes a **Subsidiary** during the **Policy Period** and whose assets total less than 25% of the total consolidated assets of the **Named Corporation** as of the inception date of this **Policy Period**. The **Named Corporation** shall provide the **Underwriter** with full particulars of the new **Subsidiary** before the end of the **Policy Period**;

3. a corporation, which becomes a **Subsidiary** during the **Policy Period** other than a corporation described in paragraph 2. above, but only upon the condition that within 90 days of its becoming a **Subsidiary**, the **Named Corporation** shall have provided the **Underwriter** with full particulars of the new **Subsidiary** and agreed to any additional premium and/or amendment of the provisions of this Policy required by the **Underwriter** relating to such new **Subsidiary**. Further, coverage as shall be afforded to the new **Subsidiary** is conditioned upon the **Named Corporation** paying when due any additional premium required by the **Underwriter** relating to such new **Subsidiary**.

   A corporation becomes a **Subsidiary** when the **Named Corporation** owns more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. A corporation ceases to be a **Subsidiary** when the **Named Corporation** ceases to own more than 50% of the issued and outstanding voting stock, either directly, or indirectly through one or more of its **Subsidiaries**. Coverage for **Claims** made against any **Subsidiary** or the **Individual Insureds** of any **Subsidiary** shall only apply to **Wrongful Acts** of such **Subsidiary** or the **Individual Insureds** of such **Subsidiary** occurring after the effective time that such **Subsidiary** became a **Subsidiary** and prior to the time that such **Subsidiary** ceased to be a **Subsidiary**.

R. **Transaction** shall mean:

1 the **Private Company** merging into or consolidating with another entity such that the other entity is the surviving entity; or

2. another entity, or person or group of entities and/or persons acting in concert acquiring securities or voting rights which result in ownership or voting control by the other entity(ies) or person(s) of more than 50% of the outstanding securities representing the present right to vote for the election of directors of the **Private Company**; or

3. **Public Offering**.

S. **Underwriter** means the stock insurance company check marked on the Declarations Page of this Policy.

T. **Wrongful Act** means:

1. with respect to Part 1, any **D&O Wrongful Act**,
2. with respect to Part 2, any **Employment Practice Act**,
3. with respect to Part 3, any **Fiduciary Liability Act**.

**PART 5**
**COMMON POLICY EXCLUSIONS**

The **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured**:

A. arising out of, based upon or attributable to such **Insured** gaining any profit, remuneration or advantage to which they were not legally entitled; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

B. arising out of, based upon or attributable to any dishonest or fraudulent act or omission or any criminal act or omission by such **Insured**; however, this exclusion shall only apply if a final and non-appealable judgment or adjudication establishes the **Insured** committed such act or omission;

No **Wrongful Act** of any **Insured** shall be imputed to any other **Individual Insured** for purpose of determining the applicability of Exclusions A and B above.

C. arising out of, based upon or attributable to the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials, or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water, or any cost or expense arising out of any governmental direction or request to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize any pollutants;

D. arising out of, based upon or attributable to any bodily injury or property damage in connection with tobacco smoke, asbestos or mold including, without limitation, the use, exposure, presence, existence, detection, removal, elimination or avoidance of tobacco smoke, asbestos or mold to any persons and in any environment, building or structure;

E. arising out of, based upon or attributable to the radioactive, toxic, or explosive properties of nuclear material which includes, but is not limited to, Source Material, Special Nuclear Material and Byproduct Material as those terms are defined in the Atomic Energy Act of 1954 and any amendments thereto and any similar provisions of any federal, state or local statutory or common law;

F. arising out of, based upon or attributable to:

    1. any litigation or demand against an **Insured** pending on or before the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, or the same or essentially the same facts as alleged in such prior litigation; or

    2. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of insurance prior to inception of this Policy; or

    3. any **Wrongful Act**, fact, circumstance or situation of which, as of the respective Prior and Pending Date set forth in Item 5 of the Declarations Page, the **Insured** had knowledge and from which the **Insured** could reasonably expect a **Claim** to arise.

G. arising out of, based upon or attributable to the insolvency, conservatorship, receivership, bankruptcy or liquidation of any bank, banking firm, broker, dealer, investment company, investment banker, insurance company, or other entity of a similar nature; or the failure to pay or suspension of payment by any such entity;

H. to the extent such **Loss** constitutes **Defense Costs** in a **Claim** directly or indirectly by, on behalf of, or for the benefit of any insurance carrier or bond carrier of the **Insured** or any affiliate of the **Insured**, regardless of in whose name such **Claim** is actually made;

I. for any actual or alleged bodily injury, mental anguish, emotional distress, sickness, disease or death of any person, or damage to or destruction of any tangible property including **Loss** of use thereof; however, this exclusion shall not apply to mental anguish or emotional distress under Part 2 (Employment Practices Liability Insurance);

J. brought or maintained by or on behalf of, or in the right of, the **Private Company** except a derivative action **Claim** by any person who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** and who brings or maintains the **Claim** without the solicitation, assistance or participation of such persons; provided, however that this exclusion shall not apply to a **Claim** brought or maintained by or on behalf of a bankruptcy or insolvency receiver, trustee, examiner, conservator, liquidator or rehabilitator for the **Private Company**, or any assignee of such receiver, trustee, examiner, conservator, liquidator or rehabilitator;

K. brought or maintained by any **Individual Insured** except:

1. any **Claim** in the form of a cross claim, third party claim or other claim for contribution or indemnity by an **Individual Insured** which is part of or results directly from a **Claim** which is not otherwise excluded by this Policy;
2. a **Claim** for an **Employment Practice Act** or a **Fiduciary Liability Act**;
3. a **Claim** for a **D&O Wrongful Act** brought or maintained by an **Employee**(s) who is not a past or present director, officer, governor, trustee, equivalent executive, management committee member, or member of the Board of Managers of the **Private Company** if such **Claim** for a **D&O Wrongful Act** is brought and maintained by such **Employee** without the assistance, participation or solicitation of any such persons.

L. for a **Wrongful Act** committed or attempted by a **Subsidiary**, **Benefit Plan** or an **Individual Insured** of a **Subsidiary** or **Benefit Plan** before such entity or plan became an **Insured** or after the entity or plan ceased to be an **Insured**;

M. for service by the **Individual Insured** in any position or capacity in any entity other than the **Private Company**, a **Benefit Plan** or an **Outside Entity**, even if the **Private Company** directed or requested the **Individual Insured** to serve in such other position or capacity;

N. arising out of, based upon or attributable to a **Public Offering** or any violation of the Securities and Exchange Act of 1933, Securities and Exchange Act of 1934, Investment Act of 1940, any state "Blue Sky" securities law, or any other federal, state or local securities law or any amendments thereto or any rules or regulations promulgated thereunder or any other provision of statutory or common law used to impose liability in connection with the offer to sell or purchase, or the actual sale or purchase of securities; provided, however that this exclusion shall not apply:

1. to any **Private Offering**, subject to terms and conditions of Part 6, Section XVII;

2. to any **Claim** made by any securityholder of the **Private Company** for the failure of the **Insured** to undertake or complete a **Public Offering**.

**PART 6**
**COMMON POLICY CONDITIONS**

I. LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A. With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Loss** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B. With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C. The **Underwriter's** maximum aggregate liability for all **Loss** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D. **Defense Costs** are part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** shall serve to reduce the Limit of Liability stated in Item 3. of the Declarations. The **Underwriter** is not obligated to pay any **Loss** after the applicable Limit of Liability has been exhausted.

E. The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

II. RETENTION CLAUSE

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

III. DEFENSE AND SETTLEMENT

A. The **Insured** and not the **Underwriter** shall have the responsibility to defend any **Claim.** However, the **Insured** shall have the right, as soon as practicable after a **Claim** is first made, to tender the defense of such **Claim** to the **Underwriter.** Upon written notice to the **Underwriter** of such election by the **Insured** and subject to all of the provisions of this Section III. DEFENSE AND SETTLEMENT, the **Underwriter** shall undertake and manage the defense of such **Claim**, even if such **Claim** is groundless, false or fraudulent.

B. If the **Insured** is defending a **Claim** pursuant to A. above, the **Underwriter** shall advance **Defense Costs** prior to the final disposition of a **Claim**. The **Insured** shall elect counsel of its choice subject to approval by the **Underwriter**, such approval shall not be unreasonably withheld. The **Underwriter** shall not be liable for **Loss** admitted by the **Insured** without the **Underwriter's** prior written consent, which shall not be unreasonably withheld. The **Underwriter** reserves the right, but not the duty, at any time to take over control of the defense of any **Claim** and with the consent of the **Insured**, settle any **Claim** as the **Underwriter** deems expedient.

C. The **Underwriter** is not obligated to pay any **Loss** after the Limit of Liability has been exhausted.

D. In the event that a **Claim** is made against the **Insured**, the **Insured** shall take reasonable measures to protect their interests.

E. If more than one **Insured** is involved in a **Claim**, the **Underwriter** may, in its sole discretion, appoint separate counsel for one or more of such **Insureds** if there is a material (actual or potential) conflict of interest among any such **Insureds**.

F. The **Insured** agrees to provide the **Underwriter** with all information, assistance and cooperation which the **Underwriter** reasonably requests and agree that in the event of a **Claim** the **Insured** will do nothing that may prejudice the **Underwriter's** position or its potential rights of recovery.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement acceptable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, then the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, including **Defense Costs** incurred, up to the date of such refusal, plus 50% of covered **Loss** in excess of such first settlement amount, it being a condition of this insurance that the remaining 50% of such **Loss** excess of the first settlement amount shall be borne by the **Insured** at their own risk and be uninsured. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement amount which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

H. ORDER OF PAYMENTS

In the event of **Loss** arising from one or more **Claims** for which payment is otherwise due under Part 1 (Directors and Officers Liability Insurance) but which **Loss** in the aggregate exceeds the remaining available Limit of Liability for Part 1(Directors and Officers Liability Insurance), the **Underwriter** shall:

1. first pay such **Loss** for which coverage is provided under Insuring Agreement A (INDIVIDUAL LIABILITY COVERAGE); then

2. with respect to whatever remaining amount of the Limit of Liability after payment of 1. above, pay such **Loss** for which coverage is provided under any other Insuring Agreement of Part 1 (Directors and Officers Liability Insurance).

IV. NOTICE/CLAIM REPORTING PROVISIONS

Notice hereunder shall be given in writing to the **Underwriter** at the following address:

Philadelphia Insurance Companies
One Bala Plaza, Suite 100
Bala Cynwyd, Pennsylvania 19004
Attention: Claims Department

The date of mailing shall constitute the date that such notice was given and proof of mailing shall be sufficient proof of notice. Any notice to the **Underwriter** shall specify the Part(s) of this Policy under which the notice is being given and shall be treated as notice only under such specified Part(s).

A. In the event that a **Claim** is made against the **Insured**, the **Insured** shall, as a condition precedent to the obligations of the **Underwriter** under this Policy, give written notice to the **Underwriter** as soon as practicable after any of the directors, officers, governors, trustees, management committee members, or members of the Board of Members first become aware of such **Claim**, but, not later than 60 days after the expiration date of this Policy, Extension Period, or **Run-Off Policy**, if applicable.

B. If during this **Policy Period** an **Insured** first becomes aware of any circumstances which may subsequently give rise to a **Claim** being made against any **Insured** for a specific alleged **Wrongful Act**, and as soon as practicable thereafter, but before the expiration or cancellation of this Policy, gives written notice to the **Underwriter** of the circumstances and the reasons for anticipating such a **Claim**, with full particulars as to the **Wrongful Act**, dates and persons involved, then any **Claim** which is subsequently made against the **Insured** arising out of such **Wrongful Act** will be considered made during this **Policy Period**.

C. All **Loss** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed one **Loss** on account of a one **Claim**. Such **Claim** shall be deemed to be first made when the earliest of such **Claims** was first made or first deemed made pursuant to Clause B. hereinabove.

V. CANCELLATION AND NON-RENEWAL

A. The **Underwriter** may not cancel this Policy except for failure to pay the premium when due, in which case the **Underwriter** shall mail written notice of cancellation to the **Private Company** at least ten (10) days prior to the effective date of cancellation.

B. The **Private Company** may cancel this Policy for itself and all other **Insureds** by surrender of this Policy to the **Underwriter** or any of its authorized agents or by mailing to the **Underwriter** written notice stating when thereafter the cancellation shall be effective. If the **Private Company** cancels, earned premium shall be computed in accordance with the customary short rate table procedure.

C. The **Underwriter** shall not be required to renew this Policy; however, written notice of the **Underwriter's** intent to non-renew this Policy shall be mailed to the **Private Company** at least sixty (60) days prior to expiration of the **Policy Period**.

VI. REPRESENTATIONS AND SEVERABILITY

A. The **Insured** represent that the particulars and statements contained in the **Application** are true and agree that (1) those particulars and statements are the basis of this Policy and are to be considered as incorporated into and constituting a part of this Policy; (2) those particulars and statements are material to the acceptance of the risk assumed by the **Underwriter** under this Policy; and (3) this Policy is issued in reliance upon the truth of such representations.

B. Except for material facts or circumstances known to the **Individual Insured** signing the **Application,** no statement in the **Application** or knowledge or information possessed by any **Insured** shall be imputed to any other **Individual Insured** for the purpose of determining the availability of coverage.

VII. SUBROGATION

In the event of any payment under this Policy, the **Underwriter** shall be subrogated to the extent of such payment to all of the **Insured's** rights of recovery. The **Insured** shall execute and deliver such instruments and papers and do whatever else is necessary to secure such rights and shall do nothing to prejudice or compromise such rights without the **Underwriter's** express written consent.

VIII. EXTENSION PERIOD

A. If the **Underwriter** refuses to renew this Policy the following will apply:

For no additional premium, the **Underwriter** will provide a 60 day extension of the coverage granted under Part 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the 60 days after the non-renewal date, but only with respect to any **Wrongful Act** committed before such non-renewal date and otherwise covered by this Policy (the "Automatic Extension"). This Automatic Extension shall not apply if the **Insured** has purchased similar insurance from the **Underwriter** or any other insurer covering such **Claim.**

Upon expiration of the Automatic Extension, the **Private Company** shall have the right, upon payment of an additional 50%, 100%, 150% of this Policy's annual premium to an extension of the coverage granted by this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the expiration of the Automatic Extension, but only with respect to **Wrongful Acts** committed before the non-renewal date and otherwise covered by this

Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made prior to the expiration of the Automatic Extension. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

B. If the **Private Company** cancels or does not renew this Policy or the **Underwriter** cancels for nonpayment of premium the following will apply:

The **Private Company** shall have the right, upon payment of an additional 50%, 100%, or 150% of this Policy's annual premium, to an extension of the cover granted under Parts 1, 2, and 3 of this Policy for any **Claim** first made against the **Insured** during the twelve (12) months, twenty-four (24) months, or thirty-six (36) months, respectively, after the date of such cancellation or non-renewal, but only with respect to any **Wrongful Acts** committed before the date of such cancellation or non-renewal and otherwise covered by this Policy (the "Extension Period"); provided however, that the request for this Extension Period must be made to the **Underwriter** in writing and payment of the additional premium must be made within 60 days following the date of such cancellation or non-renewal. In the event similar insurance is in force covering any **Claims** first made during this Extension Period, coverage provided by this Policy shall be excess over any such other insurance.

If the **Underwriter** cancels for the non-payment of premium, the **Parent Organization** may purchase the Extension Period only after any earned premium due to the **Underwriter** is paid within 10 days after the date of cancellation or Policy expiration, whichever comes first.

C. All premium paid with respect to an Extension Period shall be deemed fully earned as of the first day of the Extension Period. For the purpose of this Section VIII, any change in premium or terms on renewal shall not constitute a refusal to renew.

IX. CHANGES

Except by written endorsement issued to the **Insured** forming a part of this Policy, nothing shall effect a change in or addition to the provisions of this Policy. Furthermore, under no circumstances shall the **Underwriter** be deemed to have waived or be estopped from asserting any right under this Policy, at law, or in equity respecting any **Claim** except as stated in writing by the **Underwriter's** authorized Claims Department representative.

X. ASSIGNMENT

Assignment of interest in this Policy shall not bind the **Underwriter** until the **Underwriter's** consent is endorsed hereon.

XI. AUTHORIZATION CLAUSE AND NOTICES

By acceptance of this Policy, the **Insured** agrees that the **Private Company** shall act on behalf of any **Insured** with respect to the giving and receiving of any return premiums and notices that may become due under this Policy. Notice to the **Private Company** shall be directed to the individual named in the **Application**, or such other person as shall be designated by the **Private Company** in writing. Such notice shall be deemed to be notice to any **Insured**. The **Private Company** shall be the agent of any **Insured** to effect changes in this Policy.

XII. OTHER INSURANCE

If the **Insured** has any other insurance for **Claims** covered hereunder, the insurance provided by this Policy shall be excess over such other insurance, regardless of whether such other insurance is collectible or designated as primary or excess.

In event of a **Claim** against the **Insured** arising out of serving in his/her capacity as a director, officer, governor or trustee of an **Outside Entity** or an **Employment Practices Act** against or committed by a leased **Employee**, coverage as is afforded by this policy shall be specifically excess of indemnification provided by such **Outside Entity** or such leasing company and any insurance provided to such **Outside Entity** or such leasing company.

XIII. ACCEPTANCE

This Policy embodies all agreements existing between the parties hereunder or any of their agents relating to this insurance

XIV. ACTION AGAINST THE UNDERWRITER; ARBITRATION

A. No person or entity shall have any right under this Policy to join the **Underwriter** as a party to any action against the **Insured** to determine the **Insured's** liability, nor shall the **Underwriter** be impleaded by the **Insured** or their legal representatives. Bankruptcy or insolvency of the **Insured** or their successors in interest shall not relieve the **Underwriter** of its obligations hereunder.

B. Any dispute relating to this Policy or the alleged breach, termination or invalidity thereof, which cannot be resolved through negotiations between any **Insured** and the **Underwriter**, shall be submitted to binding arbitration. The rules of the American Arbitration Association shall apply except with the respect to the selection of the arbitration panel. The panel shall consist of one arbitrator selected by such **Insured**, one arbitrator selected by the **Underwriter** and a third independent arbitrator selected by the first two arbitrators.

XV. CHANGE IN OWNERSHIP OR CONTROL

A. If after the inception of the **Policy Period** a **Transaction** occurs then coverage under Parts 1, 2, and 3 of this Policy shall remain in force, but only for **Claims** made during the **Policy Period** for **Wrongful Acts** committed prior to the effective date of the **Transaction** and only if the following conditions are met:

1. the **Insured** provides written notice of the **Transaction** (other than **Public Offering**) to the **Underwriter** as soon as practicable but no later than 45 days of the effective date of such **Transaction**; and

2. the **Insured** provides the **Underwriter** with such information as the **Underwriter** deems necessary; and

3. in the case of a **Public Offering**, the **Insured** provides written notice of the **Public Offering** to the **Underwriter** no later than 30 days prior to the filing of any registration statement with the United States Securities and Exchange Commission. The **Underwriter** shall provide a quotation for the **Public Offering**.

If **Insured** fails to meet conditions 1., 2., & 3. above, coverage under this Policy shall cease as of the effective date of the **Transaction** and the **Underwriter** shall return any unearned premium on a pro-rata basis.

The **Insured** shall have the right, within 45 days after the **Transaction** (or such date the **Underwriter** may agree by endorsement), to request an offer from the **Underwriter** for a **Run-Off Policy** for a term up to 6 years. If elected, such **Run-Off Policy** shall be conditioned upon payment during the **Policy Period** by the **Insured** of any additional premium, which shall be fully earned at inception, and shall be subject to any additional terms and conditions required by the **Underwriter**.

XVI. TERRITORY AND VALUATION

This Policy shall extend to any **Wrongful Act** committed anywhere in the world.

All premiums, limits, retentions, **Loss** and other amounts under this Policy are expressed and payable in the currency of the United States of America. If judgment is rendered, settlement is denominated or another element of **Loss** under this Policy is stated in a currency other than United States of America dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in The Wall Street Journal on the date the final judgment is reached, the amount of the settlement is agreed upon or the other element of **Loss** is due, respectively.

XVII. COVERAGE FOR A PRIVATE OFFERING

The **Insured** shall give the **Underwriter** written notice of a **Private Offering**, together with full details and as soon as practicable, but not later than 60 days after the effective date of such **Private Offering**. However, any **Claim** arising out of, based upon or attributable to a **Private Offering** shall be subject to the Private Offering Retention stated in Item 4. of the Declarations Page. Such Private Offering Retention shall be borne by the **Insureds**, uninsured and at their own risk, except that a Private Offering Retention shall not apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so.

XVIII. TWO OR MORE COVERAGE PARTS OR POLICIES ISSUED BY THE UNDERWRITER.

It is the **Underwriter's** stated intention that the various coverage parts or policies issued to the **Private Company** by the **Underwriter**, or any affiliated company, do not provide any duplication or overlap of coverage for the same **Claim**. Notwithstanding the foregoing, if more than one coverage part applies to the same **Wrongful Act** or **Interrelated Wrongful Acts**, then the maximum Limit of Liability under all such coverage parts combined shall not exceed the highest applicable Limit of Liability under any one coverage part. Notwithstanding the other insurance provision, if this Policy and any other policy issued to the **Private Company** by the **Underwriter**, or any affiliated company, apply to the same **Wrongful Act**, professional incident, occurrence, offense, accident or **Loss**, then the maximum Limit of Liability under all such policies combined shall not exceed the highest applicable Limit of Liability under any one policy.

XIX. ALLOCATION

If both **Loss** covered by this Policy and **Loss** not covered by this Policy are incurred either because a **Claim** includes both covered and uncovered matters, or because a **Claim** is made against both the **Individual Insured** and/or the **Private Company**, and others, the **Insured** and the **Underwriter** shall use their best efforts to agree upon a fair and proper allocation of such amount between covered **Loss** and uncovered loss. Any such allocation shall be based upon the relative legal exposures of the parties to covered and uncovered matters.

PI-PRD-5 (09/02)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# PROFESSIONAL SERVICES EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way involving the **Insured's** performance of or failure to perform professional services for others.

It is provided, however, that the foregoing shall not be applicable to any derivative or shareholder class action **Claim** alleging failure to supervise those who performed or failed to perform such professional services.

All other terms and conditions of this Policy remain unchanged

PI-PRD-11 (09/02)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AGGREGATE RETENTION ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part(s) 1, 2 , Item 4 of the Declarations is amended to read as follows:

Item 4. Retention:

(A) Part 1, D&O Liability: $ 25,000 for each Claim under Insuring Agreement Sections B & C and $ 75,000 in the aggregate for all Claims under Insuring Agreement B & C.

Private Offering: $ 75,000 for each Claim under Insuring Agreement B & C.

(B) Part 2, Employment Practices: $ 25,000 for each Claim and $ 75,000 in the aggregate for all Claims.

(C) Part 3, Fiduciary Liability: $ for each Claim and $ in the aggregate for all Claims.

All other terms and conditions of this Policy remain unchanged

PI-PRD-19 (09/02)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# RETENTION WAIVER NO LIABILITY ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part(s) 1, 2 , Part 6, Common Policy Conditions, II. RETENTION CLAUSE is deleted in its entirety and replaced by the following:

II. RETENTION CLAUSE

A. The Retention amount stated in Item 4. of the Declarations shall not be applied to **Defense Cost** in the following instances:

1. a final judgment of no liability obtained prior to trial, in favor of all **Insureds**, by reason of a motion to dismiss or a motion for summary judgment, after the exhaustion of all appeals; or

2. a final judgment of no liability obtained after trial, in favor of all **Insureds**, after the exhaustion of all appeals.

In no event shall the term "no liability" apply to a **Claim** for which a settlement has occurred.

B. In the case where the **Insured** is liable, the **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

All other terms and conditions of this Policy remain unchanged

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SHAREHOLDER EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part 1, the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** brought by or on behalf of any individual or entity that owns or controls (whether beneficially, directly or indirectly) greater than Five percent ( 5 %) of the outstanding voting stock of the **Private Company**.

All other terms and conditions of this Policy remain unchanged

PI-PRD-35 (04/02)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# REGULATORY EXCLUSION (SECURITIES CARVE BACK)

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part(s) 1, 2 , the **Underwriter** shall not be liable to make any payment for **Loss** in connection with any **Claim** made against the **Insured** based upon, arising out of, directly or indirectly resulting from or in consequence of, or attributable to a violation of any local, state, or federal regulatory statute, code, rule or regulation, or procedure nor any **Claim** brought by any local, state or federal governmental body and/or any agency or subdivision thereof.

However, this exclusion shall not apply to a **Claim** arising from the **Private Company's** securities activities and brought by a governmental body or agency that is responsible for governing securities laws.

All other terms and conditions of this Policy remain unchanged

PI-PRD-38 (09/02)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# SHARED LIMITS ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

It is agreed the combined/shared Limit of Liability available for any **Claim** under Part(s) 1 and any **Claim** under Part(s) 2 shall be $ 1,000,000 .

Notwithstanding the foregoing, the Limit of Liability available for any **Claim** under a coverage **Part** shall also be subject to such Parts Limit of Liability as stated in Item 3 of the Declarations.

All other terms and conditions of this Policy remain unchanged

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# THIRD PARTY EPLI EXCLUSION

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

The Policy is amended as follows:

With respect to coverage under Part 2, Section II. DEFINITIONS, A. **Employment Practice Act** is amended to read:

A. **Employment Practice Act** means any actual or alleged:

1. wrongful dismissal, discharge or termination of employment;
2. breach of a written or oral employment contract or implied employment contract;
3. employment related misrepresentation;
4. wrongful failure to promote;
5. violation of employment discrimination laws (including harassment);
6. wrongful deprivation of a career opportunity;
7. employment related wrongful discipline;
8. negligent employee evaluation;
9. employment related invasion of privacy;
10. employment related defamation (including libel and slander);
11. sexual or workplace harassment of any kind;
12. constructive discharge of employment;
13. employment related **Retaliation**;
14. employment related humiliation;
15. wrongful demotion;
16. negligent reassignment;
17. violation of any federal, state or local civil rights laws;

and committed or attempted by an **Individual Insured** in his/her capacity as an **Individual Insured** or by the **Organization**.

It is further agreed, Section III. EXCLUSIONS, is amended to include:

which is brought by or made on behalf of any **Third Party**.

All other terms and conditions of the Policy remain unchanged.

PI-PRD-48 (09/02)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# EMPLOYERS SHIELD ENDORSEMENT

This endorsement modifies and is subject to the insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

This Policy is amended as follows:

With respect to coverage under Part 2, the **Underwriter** will pay on behalf of the **Insured**, ninety percent (90%) of **Defense Costs** incurred:

a. to defend an **Insured** against allegations of breach of the non-compete provision of a valid employment contract; or

b. to enforce the non-compete provision of a valid employment contract made with a former employee:

   1. who resigns or is terminated during the **Policy Period** (or not more than 365 days prior to the **Policy Period**); and

   2. if the **Insured** discovers the breach of contract during the **Policy Period**.

Solely for the purposes of coverage as may be afforded by this endorsement, the Limit of Liability and Retention shall be in accordance with the amounts set forth below:

Limit of Liability

$25,000 each **Policy Period**. Such limit being part of and not in addition to the Limit of Liability stated in Item 3 of the Declarations.

Retention

No retention shall apply to this coverage provision.

All other terms and conditions of this Policy remain unchanged

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# ENTREPRENEURS PRO-PAK ELITE COVERAGE

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

## 1. AGGREGATE RETENTION

Part 6 (**COMMON POLICY CONDITIONS**), section II (RETENTION CLAUSE), is replaced by:

The **Underwriter** shall only be liable for that portion of **Loss** arising from each **Claim** which is in excess of the respective Retention stated in Item 4. of the Declarations Page. Such Retention shall be borne by the **Insured**, uninsured and at their own risk, provided no Retention shall apply to **Loss** incurred by **Individual Insureds** for which the **Private Company** is not permitted or required to indemnify the **Individual Insured** or is financially unable to do so. A single Retention shall apply to **Loss** arising from all **Claims** alleging **Interrelated Wrongful Acts**.

The Aggregate Retentions, which must be borne by the **Insured**, for all **Claims** made during the **Policy Period**, will be triple the amount of the per claim Retentions stated in Item 4. of the Declarations Page.

## 2. CLAIM EXPENSES COVERED IN ADDITION TO LIMITS OF LIABILITY

Part 6 (**COMMON POLICY CONDITIONS**), section I (LIMITS OF LIABILITY) is replaced by:

I. LIMITS OF LIABILITY

Regardless of the number of **Insureds** involved, **Claims** made, the **Underwriter's** liability under the Policy is limited as follows:

A. With respect to coverage under Part 1 of this Policy, the **Underwriter's** maximum aggregate liability under Part 1 for all **Damages** on account of all **Claims** made during the **Policy Period**, whether covered under Insuring Agreement A, B or C, shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(A) of the Declarations.

B. With respect to coverage under Part 2 and Part 3 of this Policy, the **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** made during the **Policy Period** shall be the Limit of Liability for each **Policy Period** as set forth in Item 3.(B) and 3.(C), respectively, of the Declarations.

C. The **Underwriter's** maximum aggregate liability for all **Damages** on account of all **Claims** first made during the **Policy Period** under all purchased Parts, combined, shall be the Aggregate Limit of Liability set forth in Item 3.(D) of the Declarations. The Limits of Liability set forth in Item 3.(A), 3.(B), and 3.(C), are sub-limits that do not increase the **Underwriter's** maximum liability as set forth in Item 3.(D).

D. **Defense Costs** paid by the **Underwriter** are in addition to and not a part of the Limit of Liability specified in Item 3. of the Declarations. Payment by the **Underwriter** of **Defense Costs** incurred on account of any **Claim** will not reduce the Limit of Liability stated in Item 3.

of the Declarations. The most the **Underwriter** will pay for **Defense Costs** is equal to the applicable Limit of Liability stated in Item 3. of the Declarations. The **Underwriter** is not obligated to pay **Defense Costs** nor **Damages** after the applicable Limit of Liability has been exhausted.

E. The Limit of Liability for any Extension Period, if applicable, shall be a part of and not in addition to the respective Limit of Liability applicable to the **Policy Period**.

Part 6 (**COMMON POLICY CONDITIONS**), section III (DEFENSE AND SETTLEMENT), items C and G are replaced by:

C. The Underwriter is not obligated to pay any Loss after the Limit of Liability has been exhausted. The **Underwriter** may elect to tender an amount equal to the remaining Limit of Liability applicable to **Damages** to the **Private Company** at any time, which will be considered to fully satisfy the **Underwriter's** obligation with regard to that **Claim**.

G. If with respect to any **Claim** the **Insured** refuses to consent to the first settlement applicable to the claimant which the **Underwriter** recommends to the **Insured** in writing, and elects to further contest the **Claim**, the **Underwriter's** liability for such **Claim** shall not exceed the amount for which the **Claim** could have been settled, up to the date of such refusal. Notwithstanding the foregoing, this paragraph shall not apply until the settlement amount exceeds the Retention amount stated in Item 4. of the Declarations Page.

In addition, if the **Underwriter** recommends a first settlement of a **Claim** within the Policy's applicable Limit of Liability that is acceptable to the claimant, and the **Insured** consents to such settlement, then the **Insured's** applicable Retention for such **Claim** shall be retroactively reduced by ten percent (10%). It shall be a condition to such reduction that the **Insured** must consent to the first settlement amount within thirty (30) days after the date the **Underwriter** recommends to the **Insured** such first settlement amount, or in the case of a first settlement which arises from a first settlement offer by the claimant, then within the time permitted by the claimant to accept such first settlement offer, but in all events no later than thirty (30) days after the **Underwriter** recommends to the **Insured** such first settlement offer. If the **Insured** does not consent to the first settlement within the time prescribed above, the applicable Retention amount shall remain the respective amount set forth in Item 4. of the Declarations Page, even if consent is given to a subsequent settlement.

## 3. ADDITIONAL COVERAGES

The following is added as Part 7 of the Policy:

## PART 7
## ADDITIONAL COVERAGES

I. INSURING AGREEMENTS

A. IDENTITY THEFT

The **Underwriter** will reimburse any Director or Officer for **Identity Theft Expenses** incurred in specific response to any **Identity Theft** first discovered and reported to the **Underwriter** during the **Policy Period**; provided that the **Identity Theft** began to occur after the effective date of the **Insured's** first ***PRIVATE COMPANY PROTECTION PLUS*** policy purchased from the **Underwriter**. The maximum reimbursement for this coverage is $1,500 for the **Policy Period**. No Retention will apply to this coverage.

B. TERRORISM TRAVEL

The **Underwriter** will reimburse any present Director or Officer of the **Named Corporation** in the event of a **Certified Act of Terrorism** that occurs during the policy period if it necessitates that he/she incur **Emergency Travel Expenses.** The maximum reimbursement for this coverage is $1,000 for the **Policy Period** . No Retention applies to this coverage.

C. REALTOR CONSULTATION REIMBURSEMENT

The **Underwriter** will reimburse the **Insured** any realtor's fee or real estate consultant's fee necessitated by the **Insured's** need to relocate due to the **Unforeseeable Destruction** of the **Insured's** primary location, listed on the Declarations Page, during the **Policy Period.** The maximum reimbursement for this coverage will be $1,000 for the **Policy Period.** No Retention applies to this coverage.

D. RENTAL OF TEMPORARY MEETING SPACE BENEFIT

The **Underwriter** will reimburse the **Insured** for rental of meeting space that is necessitated by the temporary unavailability of the **Insured's** primary office space due to the failure of a climate control system, or leakage of a hot water heater during the **Policy Period**. Coverage will exist only for the renting of temporary meeting space required for meeting with parties who are not an **Insured** under this policy. The maximum reimbursement for this coverage will be $1,000 for the **Policy Period.** No Retention applies to this coverage.

E. WORKPLACE VIOLENCE COUNSELING

In the event that an incidence of **Workplace Violence** occurs at any of the **Insured's** owned or leased premises during the **Policy Period**, the **Underwriter** will reimburse the **Insured** for expenses incurred for the emotional counseling of **Employees** of the **Insured** during the **Policy Period**. The maximum reimbursement for this coverage is $5,000 during the **Policy Period**. No Retention applies to this coverage.

F. THEFT OF WORK MATERIALS FROM PERSONAL AREAS

The **Underwriter** will reimburse any **Insured** 50% of their personal or business property policy's deductible for any theft involving **Work Materials** that are stolen from the **Insured's Personal Areas** during the **Policy Period**, provided that the theft is covered by other insurance. No reimbursement is applicable under this section for thefts for which no other insurance policy provides a settlement. The maximum reimbursement for this coverage is $1,000 for the **Policy Period**. No Retention applies to this coverage.

G. SPECIAL RISK

The **Underwriter** will reimburse any Director or Officer, or spouse thereof, reasonable fees incurred in response to the kidnapping of a Director or Officer, or spouse thereof, during the **Policy Period**, provided that the kidnapping occurs within the United States. Coverage under this section G is subject to a maximum reimbursement of $25,000. No Retention applies to this coverage.

Reasonable fees will include:

1) fees and expenses of an independent negotiator or consultant retained with prior approval of the **Underwriter**;

2) costs of travel and accommodations incurred by any **Individual Insured** which become specifically necessary due to the applicable kidnapping; and

3) the reward paid by any **Insured** to an informant for information not otherwise available which leads to the arrest and conviction of persons for the applicable kidnapping.

H. IMAGE RESTORATION AND COUNSELING

The **Underwriter** shall reimburse to the **Insured** expenses arising out of **Improper Acts** by any **Individual Insured.** Covered expenses are limited to:

1. the costs of rehabilitation and counseling for the accused **Individual Insured**, up to a limit of $1,000 per **Policy Period,** provided the **Individual Insured** is not ultimately found guilty of criminal conduct;

2. the costs, charged by a recruiter or expended on advertising, of replacing an Officer as a result of **Improper Acts** up to a limit of $5,000 per **Policy Period**; and

3. the costs of restoring the **Private Company's** reputation and consumer confidence through image consulting up to a limit of $2,500 per **Policy Period**.

I. KEY INDIVIDUAL REPLACEMENT

If during the **Policy Period**, the Chief Executive Officer, or equivalent officer, dies or becomes totally and permanently disabled, the **Underwriter** will reimburse the **Private Company** up to $5,000 for expenses charged by a recruiter or expended by the **Private Company** on advertising to search for a replacement.

II. DEFINITIONS

A. **Identity Theft** means the act of knowingly transferring or using, without lawful authority, a means of identification of any **Insured** with the intent to commit, or to aid or abet another to commit, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

B. **Identity Theft Expenses** means:

a. Costs for notarizing affidavits or similar documents attesting to fraud required by financial institutions or similar credit grantors or credit agencies.
b. Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors.
c. Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

C. **Emergency Travel Expenses** means, while traveling in the course of the **Private Company's** business, hotel expenses incurred which directly result from the cancellation of a scheduled transport, by train or air, by a commercial transportation carrier resulting directly from and within forty-eight hours of a **Certified Act of Terrorism** and the marginal increase in air or train fare which may result from re-scheduling comparable transport, to replace a similarly scheduled transport canceled by a commercial transportation carrier in direct response to a terrorist incident.

D. **Certified Act of Terrorism** means any act that is certified by the Secretary, in concurrence with the Secretary of State, and the Attorney General of the United States (i) to be an act of terrorism; (ii) to be a violent act or an act that is dangerous to (I) human life; (II) property; or

(III) infrastructure; (iii) to have resulted in damage within the United States, or outside the United States in the case of (I) an air carrier or vessel described in paragraph (5)(B); or (II) the premises of a United States mission; and (iv) to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

E. **Unforeseeable Destruction** means damage resulting from a **Certified Act of Terrorist**, fire, crash or collapse which renders a premises completely unusable.

F. **Workplace Violence** means any intentional use of, or threat to use deadly force by any natural person, with an intent to cause harm and that results in bodily injury or death of a member of the **Insured** or any other natural person while on the **Insured's** premises.

G. **Work Materials** means any equipment that is used by the **Insured** solely in the course of the **Private Company's** business; inclusive of stores of data and client records.

H. **Insured's Personal Areas** means any residence or automobile owned or rented by any **Individual Insured.**

I. **Improper Acts** means any actual or alleged act of: sexual abuse, sexual intimacy, sexual molestation, sexual assault, sexual harassment, discrimination of any kind, committed by an **Individual Insured** against a party who is not an **Insured** under this policy. Such **Improper Acts** must have been committed by the **Individual Insured** while in his or her capacity as an **Individual Insured.**

III. CONDITIONS

A. With respect to coverage under Part 7 of this Policy, the **Underwriter's** maximum aggregate liability under part 7 is $25,000.

B. The reimbursement amounts payable under Part 7 are in addition to the Limit of Liability as set forth in Item 3 of the Declarations Page.

IV. EXCLUSIONS

The Underwriter shall not be liable to make any payment under Part 7 as a result of any event:

a. arising out of, based on or attributable to any intentional or criminal act by any **Individual Insured**; or

b. arising out of, based on or attributable to any governmental action, nuclear activity, riot, flood or earthquake.

Exclusion A. will not apply to coverages H. or I.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# AMENDMENT OF EXCLUSIONS

This endorsement modifies insurance provided under the following:

PRIVATE COMPANY PROTECTION PLUS

Part 1 (**DIRECTORS & OFFICERS LIABILITY INSURANCE**), section III (EXCLUSIONS), item E. is replaced by:

E. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 2 (**EMPLOYMENT PRACTICES LIABILITY INSURANCE**), section III (EXCLUSIONS), item B. is replaced by:

B. for any actual or alleged violation(s) of any of the responsibilities, obligations or duties imposed by the Employee Retirement Income Security Act of 1974, the Fair Labor Standards Act (except the Equal Pay Act), the National Labor Relations Act, the Worker Adjustment and Retraining Notification Act, the Consolidated Omnibus Budget Reconciliation Act, the Occupational Safety and Health Act, any rules or regulations of the foregoing promulgated thereunder, and amendments thereto or any similar federal, state, local or foreign statutory law or common law; provided, however, this exclusion shall not apply to a **Claim** for **Retaliation**; provided, further, however, there is no coverage provided under this policy for any **Claim** related to, arising out of, based upon, or attributable to the refusal, failure or inability of any **Insured(s)** to pay **Earned Wages** (as opposed to tort-based back pay or front pay damages) or for improper payroll deductions taken by any **Insured(s)** from any **Employee(s)** or purported **Employee(s)**, including, but not limited to, (i) any unfair business practice claim alleged because of the failure to pay **Earned Wages**, or (ii) any **Claim** seeking **Earned Wages** because any **Employee(s)** or purported **Employee(s)** were improperly classified or mislabeled as "exempt."

Part 4 (**COMMON POLICY DEFINITIONS**), is supplemented by:

**Earned Wages** means wages or overtime pay for services rendered.

PI-PL-CA (1/98)

**THIS ENDORSMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

# CALIFORNIA AMENDATORY ENDORSEMENT

To be attached to and form a part of all policies written in California.

In consideration of the premium charged, it is understood and agreed that:

The CANCELLATION AND NONRENEWAL POLICY CONDITIONS is hereby deleted and replaced with the following:

A. Cancellation

1. The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

2. All Policies In Effect For 60 Days Or Less

   If this policy has been in effect for 60 days or less, and is not a renewal of a policy we have previously issued, we may cancel this policy by mailing or delivering to the first Named Insured at the mailing address shown in the policy and to the producer of record, advance written notice of cancellation, stating the reason for cancellation, at least:

   a. 10 days before the effective date of cancellation if we cancel for:

      (1) Nonpayment of premium; or

      (2) Discovery of fraud or material misrepresentation by:

         (a) Any insured or his or her representative in obtaining this insurance; or

         (b) You or your representative in pursuing a claim under this policy.

   b. 30 days before the effective date of cancellation if we cancel for any other reason.

3. All Policies In Effect For More Than 60 Days

   a. If this policy has been in effect for more than 60 days, or is a renewal of a policy we issued, we may cancel this policy only upon the occurrence, after the effective date of the policy, of one or more of the following:

      (1) Nonpayment of premium, including payment due on a prior policy we issued and due during the current policy term covering the same risks.

      (2) Discovery of fraud or material misrepresentation by:

         (a) Any insured or his or her representative in obtaining this insurance; or

         (b) You or your representative in pursuing a claim under this policy.

      (3) A judgment by a court or an administrative tribunal that you have violated a California or Federal law, having as one of its necessary elements an act which materially increases any of the risks insured against.

(4) Discovery of willful or grossly negligent acts or omissions, or of any violations of state laws or regulations establishing safety standards, by you or your representative, which materially increase any of the risks insured against.

(5) Failure by you or your representative to implement reasonable loss control requirements, agreed to by you as a condition of policy issuance, or which were conditions precedent to our use of a particular rate or rating plan, if that failure materially increases any of the risks insured against.

(6) A determination by the Commissioner of Insurance that the:

(a) Loss of, or changes in, our reinsurance covering all or part of the risk would threaten our financial integrity or solvency; or

(b) Continuation of the policy coverage would:

(1) Place us in violation of California law or the laws of the state where we are domiciled; or

(2) Threaten our solvency.

(7) A change by you or your representative in the activities or property of the commercial or industrial enterprise, which results in a materially added, increased or changed risk, unless the added, increased or changed risk is included in the policy.

(a) We will mail or deliver advance written notice of cancellation, stating the reason for cancellation, to the first Named Insured, at the mailing address shown in the policy, and to the producer of record, at least:

(1) 10 days before the effective date of cancellation if we cancel for a reason listed in Paragraph 3.a.(1) or 3.a.(2); or

(2) 30 days before the effective date of cancellation if we cancel for any other reason listed in Paragraph 3.a.

4. Notice of cancellation will state the effective date of cancellation. The policy period will end on that date.

5. If this policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

6. If notice is mailed, proof of mailing will be sufficient proof of notice.

B. The following is added and supersedes any provisions to the contrary:

NONRENEWAL

1. Subject to the provisions of Paragraphs B.2. below, if we elect not to renew this policy, we will mail or deliver written notice stating the reason for nonrenewal to the first Named Insured shown in the Declarations and to the producer of record, at least 60 days, but not more than 120 days, before the expiration or anniversary date.

We will mail or deliver our notice to the first Named Insured, and to the producer of record, at the mailing address shown in the policy.

2. We are not required to send notice of nonrenewal in the following situations:

(a.) If the transfer or renewal of a policy, without any changes in terms, conditions, or rates, is between us and a member of our insurance group.

(b.) If the policy has been extended for 90 days or less, provided that notice has been given in accordance with Paragraph B.1.

(c.) If you have obtained replacement coverage, or if the first Named Insured has agreed, in writing, within 60 days of the termination of the policy, to obtain that coverage.

(d.) If the policy is for a period of no more than 60 days and you are notified at the time of issuance that it will not be renewed.

(e.) If the first Named Insured requests a change in the terms or conditions or risks covered by the policy within 60 days of the end of the policy period.

(f.) If we have made a written offer to the first Named Insured, in accordance with the timeframes shown in Paragraph B.1, to renew the policy under changed terms or conditions or at an increased premium rate, when the increase exceeds 25%.

3. If we fail to give the timely notice required in Paragraph B.1., the policy shall be continued, with no change in terms or conditions, for a period of 60 days after we deliver said written notice.

# THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM

This endorsement modifies insurance provided under the following:

## PROFESSIONAL LIABILITY

### *DIRECTORS AND OFFICERS LIABILITY*

With respect to any one or more "certified acts of terrorism", we will not pay any amounts for which we are not responsible under the terms of the federal Terrorism Risk Insurance Act of 2002 (including subsequent acts of Congress pursuant to the Act) due to the application of any clause which results in a cap on our liability for payments for terrorism losses.

"Certified act of terrorism" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States, to be an act of terrorism pursuant to the federal Terrorism Risk Insurance Act of 2002. The federal Terrorism Risk Insurance Act of 2002 sets forth the following criteria for a "certified act of terrorism":

1. The act resulted in aggregate losses in excess of $5 million; and
2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals acting on behalf of any foreign person or foreign interest, as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.



Includes copyrighted material of the Insurance Services Office Inc., used with its permission.